**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PRECISION TRENCHLESS, LLC, ET AL., | : | CIVIL CASE NO. |
| | : | 3:19-CV-0054 (JCH) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SAERTEX MULTICOM LP, ET AL., | : | FEBRUARY 28, 2022 |
|     Defendants. | : | |

**RULING ON MOTIONS TO PRECLUDE**
**(DOC. NOS. 233, 234, 237, 238, 239, 240, & 243) AND MOTION TO SEAL (262)**

**Index**

I.    Introduction ................................................................................................ 2

II.   Background ................................................................................................. 3

III.   Legal Standard .......................................................................................... 5

IV.   Discussion .................................................................................................. 9

    A.   Granite Motion To Preclude Precision Expert Mr. Kaleel Rahaim (Doc. No. 233) ................................................................................ 9

    B.   Granite Motion To Preclude Precision Expert Dr. Mark Knight (Doc. No. 234) .............................................................................. 25

    C.   Saertex Motion To Preclude Precision Experts Dr. Knight and Mr. Rahaim (Doc. No. 237) ........................................................... 36

    D.   Precision Motion To Preclude Saertex Expert Dr. Jorg Sebastian (Doc. No. 240) ................................................................................ 38

    E.   Precision Motion To Preclude Granite Experts Dr. Jericho Moll and Dr. Antonios Vytiniotis (Doc. No. 243) ........................................ 44

    F.   Precision Motion To Preclude MDC Damages Expert Mr. Vincent Vizzo (Doc. No. 239) ................................................................. 64

    G.   MDC Motion To Preclude Precision Damages Expert Mr. John J. Fleming (Doc. No. 238) ............................................................... 72

V.   Conclusion ............................................................................................... 75

## I.   INTRODUCTION

This consolidated action arises out of property damage caused by the failure of a newly installed pipe liner that was supposed to rehabilitate and reinforce an existing sewer pipe in West Hartford, Connecticut.  The parties to this action are: (1) the Metropolitan District Commission ("MDC"), the specially chartered Connecticut municipal corporation that commissioned the pipe-replacement project; (2) Ludlow Construction Company, Inc. ("Ludlow"), MDC's general contractor; (3) The Charter Oak Fire Insurance Company ("Charter Oak") and Travelers Property Casualty Company of America ("TPCCA"), Ludlow's insurers (collectively, "the Insurance Companies"); (4) Precision Trenchless, LLC ("Precision"), Ludlow's subcontractor; and (5) Saertex multiCom LP ("Saertex") and Granite Inliner, LLP ("Granite"), the manufacturers of the failed liner.  The parties have filed various multi-count Complaints and counterclaims against each other, as well as several Motions to preclude expert testimony.

Now before the court are: (1) Granite's Motion to Preclude Precision's Expert Mr. Kaleel Rahaim (Doc. No. 233); (2) Granite's Motion to Preclude Precision's Expert Dr. Mark Knight (Doc. No. 234); (3) Saertex's Motion to Preclude Precision's Experts Mr. Kaleel Rahaim and Dr. Mark Knight (Doc. No. 237); (4) Precision's Motion to Preclude Testimony of Saertex Expert Dr. Jorg Sebastian and Strike His Letter Report (Doc. No. 240); (5) Precision's Motion to Preclude Testimony of Granite Experts Dr. Jericho Moll and Dr. Antonios Vytiniotis (Doc. No. 243); (6) Precision's Motion to Preclude MDC's

Damages Expert Mr. Vincent Vizzo (Doc. No. 239); and (7) MDC's Motion to Preclude Precision's Expert Mr. John J. Fleming (Doc. No. 238).[1]

## II.   BACKGROUND[2]

The facts and most of the procedural background pertaining to this consolidated matter are laid out in the court's September 22, 2021 Ruling on the Insurance Companies' Motion for Partial Summary Judgment as to Precision (Doc. No. 102), MDC's Motion for Partial Summary Judgment as to Ludlow (Doc. No. 122), and MDC's Motion for Partial Summary Judgment as to Precision (Doc. No. 129). See Sept. 22, 2021 Ruling at 2-10 (Doc. No. 310). The court will not repeat those facts in detail here, but assumes the parties' familiarity with them.

By way of brief background, this action concerns a pipe repair gone wrong in West Hartford, Connecticut. To rehabilitate a failing pipe, MDC contracted with Ludlow, which in turn retained Precision to carry out the repair work.

Precision completed the repair using UV Cured in Place Pipe (UV CIPP) technology. UV CIPP promises an efficient solution for damaged pipes; rather than digging to excavate an entire pipeline, a specially manufactured, flexible, resin-infused liner is inserted into the faulty pipe and pulled through until it covers the damaged portion of the pipe. The liner is then inflated so that it tightly lines the inside of the surrounding pipe. Finally, the liner is exposed to UV light, causing the resin to cure,

---

[1] Five Motions for Summary Judgment and a Motion to Amend are also pending before the court. See Doc. Nos. 246, 253, 254, 255, 256, 313. The court intends to issue a separate Ruling on those Motions after disposing of the instant Motions to Preclude.

[2] The facts in this section are undisputed unless otherwise noted.

hardening the liner, and effectively forming a new, intact pipe within the existing, damaged pipe.

The West Hartford pipe repair utilized this UV CIPP technology, using a Type-S Saertex UV-liner.  See Sept. 22, 2021 Ruling at 2.  Saertex and Granite manufactured the liner.  The "dry" liner—i.e., the liner before being infused with resin—was manufactured by Saertex in its North Carolina factory.  The dry liner was then shipped to Granite's facility in Indiana, where Granite "wet-out" the liner, infusing it with resin on May 28, 2018.  The wet-out process was computer automated and involved several steps, including pulling the liner through a vacuum chamber, into a resin bath, and out through a set of "nip rollers" that removed excess resin.  After wetting out, the liner was shipped to Precision in Connecticut, where Precision installed it on May 14, 2018.  On October 3, 2018, the liner buckled and failed.

The expert testimony at issue in the first five Motions to Preclude concerns the manufacturing and installation processes for the UV CIPP liner used in the West Hartford pipe repair.  Precision, Granite, and Saertex have produced expert witnesses, each of whom puts forth a different theory as to why the liner failed.  While each expert's opinion is discussed in more detail below, in broad strokes, Precision's experts, Mr. Rahaim and Dr. Knight, opine that manufacturing error during the wet-out process at Granite's facility left the liner insufficiently saturated with resin, causing the liner's collapse.  See pp. 9-38, infra.  Granite and Saertex's experts, Drs. Moll, Vytiniotis, and Sebastian, opine that faulty installation by Precision is to blame, and that the liner failed because resin migrated within or out of the liner, or was washed out upon installation.  See pp. 38-63, infra.

The final two Motions to Preclude seek to exclude the testimony of damages experts.  MDC and Precision have both produced expert witnesses, Mr. Vizzo and Mr. Fleming, to address the issue of damages.  When the liner failed, sewage seeped into nearby homes and yards, causing property damage.  MDC issued payments to homeowners who claimed their property had been damaged or destroyed, and MDC seeks indemnification from Precision for these payments.  <u>See</u> MDC Amended Compl. ¶¶ 1-26 & p. 6 (Doc. No. 92).  MDC's damages expert, Mr. Vizzo, opines that MDC's methodology for repaying homeowners was reasonable, while Precision's expert, Mr. Fleming, contends that MDC used the wrong standard to calculate the homeowners' damages. <u>See</u> pp. 64-75, <u>infra</u>.

### III.    LEGAL STANDARD

Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence, which provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rules of Evid. 702. The district court acts as a gatekeeper, charged with the task of deciding whether the expert's testimony satisfies Rule 702's general requirements. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 113 (1993).  This gatekeeping function "is tempered by the liberal thrust of the Federal Rules of Evidence and the 'presumption of admissibility.'"  <u>Bunt v. Altec Indus., Inc.</u>, 962 F. Supp. 313, 317 (N.D.N.Y. 1997) (quoting <u>Borawick v. Shay</u>, 68 F.3d 597, 610 (2d Cir. 1995)).  The

Second Circuit has endorsed a "particularly broad standard for the admissibility of expert testimony", Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp.2d 53, 75 (S.D.N.Y. 2001), wherein expert testimony should only be excluded if it is "speculative or conjectural", if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples to oranges comparison.'" Boucher v. U.S. Suzuki Motor Corp., 73 F. 3d 18, 21 (2d Cir. 1996) (quoting Shatkin v. McDonnel Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984)).

In defining the gatekeeping role of the district court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. See Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005).

A.   Qualifications

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself. Vale v. United States of Am., 673 F. App'x 114, 116 (2d Cir. 2016) (summary opinion) (citing Nimely, 414 F.3d at 396 n.11 (2d Cir. 2005)). A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). However, the Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case. See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997). "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized

6

areas that are directly pertinent." Tardiff v. City of New York, 344 F.Supp.3d 579, 598 (S.D.N.Y. 2018).

  B.  Reliability

  If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable and relevant.  In Daubert, the Supreme Court identified several factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation' " and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 593–94) (internal quotations and citations omitted). These factors, the Supreme Court noted, do not constitute a "definitive checklist or test." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).  Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id.; see also Nicholas v. Bratton, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) ("[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis, . . . courts recognize that [e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience." (internal quotation marks and citations omitted)).

  In assessing reliability, "[t]he district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses." Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.,

208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing <u>Travelers Prop. & Cas. Corp. v. Gen.</u> <u>Elec. Co.</u>, 150 F. Supp. 2d 360, 362 (D. Conn. 2001)).  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Daubert</u>, 509 U.S. at 596.

   C.   <u>Relevance</u>

   In addition to ensuring that expert testimony is reliable, the court must decide whether the expert's testimony is relevant, <u>i.e.</u>, whether it will "help the trier of fact."  <u>In</u> <u>re Mirena IUD Prod. Liab. Litig.</u>, 169 F.Supp.3d 396, 413 (S.D.N.Y. 2016).  Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

   However, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it", <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir.1991), does not aid the jury in making a decision.  <u>In re Mirena IUD Prod. Liab. Litig.</u>, 169 F.Supp.3d at 413.  Accordingly, this court permits experts to state opinions, not "conclusions." <u>See</u> <u>Bilzerian</u>, 926 F.2d at 1294 (holding that while expert "may opine on an issue of fact within the jury's province", he "may not give testimony stating ultimate legal conclusions based on those facts"); <u>see also</u> <u>Snyder v. Wells Fargo Bank</u>, N.A., 594 F. App'x 710, 714 (2d Cir. 2014) (same).[3]

---

   [3] While several experts in this case have framed some or all of their opinions as "conclusions", the court assumes that the experts will testify, as to such "conclusions" that they can state them to a reasonable degree of certainty based upon their training, education, and expertise, their observations,

"Once the thresholds of reliability and relevance are met, the testimony is admissible.  Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility."  Royal Ins. Co. of Am., 208 F. Supp. 2d at 426.

## IV.    DISCUSSION

### A.    Granite Motion to Preclude Precision Expert Mr. Kaleel Rahaim (Doc. No. 233)

Granite seeks to preclude the testimony of Precision's manufacturing process expert, Kaleel Rahaim.  See Granite Mot. to Preclude Rahaim at 1.  Mr. Rahaim, a chemical engineer, authored four Reports dated November 13, 2020, February 1, 2021, February 12, 2021, and June 28, 2021.  See Rahaim Reports (Doc. Nos. 233-2, 233-3, 233-4, and 288-1).  After Mr. Rahaim filed his first three Reports, Granite deposed Mr. Rahaim on May 3, 2021.  See Rahaim Depo. (Doc. No. 233-1).

In his November 2020 Report, Mr. Rahaim detailed Granite Inliner's "wet-out" process for UV CIPP liners based on an inspection of Granite's facilities, opining that poor quality assessment and quality control ("QA/QC") measures and miscalibrated machinery were to blame for the liner's failure.  See Rahaim Nov. 13, 2020 Report.  The shorter February Reports, which accounted for additional documents related to Granite's UV CIPP quality control and claims involving Saertex liners, related to Mr. Rahaim's opinion that substandard wet-out processes led to the liner's failure.  See

---

and the facts set forth in their Reports. If any expert cannot so testify, such "conclusions" will be excluded. See, e.g., Rahaim Nov. 13, 2020 Report at 12 ("With respect to the CIPP Consulting LLC Investigation, the following conclusions are reached . . . .") (emphasis added); Knight Nov. 13, 2020 Report at 29 ("With respect to eTrenchless' investigation the following conclusions are drawn.") (emphasis added); see also Sebastian Nov. 28, 2019 Report at 18  ("in my point of view a damaged membrane causes the washing out of the liquid resin . . . .").

Rahaim Feb. 1, 2021 Report & Rahaim Feb. 12, 2021 Report.  Lastly, the June 2021

Report, produced in rebuttal to a May 28 Report by Granite expert Dr. Jericho Moll,

explained Mr. Rahaim's concerns with Dr. Moll's analysis in her May Report.  See

Rahaim June 28, 2021 Report.

                    1.      Mr. Rahaim's Qualifications

       Granite argues, first, that Mr. Rahaim is unqualified to offer opinions regarding

the effect of water on resin migration in UV CIPP liners.  See Granite Mot. to Preclude

Rahaim at 6.   However, Mr. Rahaim's CV indicates that he possesses the requisite

"superior knowledge, education, experience, or skill with the subject matter of the

proffered testimony."  Tin Yat Chin, 371 F.3d at 40.  See Rahaim Qualifications (Doc.

No. 233-2 at 13-15).  Mr. Rahaim has substantial experience and education related to

CIPP.  He is the Principal Engineer for CIPP Consulting, LLC.  See Rahaim

Qualifications (Doc. No. 233-2 at 13-15).  He has a B.S. in chemical engineering, over

30 years of experience in the thermoset polymer industry, and multiple publications

related to CIPP, including the North American Society for Trenchless Technology

(NASTT) Cured In Place Pipe (CIPP) Good Practices Guidelines, First Edition, 2015.

Id.

       To support its position that Mr. Rahaim is not qualified to offer opinions on resin

migration and water in UV CIPP liners, Granite misframes Mr. Rahaim's testimony to

suggest that he has admitted to being unqualified to testify as to these subjects.  See

Granite Mot. to Preclude Rahaim at 6 (citing Mr. Rahaim's statement that he "ha[sn't]

seen" water's effect on the "migration of resin in a UV CIPP liner").  However, Mr.

Rahaim's deposition testimony does not indicate a lack of skill, experience, or

knowledge.  Rather, Mr. Rahaim remarked that he had not seen the effect of water on

resin migration over the course of an exchange with Saertex's counsel during which Mr. Rahaim, in response to a question, stated that resin and water are impermeable, thus the effect of incidental water on resin fiberglass laminate "would be nothing."  See Rahaim Depo. at 151-52.[4]  When counsel subsequently asked whether Mr. Rahaim had a "scientific understanding of the effect that water can have on the migration of resin in a UV CIPP liner", Mr. Rahaim's response—"I guess I don't because I haven't seen it"—was consistent with his previous answer, reflecting his opinion, as a chemical engineer, that water and resin are impermeable, rather than a lack of understanding.  See id. Accordingly, the court is not persuaded by Granite's claim that Mr. Rahaim has admitted to his own underqualification.

---

[4] The exchange between Saertex's counsel and Mr. Rahaim unfolded as follows:

Saertex Counsel: On what type of liners have you seen the effects of water migration inside the liner?

. . .

Mr. Rahaim:· I've seen some examples of that, extremely limited examples of that, in heat-cured liners.

Saertex Counsel: Okay. And so how would somebody recognize the effects of water intrusion and resin migration inside a UV CIPP liner?

. . .

Mr. Rahaim: It would be difficult to assess that because the resin viscosity is so high that incidental water contact in a void coming in contact with the resin itself would do nothing. Resin and water are impermeable. Resin would tend to flow over the water, just like resin would flow over oil or oil over water. So, to see any effect with incidental water contact coming in contact with a resin fiberglass laminate without the presence of some sort of a foil, would be very difficult to see. There would be nothing.

Saertex Counsel: Do you have a scientific understanding of the effect that water can have on the migration of resin in a UV CIPP liner?

. . .

Mr. Rahaim: I guess I don't because I haven't seen it.

Rahaim Depo. at 151-52.

Thus, because Precision has demonstrated Mr. Rahaim's is qualified by citing his education and his history working with CIPP technology, Mr. Rahaim is qualified to offer opinions regarding UV CIPP liner failure, including those related to resin migration and water.  Granite may, of course, subject Mr. Rahaim to cross-examination as to his experience with water and resin migration in UV CIPP liners.

       2.     "Sandbagging" Opinions Offered at May 3, 2021 Deposition

Granite seeks to preclude several statements that Mr. Rahaim offered at his May 3, 2021 deposition.

First, Granite contends that Mr. Rahaim should be precluded from stating, as he did in his deposition, that the lining's resin was too thick to leak on May 14, 2018.  See Rahaim Depo. at 88-95, 98, 115-18.[5]  Granite argues that, because this opinion was not included in Mr. Rahaim's first three Reports, to offer it at his deposition constitutes

---

[5] Granite also seeks to preclude Mr. Rahaim's "opinion" that Granite changed its manufacturing process after "problems" with wet-out liners.  Id. at 135-36; see also Granite Mot. to Preclude Rahaim at 4. Mr. Rahaim's deposition testimony regarding changes in Granite's manufacturing process was as follows:

> Granite Counsel: Do you know if the manufacturing process that Granite used was the same for every single liner?
>  . . .
> Mr. Rahaim: I do know that the Granite process was changed shortly after the history of problems with poor wet-out liners.
>  . . .
> Granite Counsel: What changed?
>  . . .
> Mr. Rahaim: I don't know what the specifics were, but I do know changes were made after that fact.
>  . . .
> Granite Counsel: Okay. And you don't know specifically what was changed; correct?
>
>  Rahaim: I do not.

Rahaim Depo. at 136. The court notes that Granite's framing of Mr. Rahaim's statements during this exchange as an "opinion" strains credulity, therefore the court will not address Granite's argument in favor of precluding the "opinion."  Moreover, such a statement would likely be inadmissible at trial under Federal Rule of Evidence 407, governing subsequent remedial measures, and possibly as well under Federal Rule of Evidence 802, the Rule against hearsay.

impermissible "sandbagging."  See, e.g., Haas v. Delaware & Hudson Ry. Co., 282 F. App'x 84, 86 (2d Cir. 2008).  "The purpose of [Federal Rules governing the disclosure of expert witnesses] is to prevent the practice of 'sandbagging' an opposing party with new evidence."  Id. (internal citation omitted).

However, Mr. Rahaim's deposition statements regarding the resin's viscosity are not "sandbagging."  See Cary Oil Co. v. MG Ref. & Mktg., Inc., 2003 WL 1878246, at *4 (S.D.N.Y. Apr. 11, 2003) (holding that the Federal Rules for disclosure of expert opinions "are not designed to prohibit a witness from testifying about anything not explicitly mentioned in his Rule 26 disclosure, but rather to protect one party from being blindsided by another party with new opinions never before discussed").  Mr. Rahaim did not discuss the viscosity of the resin on May 14, 2018, in his Reports because his Reports did not advance a viscosity-related resin washout or resin migration theory. Rather, his Reports analyzed Granite's manufacturing process and its effect on the resin content of the liner when the liner left Granite's wet-out facilities.  In his deposition, he spoke to the viscosity of the resin only because opposing counsel "affirmatively solicited" these opinions while questioning him about Granite's resin migration theory of the case. See, e.g., Sitts v. Dairy Farmers of Am., Inc., No. 2:16-CV-287, 2019 WL 3298537, at *8 (D. Vt. July 23, 2019) (declining to strike an opinion, in part, because the defendants had "affirmatively solicited" the opinion that they sought to strike).  In response to questioning about the possibility that water washed resin out of the liner due to installation error, Mr. Rahaim offered his opinion that the resin was too viscous to leak based on his knowledge and experience, as well as his review of technical data

sheets for the resin that were produced by Granite.  <u>See</u> Rahaim Depo. at 89-95, 92-94;[6] <u>see also</u> Precision Opp'n to Granite Mot. to Preclude Rahaim at 16.

---

[6] In the exchange regarding resin migration, Mr. Rahaim testified in response to Granite counsel's questioning:

> Granite Counsel: . . . . My question was, the phenomenon of resin washing out of a CIPP liner that is breached on the exterior or exposed to high-pressure water, that can occur?
> . . . .
> Mr. Rahaim: In my opinion, because of the thickness of the resin and the lack of high-pressure water coming in, it could not happen.
>
> Granite Counsel: I want you to assume that there was water coming in, same thickness of the resin, but I want you to assume that high-pressure water is coming in. Can that phenomenon occur as I have described it to you?
> . . . .
> Mr. Rahaim: Even in the case of high-pressure water coming in, because of the thickness of the resin, it is highly, highly unlikely.
>
> Granite Counsel: Would the thickness of the resin used for the subject liner, if the subject liner was breached during installation and there was high-pressure water, could the resin leak out of the liner?
> . . . .
> Mr. Rahaim: That resin would -- it would be very difficult to move that resin outside of the liner even with a breach in one of the foils.

Rahaim Depo. at 89-90.  Following the exchange, he explained the basis for his opinion that the resin would be too thick to migrate out of the liner:

> Granite Counsel: All right. Now, did you perform any measurements on the [G]ranite resin that was used to measure this liner in order to determine the centipoise of the resin that was applied?
> . . . .
> Mr. Rahaim: I did not. I looked at technical data sheets for the resin, and that was all that I looked at.
> . . . .
> Granite Counsel: And do you have any physical testing to indicate -- you said it could be up to a million centipoise?
>
> Mr. Rahaim: Correct, that's correct.
>
> Granite Counsel: Can you point me to any test report in your file that contains that information?
> . . . .
> Mr. Rahaim: I do not. I have historical knowledge about thickening resins and about the isentropic process of those resins after being thickened over time.

<u>Id.</u> at 92-94.

Mr. Rahaim's statements are the kind of responses contemplated by the Federal Rules of Civil Procedure.  "[Federal Rule of Civil Procedure 26] does not limit an expert's testimony simply to reading his report[;] . . . [t]he [R]ule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."  See Harkabi v. SanDisk Corp., 2012 WL 2574717, at *3-4 (S.D.N.Y. 2012) (internal quotations omitted).  Because Granite's counsel solicited Mr. Rahaim's opinion and testimony about washout, and because Granite has "ample time to prepare effective cross examination" before trial, the court will not preclude this opinion.  See Cary Oil Co., 2003 WL 1878246, at *5.[7]

Granite also argues, based on Mr. Rahaim's deposition, that Mr. Rahaim should be precluded from offering certain testimony because he purportedly admitted to the following during his deposition: (1) he was unsure whether punctures in the liner were

---

[7] To the extent that Granite attempts to argue that Mr. Rahaim's statements at his deposition constitute untimely rebuttal opinions, the court is not persuaded.  As the court has determined, Granite solicited these statements regarding Granite's theory of the case.  See pp. 12-15, supra.  Granite is free to cross-examine Mr. Rahaim about them or not solicit further testimony regarding these statements at trial.

Furthermore, to the extent that the testimony regarding resin viscosity constitutes an opinion that Precision plans to elicit on direct examination of Mr. Rahaim, the court orders Precision to file a supplemental disclosure within 14 days of this Ruling stating the opinion as Mr. Rahaim stated it during his deposition. Any such supplemental disclosure should be formatted to comply with Federal Rule of Civil Procedure 26. Precision is advised that any attempt to include in such a Supplemental Report information beyond that stated at Mr. Rahaim's deposition will result in sanctions. See pp. 62-63, infra (striking Mr. Rahaim's June 1, 2021 Declaration).

Mr. Rahaim's trial testimony, like that of all experts, will be limited to opinions he has formed to a reasonable degree of engineering certainty and disclosed in his Reports. Thus, Mr. Rahaim's testimony at trial regarding resin viscosity will be limited to the extent of his deposition testimony as disclosed in the Supplemental Report, should Precision choose to file one. Should Precision decide not to file a Supplemental Report, Mr. Rahaim will not be permitted to testify as to resin viscosity at trial, unless, of course, he is asked on cross examination.

Any dispute over a supplemental disclosure ordered by the court in this Ruling will result in the court's issuing sanctions, under Federal Rule of Civil Procedure 11(b), to the party against whom the court rules in resolving the dispute.

made before or after the liner was cured; (2) he could not determine whether the liner contained sufficient resin based on post-installation video; and (3) he could not determine what percentage of resin is required for proper curing.  See Granite Mot. to Preclude Rahaim at 20-21.

The "admissions" to which Granite objects are the kinds of statements that are best subjected to "vigorous cross-examination" and "presentation of contrary evidence . . . ."  See Daubert, 509 U.S. at 596.  Indeed, it is unclear to the court exactly which opinions Granite would have the court preclude on the basis of these statements—surely, it cannot wish to preclude the opposing witness' statement that he was unable to determine the timing of punctures, the resin content of the liner, or the percentage of resin required?  Here, Granite identifies no unreliable or irrelevant testimony, so these statements, "go[ ] to the degree of credibility to be accorded to the evidence, not to the question of its admissibility."  Royal Ins. Co. of Am., 208 F. Supp. 2d at 426.

3.      Timeliness of June 28, 2021 Rebuttal Report

Granite briefly argues that Mr. Rahaim's June 28, 2021 Rebuttal to a Report issued on May 28, 2021, by Dr. Moll should be precluded as untimely.  See Granite Reply to Mot. to Preclude Rahaim at 6 (Doc. No. 288).  In Mr. Rahaim's June 28 Report, he contested the results of resin viscosity testing that Dr. Moll had performed. See Rahaim June 28, 2021 Report (Doc. No. 288-1).

The court will not take up Granite's arguments because, as the court discusses at length following, see pp. 59-62, infra, Dr. Moll's May 28, 2021 Report warrants preclusion.  Therefore, the court will also preclude Mr. Rahaim's rebuttal Report, because it is no longer relevant to contradict or rebut Dr. Moll's stricken May 28, 2021 Report.  See Fed. R. Civ. P. 26(a)(2)(D)(ii) (permitting the disclosure of rebuttal

evidence "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party").

### 4.   Reliability and Relevance of Mr. Rahaim's Opinions

As for the reliability and relevance of Mr. Rahaim's testimony, he offers several opinions at the end of his primary, November 13, 2020 Report:

> "With respect to the CIPP Consulting LLC investigation, the following conclusions are reached:[8]
>
> 1. The liner failed due to buckling as determined by observation of and mechanical property testing of the failed liner samples pulled from the host pipe.
>
> 2. Buckling was caused by insufficient resin in the liner matrix as determined by mechanical property testing of the failed liner samples.
>
> 3. The possibility of contractor error causing poor resin saturation in the liner is negligible.
>
> 4. The liner was not properly saturated with resin at certain points at the wet-out facility.
>
> 5. Poor QA/QC procedures are in place at the wet-out facility allowing for problematic wet out issues.
>
> 6. Insufficient calibration of equipment by Saertex of the wet-out equipment at the wet-out facility contributed to poor resin saturation."

Rahaim Nov. 13, 2020 Report at 12 (numbering added in place of bullet points).  As the court discusses below, some of Mr. Rahaim's opinions are sufficiently reliable and relevant as to be admissible, while others are too speculative as to be reliable, warranting preclusion.

---

[8] The court assumes that Mr. Rahaim will testify that he can state his "conclusions" to a reasonable degree of engineering certainty. See p. 8 n. 3, supra (setting forth the court's expectation that experts state opinions, rather than conclusions, based on a reasonable degree of certainty given their expertise).

a.   <u>Admissible Opinions</u>

Mr. Rahaim's first and second opinions—that the liner failed due to buckling and that the buckling was caused by insufficient resin—are not contested by Granite.  <u>See</u> Granite Motion to Preclude Rahaim at 3 ("All experts also agree that groundwater pressure caused the collapse of the liner by eventually overcoming the reduced mechanical strength of the 30-foot section of the liner missing some amount of resin."). Furthermore, Rahaim states that he reached these opinions on the basis of reliable mechanical property testing conducted by another Precision expert, Dr. Knight.[9]  <u>See</u> <u>U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.</u>, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (an expert "is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case . . . .").  These opinions are therefore sufficiently reliable as to be admissible. Furthermore, they are relevant in that they will assist the jury in understanding conditions that contributed to the liner's collapse.

Granite also argues Mr. Rahaim's third opinion—that "[t]he possibility of contractor error[10] causing poor resin saturation in the liner is negligible", <u>see</u> Rahaim Nov. 13, 2020 Report at 12—is unsupported by his Reports.[11]  Rule 26 of the Federal Rules of Civil Procedure requires an expert's report to "contain . . . a complete

---

[9] The reliability of Dr. Knight's testimony is discussed later in this Ruling. <u>See</u> pp. 28-36, <u>infra</u>.

[10] The court assumes that Mr. Rahaim uses the phrase "contractor error" to refer to error allegedly committed by Precision during installation, as multiple parties to the litigation are "contractors" or "subcontractors."

[11] The court has some concern that Mr. Rahaim's phrasing of this opinion borders on an opinion as to a legal standard. However, the court will not preclude the opinion on the expectation that, at trial, Mr. Rahaim will testify to his understanding regarding the evidence that Precision properly installed the liner, rather than improperly testifying as to a party's liability.

Case 3:19-cv-00054-JCH    Document 320    Filed 02/28/22    Page 19 of 77

statement of all opinions the witness will express and the basis and reasons for them",

and well as "the facts or data considered by the witness in forming them[.]"  Fed. R. Civ.

P. 26(a)(2)(B)(i), (ii); see also Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir.2006)

("An expert opinion requires some explanation as to how the expert came to his

conclusion and what methodologies or evidence substantiate that conclusion.");

Amorgianos, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw

[in the expert's reasoning or methodology] is large enough that the expert lacks 'good

grounds' for his or her conclusions.").[12]  The court's review of Mr. Rahaim's November

Report reveals little to explain Mr. Rahaim's methodology in reaching his opinion

regarding contractor error.  However, during his deposition, Mr. Rahaim explained that

he formed his opinion after watching the post-installation CCTV video, cited in his

Report.  See Rahaim Nov. 13, 2020 Report at 1.  He elaborated: "the installation of a

successful product primarily depends upon a close standard tight fit of the liner inside of

the host pipe. And that's exactly what I saw when I saw the post-installation video."  See

Rahaim Depo. at 14-15.  He acknowledged that the post-installation video provided only

a "snapshot view" of the liner, but explained that his observations, "taken into account

with the longevity of the liner, prior to failure, gave me the conclusion that the installation

was proper."  Id. at 15.  Thus, Mr. Rahaim has adequately demonstrated that he

reached his opinion about the improbability of contractor error by applying his expertise

---

[12] Furthermore, Mr. Rahaim acknowledges that "insufficient resin could have been caused [by] other conditions that were not indicated here. For example, you could have a loss of resin due to damage during shipping or if the liner is torn at some point." Rahaim Nov. 13, 2020 Report at 9. At his deposition, Mr. Rahaim clarified that, while tearing could have taken place during installation, he did not think that  "a liner tear at a point after production [i.e., during installation] would produce enough resin loss to account for the resin deficiency . . . ." Rahaim Depo. at 114.

and training—acquired over 30 years in the CIPP industry—to the facts and data presented in the CCTV video.  See Fed. R. Civ. P. 702; see also Kumho, 526 U.S. at 150 (courts may consider "the nature of the issue, the expert's particular expertise, and the subject of his testimony" to assess whether opinion evidence is reliable); Nicholas, 376 F. Supp. 3d at 290 (S.D.N.Y. 2019) ("[e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience." (internal quotation marks and citations omitted)).  Because Mr. Rahaim applied his own experience and knowledge to the facts of the case, and because his testimony with regard to contractor error will help the jury to determine the issue of liability, the court will not preclude his opinion regarding contractor error.[13]

Mr. Rahaim's fifth opinion—that poor QA/QC procedures were in place at Granite's facilities "allowing for problematic wet out issues"—is also admissible based on his qualifications and his observation of the Granite plant.  See Rahaim Nov. 13, 2020 Report at 12.  Mr. Rahaim is well-acquainted with best practices for CIPP production: he has worked in related industries for over thirty years, serving six years as an operations manager at Interplastic Corporation, assisting customers "with the proper wet out and installation" of the liners purchased from Interplastic.  Rahaim Depo. at 21-24.  He also helped author the North American Society for Trenchless Technology (NASTT) CIPP Good Practices Guidelines, which include best practices for QA/QC protocol for CIPP liner production.  See id. 143-44.

---

[13] However the court reiterates that, at trial, Mr. Rahaim may testify only to the extent that he has reached this opinion to a reasonable degree of engineering based on his review of the post-installation video and the liner's longevity.

Mr. Rahaim identifies flaws in the QA/QC procedures employed by Granite to a reasonable degree of engineering certainty based on his inspection of the facilities, his reading of Granite personnel's depositions, his knowledge, and his experience.  See id. at 110-112, 153; see also Rahaim Report at 1, 9, 12.  Thus, his opinions regarding Granite's QA/QC processes are sufficiently reliable.  His opinions about the QA/QC protocols and procedures are also relevant, because insight into QA/QC during the wet-out process is likely to be helpful to the jury on the issue of causation.  See, e.g., Bausch & Lomb, Inc. v. Alcon Lab'ys, Inc., 79 F. Supp. 2d 252, 255 (W.D.N.Y. 2000) (permitting expert testimony in a patent infringement case, holding "[t]o the extent that [the party] intends to elicit testimony from [the expert] concerning the general procedures involved in the patent application process, such testimony may be helpful to the jury, and is therefore admissible.").

Because they are reliable and relevant, Mr. Rahaim's first (buckling), second (insufficient resin), third (contractor error), and fifth (QA/QC) opinions are admissible.

b.      Inadmissible or Partially Admissible Opinions

Mr. Rahaim's fourth opinion—that the liner was not properly saturated with resin at "certain points" at the wet-out facility—is both too conjectural and too speculative to assist the finder of fact.  While the Federal Rules of Evidence espouse a liberal standard for the admissibility of expert testimony, courts generally will not admit "[a]n expert's opinions that are without factual basis and are based on speculation or conjecture . . . ." See Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  Mr. Rahaim identifies several possible flaws in Granite's wet-out process, including: a hypothetical spontaneous surge in the vacuum system; a potential variance in the spacing of the nip rollers; possible poor equipment

maintenance; or some other indefinite error in the wet-out process.  See Rahaim Nov. 13, 2020 Report at 9; Granite Mot. to Preclude Rahaim at 12-15.  In his deposition, Mr. Rahaim explained that he could not identify a cause for the liner's failure within a reasonable degree of scientific certainty.  See Rahaim Depo. at 112-13.[14]   He acknowledged that he could not establish which, if any, manufacturing errors caused the improper resin content.  See Rahaim Depo. at 127-28 (stating he could not say "within scientific certainty" that the space between the nip rollers was not as recorded in the wet-out notes for the subject liner); id. at 137-38 (stating he could not say "within scientific certainty" that there was any particular item in the manufacturing process that had poor equipment maintenance); id. at 138-39 (stating he could not say "within scientific certainty" there were vacuum variances in connection with the subject liner). Mr. Rahaim's conjecturing as to several possible manufacturing errors without any specific theory of failure is too ambiguous and speculative to be helpful to a fact finder; indeed, such speculation poses the risk of confusing and misleading the jury. See Daubert, 509 U.S. at 590 (noting that expert opinions that reflect "subjective belief or unsupported speculation" must be excluded); see also Est. of Ratcliffe v. Pradera Realty Co., No. 05 CIV. 10272 (JFK), 2008 WL 53115, at *5 (S.D.N.Y. Jan. 2, 2008) (excluding an expert's opinions as "speculative and unsupported by a sufficient evidentiary foundation" when they were based on a "guess about what happened" when the expert was not present, rather than "sufficient facts or data", as required of expert

_____

[14] As Mr. Rahaim stated at his deposition: ". . . [T]he process is so variable. At any particular point in time, you could have a successful wet out. But again, at any other particular point in time, you could not have a successful wet out. But to definitively say at that particular point in time there would be insufficient wet out is impossible to determine. But the possibility occurs because of the lack of control and the lack of QA/QC in the process itself." Rahaim Depo. at 113.

testimony.); cf. Tedone v. H.J. Heinz Co., 686 F. Supp. 2d 300, 314 (S.D.N.Y. 2009) (admitting an expert's testimony where "[the expert] has identified specific properties of the [allegedly defective product] that he contends support a specific theory of failure . . . ." (emphasis added)).  Thus, because Mr. Rahaim's opinion that possible failures in the vacuum, the nip rollers, or other poor machine maintenance caused the liner to be undersaturated is rooted in "a guess about what happened", Est. of Ratcliffe, 2008 WL 53115 at *5, the court will preclude his sixth opinion.

Mr. Rahaim's sixth opinion—that insufficient calibration of equipment contributed to poor resin saturation—is similarly speculative.  His theory that the equipment was improperly calibrated depends upon his assumption that the machines' settings were incorrect at the time that the subject liner was produced.  See Rahaim Depo. at 80-81 ("after viewing and inspecting the Saertex facility, I just didn't believe that the numbers were accurate").  However, nothing in the record evidences that the machines were improperly set.  Mr. Rahaim acknowledged as much in his deposition, stating that the values on the notes for the wet-out of the subject liner and the values of Saertex' recommended machine adjustments "tend to indicate that the settings on the machine were the same as the suggested settings for the machine adjustment." Rahaim Depo. at 71-72; see also Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC, 419 F. Supp. 3d 490, 516–17 (E.D.N.Y. 2019) (excluding an expert's opinions as speculative when "his conclusions regarding causation derive[d] solely from" an assumption, unsupported by the record or his own report, that a system was reset improperly). Therefore, the court

precludes Mr. Rahaim's sixth opinion that insufficient calibration of Granite's equipment contributed to poor resin saturation, because it is based on his speculation.[15]

In sum, Mr. Rahaim may testify as to his opinions regarding the liner's resin content, the unlikelihood of contractor error, and QA/QC deficiencies at Granite's facilities, including those related to Saertex and Granite's protocols for calibrating the equipment.  However, he may not offer opinions as to whether nip roller error, vacuum error, or poor calibration were contributing causes of the liner's insufficient resin saturation.  Further, he may testify regarding resin as solicited by Granite's counsel, but only to the extent that he has testified to it during his deposition, and only if Precision files a Supplemental Report as the court has ordered above.  See p. 15 n. 7, supra.  His June 28, 2021 Report in rebuttal to Dr. Moll's May 28, 2021 Report is stricken.

Thus, Granite's Motion to Preclude is granted in part as to the following opinions listed in Rahaim's November 13, 2021 Report: the fourth (that the liner was not properly saturated with resin at "certain points" during the wet out), and the sixth (insufficient calibration of machinery at Granite's facilities), except that Mr. Rahaim is not precluded from opining as to the efficacy of Granite and Saertex's QA/QC protocols for calibrating Granite's equipment.  Granite's Motion is also granted to the extent that it seeks to

---

[15] To the extent that Mr. Rahaim opines that Granite or Saertex did not calibrate the equipment frequently enough, based on his inspection of Granite's facilities and his analysis of deposition testimony, the court construes this opinion as related to his fifth opinion that Granite employed poor QA/QC procedures. See Rahaim Nov. 13, 2020 Report at 9 (stating that Saertex personnel only visit the Granite facility "a couple of times a year at most" and that the equipment "needs frequent calibration").  To the extent that Mr. Rahaim offers an opinion about the quality of Saertex or Granites' procedures for calibrating the machines, formed to a reasonable degree of engineering certainty by applying his expertise and knowledge to the facts of the case, such testimony is admissible.

The court distinguishes such testimony from his sixth opinion which, as stated, asserts that Granite's machinery was improperly calibrated at the time of the liner's wet out. Neither Mr. Rahaim's Reports nor his deposition testimony provide a basis for this opinion.

strike Mr. Rahaim's June 28, 2021 Report.  The Motion to Preclude is denied as to the remainder of Mr. Rahaim's opinions.

B.    <u>Granite Motion to Preclude Precision Expert Dr. Mark Knight (Doc. No. 234)</u>

Granite also seeks to preclude the testimony of Dr. Mark Knight, Precision's expert on the root cause of the liner's failure.  <u>See</u> Granite Mot. to Preclude Knight at 1. Dr. Knight is an Associate Professor in the University of Waterloo's Department of Civil Engineering and the Executive Director of the Centre for the Advancement of Trenchless Technologies, also located at the University of Waterloo (Ontario).  <u>See</u> Knight Resume at 128 (Doc. No. 234-1).  As an expert in this matter, he authored three Reports dated November 13, 2020, February 1, 2021, and February 12, 2021.  <u>See</u> Knight Reports (Doc. Nos. 234-1, 234-3, 234-4).  Dr. Knight's extensive Reports rely on field sample tests, CCTV video of the pipeline, and Saertex's installation instructions, among other evidence, to determine to a reasonable degree of engineering certainty that the cause of the liner failure was insufficient resin content caused by the liner wet-out process.  <u>See</u> Knight Nov. 13, 2020 Report at ii-iii. He also bases this opinion, in part, on the lack of any evidence of installation error. <u>See</u> <u>id.</u>

1.    Dr. Knight's Qualifications

Dr. Knight's resume indicates that he is qualified to testify as an expert in this case, given his "superior knowledge, education, experience, or skill" with respect to CIPP technology.  <u>See</u> <u>Tin Yat Chin</u>, 371 F.3d at 40; <u>see also</u> Knight Resume at 128. Indeed, Dr. Knight possesses a Ph.D. and M.Sc.E. in Civil Engineering, as well as a B.Sc.E. in Geological Engineering. Knight Resume at 128.  He has over twenty years of experience in water pipeline construction and trenchless pipe renovation.  <u>Id.</u>  He

25

helped to develop the NASTT CIPP Good Practice Course, and co-authored the NASTT

CIPP Good Practice Manual.  Id.  He has produced multiple publications related to

trenchless technology.  Id.  Unsurprisingly, Granite does not contest that Dr. Knight is

qualified to testify as to the liner's reduced mechanical strength or missing resin.  See

Granite Mem. in Support of Mot. to Preclude Knight at 5-6.

Despite Dr. Knight's extensive experience and expertise in the field, Granite

argues that he is not qualified to testify to resin migration in the liner because he has

"[n]ever seen washout actually occur in a liner system."  See id. at 7.  Granite supports

its position by citing a limited, cherry-picked excerpt of Dr. Knight's deposition testimony

in which he discusses his own experience studying resin migration and washout.  A

fuller reading of the deposition, however, undermines Granite's preclusion claim.[16]

---

[16] Granite cites the following exchange between Dr. Knight and Precision's counsel:

Precision Counsel: In the event of washout what would you expect to see as far as resin?
. . . .

Dr. Knight: I would expect the resin to have to go some place. I would expect if there was enough groundwater pressure to cause resin and for water -- enough water pressure on the backside of the -- of that liner between the liner and the host pipe that there would have been water coming through the manhole that the liner would not be tight fitting at the top of the pipe.
. . . .

Precision Counsel: What would a washout look like?
. . . .

Dr. Knight: I can't answer that question because I've never seen washout actually occur in a liner system.

Precision Counsel: . . . . Has washout ever occurred in CIPP lining industry?
. . . .
Dr. Knight: Not in any project that I've been involved in, and I've not actually heard of it occurring in a project, but that's not to say it hasn't occurred.

Precision Counsel: Is it something that is common in the industry to have washout?
. . . .

Dr. Knight: I would say it's not common to have washouts.

During the deposition, Dr. Knight explained that, in his experience, washout is rare.  See Knight Depo. at 234-36.  He also stated, in the same course of questioning, that water penetrating the liner "would not wash out the resin unless there was significant amount of flow in order to be able to cause a resin washout", before explaining that he could not offer opinions about "what would happen to the resin that remained inside the liner if water penetrated inside the liner and interacted with the resin."  See id. at 223-24.  Furthermore, earlier in the deposition, Dr. Knight explained the conditions that would need to be present for a washout to occur, including "a significant source of water . . . ."  See id. at 126-27.  Read in context, Dr. Knight's statements make clear that he applied his expertise to review the CCTV video and identify specific signs of resin washout, including high water pressure leading to "water coming through the manhole that the liner would not be tight fitting at the top of the pipe."  Knight Depo. at 234-36.    Moreover, his testimony that resin washouts are uncommon and that he has neither seen nor heard of resin washouts occurring in CIPP projects, see id. at 236, does not undermine his qualification as an expert, but rather supports his opinions that there is no evidence "resin washed out of the liner prior to curing to result in the low liner resin content" and that the "low resin content is consistent with a defect in the liner wet out process . . . ."  See Knight Nov. 13, 2020 Report at 29.  The court is therefore not persuaded by Granite's argument that Dr. Knight admitted, at his deposition, to being unqualified to offer his opinions.

---

See Knight Depo. at 234-36.

Precision has carried its burden to establish Dr. Knight's extensive "knowledge, education, experience, [and] skill" in the area of CIPP systems and trenchless pipe renovation, see Tin Yat Chin, 371 F.3d at 40. The court will not preclude Dr. Knight's testimony for lack of qualification. Any remaining dispute regarding his qualifications goes to the weight rather than the admissibility of his testimony and can be addressed on cross-examination by Granite.

        2.     "Sandbagging" Opinions Offered at May 29, 2021 Deposition

Granite objects to two opinions that Dr. Knight offered in his May 29, 2021 deposition but not in his Reports: (1) his discussion of puncture holes in the liner; and (2) his statement that he did not observe any significant resin on the outside of the liner sample. See Granite Mot. to Preclude Knight at 20-21. However, the court will not preclude these opinions for the same reasons discussed in detail with regard to Mr. Rahaim's deposition statements. See pp. 12-16, supra (determining that the opposing counsel solicited opinions from the deponent; the deponent's Reports did not address a washout or resin migration theory in great depth because it was not the working theory developed in his Reports; and Granite would have an opportunity to subject the deponent to cross-examination).[17]

        3.     Reliability and Relevance of Dr. Knight's Opinions

As explained in the following subsections, Dr. Knight's opinions are reliable, because he reached them by applying reliable methodology and extensive professional

---

[17] To the extent that Precision intends to elicit opinions regarding puncture holes or resin on the liner's exterior from Dr. Knight, the court orders Precision to file, within 14 days of this Ruling, a Supplemental Report stating Dr. Knight's opinions as he stated them during his deposition. Any such supplemental disclosure should be formatted to comply with Federal Rule of Civil Procedure 26. At trial, Dr. Knight's testimony, like that of any expert, will be limited to opinions formed to a reasonable degree of engineering certainty and disclosed in his Reports. See p. 8 n. 3, supra.

experience and knowledge to sufficient facts and data.  Furthermore, his opinions are relevant because they tend to support Precision's position that manufacturing error caused the liner's failure.

a.    <u>Evidence Dr. Knight Allegedly Did Not Consider</u>

Granite contends that Dr. Knight failed to account for evidence, including depositions of Precision and MDC inspectors and MDC documents, about the sewer's historical conditions.  <u>See</u> Granite Mot. to Preclude Knight at 16.  However, claims that an expert did not weigh a certain piece of evidence adequately do not take an expert opinion into the realm of unreliable "speculative or conjectural" testimony.  <u>Boucher</u>, 73 F.3d at 21.  Rather, the factual underpinning of an expert opinion should be contested through "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof."  <u>Daubert</u>, 509 U.S. at 596 (citations and quotations omitted)).

Dr. Knight relied upon a large body of evidence in authoring his detailed Reports. He reviewed and analyzed three CCTV videos of the liner before installation, after installation, and after failure.  <u>See</u> Knight Nov. 13, 2020 Report at 3-4.  He also considered Saertex's installation instructions and invoices, and he conducted two in-person inspections of the liner at Precision's facility.  <u>See</u> Knight Nov. 13, 2020 Report at 3-4.  He also physically tested the failed liner samples.  <u>See</u> Knight Nov. 13, 2020 Report at 3-4.  To support his later February 2021 Reports, he reviewed Saertex documents, including "cover liner complaint records, correspondence regarding the Saertex Winnipeg Liner that had dry spots, as well as[ ] documents reflecting Granite Inliner liner construction and wet out."  <u>See</u> Knight Feb. 1, 2021 Report at 2.  By no

29

means, therefore, are his opinions so "speculative or conjectural" as to be unreliable. See Boucher, 73 F.3d at 21.[18]

Because Dr. Knight used reliable testing methods to analyze available evidence and produce helpful information about the liner, its installation, and its production, any failure by Dr. Knight to weigh additional evidence is best addressed through cross examination and is not a ground for precluding his opinions.

b.   Differential Analysis in Dr. Knight's Reports

Granite challenges Dr. Knight's use of differential analysis to reach his opinions, specifically asserting that he does not effectively rule out the possibility that faulty installation caused resin to wash out of the liner.  See Granite Mot. to Preclude Knight at 6-10.  Differential diagnosis—the elimination of alternative causes to identify the likely cause—is a "reliable basis to prove general causation in this Circuit", though it is primarily employed by medical experts.  See Perkins v. Origin Medsystems, Inc., 299 F. Supp. 2d 45, 57 (D. Conn. 2004) (citing cases related to medical diagnoses).  Outside of the medical context, experts must also eliminate alternative causes, accounting for "obvious alternative explanations" before drawing a conclusion as to causation.  See, e.g., U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004); see also Rella v. Westchester BMW, Inc., No. 7:16-CV-916 (JCH), 2019 WL 10270223, at *6 (D. Conn. Sept. 30, 2019) (declining to preclude an expert's testimony when he "eliminated possible alterative causes" on the

----

[18] Furthermore, the record indicates that Dr. Knight did consider at least some of the information contained in the MDC depositions, as he addressed their claims during his own deposition. See Knight Depo. at 127-28 (stating, "I've read in the Exponent report that some people from MDC have made some claims, but I find those claims not valid" before explaining why he did not find the statements credible.).

basis of testing).  An expert is not required, however, to "categorically exclude each and every possible alternative cause."  Id.  Furthermore, the Second Circuit has held that, under some circumstances, "[d]isputes as to . . . faults in [an expert's] use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."  McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (medical opinion); but see Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005) (limiting McCullock's reach by clarifying that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached", the opinion should be excluded as unreliable, but recognizing the District Court's "broad discretion" to determine whether a differential diagnosis is sufficient to support an expert's opinion) (citing Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir.2002)).

Granite asserts that, because Dr. Knight is not qualified to issue opinions about resin migration, he cannot rule out the possibility of resin washout resulting from Precision's alleged installation error.  See Granite Mem. in Support of Mot. to Preclude Knight at 16.  However, the court has already determined that Dr. Knight's education and experience in pipeline construction and renovation qualifies him to testify.  See pp. 25-28, supra.  Further, Dr. Knight employed reliable methods to reach his opinion that manufacturing error, not installation error, caused the liner's failure, eliminating the "obvious alternative explanations" to manufacturing error.

In Dr. Knight's November 13, 2020 Report, he explains the bases for his opinion that "the root cause of the liner failure is due to Saertex and/or Granite's improper manufacture of the liner and not Precisions' [sic] installation and curing", because there

is "no evidence of resin wash out." <u>See</u> Knight Nov. 13, 2020 Report at 25-26 (listing specific characteristics of the liner samples indicating manufacturing failure).  In the body of his Report, he elaborates upon the facts in support of his opinion that there is "no evidence of resin wash out", stating that CCTV videos show, "[t]he lack of water infiltration at the lateral indicates that there is no significant ground water pressure against the liner that will wash out resin from the liner after its installation and before it is cured."  <u>See</u> <u>id.</u> at 8.  Dr. Knight properly applied his knowledge and experience to assess the CCTV video and form an opinion, to a reasonable degree of engineering certainty, that resin washout did not cause the liner's failure.

Dr. Knight also provides a comprehensive list of his opinions at the end of his November 13, 2020 Report. <u>See</u> Knight Nov. 13, 2020 Report at 29. Granite objects to the tenth, eleventh, and twelfth opinions Dr. Knight offers, namely: [19]

---

[19] Dr. Knight's first nine findings, which Granite does not specifically seek to preclude, are:

"1. The 27in vitrified CIPP lined host pipe from Manhole 437 to 552 is circular and shows no sign of significant deformation or distress.

2. Precision installed a Saertex 7mm thick Type-S UV cured liner on or around May 14, 2018 and the liner collapsed on or around October 3, 2018.

3. The CIPP liner install length from Manhole 552 to 437 was 371 feet and the collapse occurred at the crown of the liner near Manhole 437.

4. The closest lateral to the location of the failure is approximately 31.4 feet in from Manhole 437. This factory made lateral connects into the pipe at the top of the pipe (12 o'clock position). This lateral was opened on May 14, 2018 when the post installed liner video was performed by Precision. There are no laterals in the area in which the liner collapse occurred.

5. The May 14, 2018 post installation liner video shows the liner to be in good condition and properly installed. There were no sags or indications of an improperly installed or incomplete UV cured liner. The video footage demonstrates that the liner was tight to the host pipe and property installed and cured.

6. eTrenchless is not aware of any concerns about construction or cure of this CIPP liner prior to its failure.

10. There is no evidence to support that the liner coating was damaged or that resin washed out of the liner prior to curing to result in the low liner resin content.

11. It is eTrenchless' position that the low resin content is consistent with a defect in the liner wet out process performed by Granite Inliner that occurred prior to the shipment of the liner to the site for installation by Precision. This conclusion is supported by the large variation in resin content, density and flexural properties found in the testing of the failed liner during this investigation and visual observation of the failed liner sections.[20]

12. The evidence establishes that there [sic] nothing that Precision did that would have caused or contributed to the liner failure.

Knight Nov. 13, 2020 Report at 29.

Contrary to Granite's contentions, the body of Dr. Knight's November 13, 2020

Report supports his tenth and eleventh opinions and indicates that he parsed relevant

facts and data using reliable methods.  Dr. Knight provides a thorough overview of his

analysis of the post-installation CCTV video, offering his opinion that the video indicates

---

7. Post failure CCTV video shows the liner to have collapsed at the 12 o'clock position near Manhole 437, as well as folds and deformations at the 3 and 9 o'clock position approximately 16.6 feet from Manhole 437 which indicates the weakness at these locations and insufficient structural strength to resist ground water pressure on the liner.

8. Flexural, ignition and density testing performed on samples of the failed liner demonstrate that the liner has low resin content at the locations where the liner collapsed, buckled and/or folded and this resulted in extremely low liner flexural properties.

9. eTrenchless structural analysis supports the position that, while the liner had sufficient structural strength to support the weight of the liner itself, the liner had in sufficient structural capacity to resist six feet of external ground water pressure.

Knight Nov. 13, 2020 Report at 29.

[20] The court notes that Dr. Knight affirmatively opines, on the basis of his own testing and observation of the liner segments, that the wet-out process caused the low resin content.  Knight Nov. 13, 2020 Report at 29 ¶ 11.  Thus, he does not rely exclusively on differential diagnosis and, to the extent that he does, he effectively "rules in," by his opinion in paragraph 11, the root cause he has identified.  See Ruggiero, 424 F.3d at 254 ("Where an expert employs differential diagnosis to 'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology" (internal quotation marks omitted)).

33

proper cure and installation.  See id. at 8-10; Figs. 6-8.  He also offers an assessment of the pre-installation CCTV video, stating that the video shows an "ideal host pipe" with "no evidence of significant ground water infiltration."  See id. at 10-12.

Dr. Knight developed his opinions by conducting flexural testing, density testing, and strength testing, among other commonly accepted, replicable measurement and testing methods.  See, e.g., id. at 17-25.  In its role as a "gatekeeper", this court will not preclude Dr. Knight's tenth and eleventh opinions, which he has established to a reasonable degree of engineering certainty and which will assist the factfinder in understanding the properties and failure of the CIPP liner at issue in this case.  Granite is free to cross-examine Dr. Knight as to whether he has effectively ruled out a washout, resin migration, or installation error.

However, with respect to his twelfth opinion, "[t]he evidence establishes that there [sic] nothing that Precision did that would have caused or contributed to the liner failure", Dr. Knight crosses the line to assert a legal conclusion that is properly within the province of the jury.  While Federal Rule of Evidence 704(a) recognizes that "[a]n opinion is not objectionable just because it embraces an ultimate issue", the Second Circuit has made clear that "expert testimony that expresses a legal conclusion" must nonetheless be excluded.  Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992).  In Dr. Knight's twelfth opinion as stated, he does not explain what it is Precision has or has not done to absolve itself of responsibility for having caused or contributed to the liner's failure. Rather, he offers what is effectively a legal conclusion or an impermissible "opinion which would merely tell the jury what result to reach" with respect to the question of Precision's responsibility for causing the liner's failure.  Hygh, 961 F.2d at

363 (quoting Fed. R. Evid. 704 advisory committee's note).  Thus, the court precludes Dr. Knight from opining that the evidence establishes that Precision did nothing to cause or contribute to the liner's failure.

Though the court precludes Dr. Knight from testifying to his twelfth opinion as stated in his November 2020 Report, he is not precluded from testifying as to whether his analysis of the evidence indicates that Precision properly installed the liner.  For instance, in his Report, he explains:

> Liner flexural testing also shows sections of liner with flexural modulus greater than 1,000,000 psi. This along with the failure only occurring in the last 30 feet of a 371 feet long liner cure suggests that the liner was properly cured. There is no evidence that the liner had been stretched to fit because the liner thickness measurements are consistent. If the liner had been stretched, there would be areas with reduced thickness. eTrenchless found no evidence to indicate that the UV liner was not cured as to Saertex's specifications. Thus, it is eTrenchless' opinion that Precision properly installed and cured the liner. Thus, the evidence establishes that Precision did not do anything that would have created the issue that resulted in the liner failure.

Id. at 26 (emphasis added).  He may testify that the evidence suggests the liner was correctly cured and installed and had not been stretched.  Further, he may testify that neither improper curing nor installation error led to reduced thickness or to the liner's collapse, to the extent that he can support such testimony to a reasonable degree of engineering certainty based on an application of his experience to facts and data.  Such testimony is both reliable—based on Dr. Knight's testing, analysis, and observation of the liner—and relevant—helpful to the trier of fact in determining the issue of the cause of the liner's failure and, ultimately, the parties' liability. However, for the same reasons explained above with regard to Dr. Knight's twelfth opinion, he may not testify that "the evidence establishes that Precision did not do anything that would have created the

issue that resulted in the liner failure", because this testimony, in effect, reaches a legal conclusion for the fact finder.  Id. at 26.

In sum, Precision has met its burden to show that Dr. Knight is qualified and that his opinions are both reliable and relevant.  Granite's Motion to Preclude Dr. Knight's testimony is therefore denied, with two limited exceptions: the court precludes Dr. Knight's twelfth opinion, that "[t]he evidence establishes that there [sic] nothing that Precision did that would have caused or contributed to the liner failure", id. at 29, and his opinion that "the evidence establishes that Precision did not do anything that would have created the issue that resulted in the liner failure." Id. at 26.

C.    Saertex Motion to Preclude Precision Experts Dr. Knight and Mr. Rahaim (Doc. No. 237)

Like Granite, Saertex moves to preclude certain testimony by Precision's experts, Dr. Knight and Mr. Rahaim.  See Saertex Mot. to Preclude Precision Experts (Doc. No. 237).  Saertex argues that Precision should be precluded from offering any expert opinions against Saertex because: (1) neither Dr. Knight nor Mr. Rahaim has expressed any expert opinions about Saertex, and (2) Precision has offered no additional liability expert to offer expert opinions about Saertex.  Id. at 1.  In addition, Saertex states that it adopts the legal arguments put forth by Granite in its Motions to Preclude Dr. Knight and Mr. Rahaim, which the court has already addressed.  See pp. 9-36, supra.

As to the contention that the court should preclude any expert opinions against Saertex because Precision's experts have not addressed Saertex's liability, Saertex's arguments miss the mark.  It is "well-established" in this Circuit that "experts are not permitted to present testimony in the form of legal conclusions."  United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined No. of Cans

of Rainbow Foam Paint, 34 F.3d 91, 96 (2d Cir. 1994); see also Cameron v. City of

N.Y., 598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not "present testimony in the

form of legal conclusions . . . [because] [s]uch testimony undertakes to tell the jury what

result to reach, and thus attempts to substitute the witness's judgment for the jury's.")

(citation, internal quotation marks, and brackets omitted).  Thus, while Mr. Rahaim and

Dr. Knight have not offered expert opinions as to Saertex's liability, their self-restraint is

appropriate in providing relevant testimony helpful to the fact finder.  They have properly

testified to the circumstances causing the liner's failure and have not overstepped to

offer legal conclusions regarding liability that lie within the province of the jury.

Saertex argues that the experts "offer no opinions or testimony to support any

elements of negligence against Saertex."  See Saertex Reply to Precision Opp'n to

Saertex Mot. to Preclude Precision Experts (Doc. No. 289).  However, Dr. Knight's

November 13, 2020 Report expressly states that: "[I]t is eTrenchless position that the

root cause of the liner failure is due to Saertex and/or Granite's improper manufacture of

the liner and not Precisions' installation and curing."  See Knight Nov. 13, 2020 Report

(also explaining the subject liner exhibited extreme variability in ignition, density, and

flexural testing values, and fell below Saertex's reported ranges for flexural properties).

Moreover, both Mr. Rahaim and Dr. Knight offer opinions that are relevant to the

question of negligence in that they will "assist the trier of fact" in determining the cause

of the liner's failure.  Nimely, 414 F.3d at 397 (citing Fed. R. Evid. 702).  Thus, the court

Case 3:19-cv-00054-JCH   Document 320   Filed 02/28/22   Page 38 of 77

will not preclude the experts' opinions to the extent that they are helpful to the jury's consideration of Saertex's liability.[21]

As for Saertex's adoption of Granite's legal arguments to Preclude Dr. Knight and Mr. Rahaim, the court refers to its analysis of Granite's Motions, <u>see</u> pp. 9-36, <u>supra</u>, and grants in part Saertex's Motion to the same extent as Granite's Motions with respect to each expert. <u>See</u> p. 24, 36 <u>supra</u>. To the extent that any of Dr. Knight's or Mr. Rahaim's opinions already identified as admissible by this court are probative of and helpful to the jury's consideration of Saertex's liability, they are admissible against Saertex.

> D.   <u>Precision Motion to Preclude Saertex Expert Dr. Jorg Sebastian (Doc. No. 240)</u>

Precision moves to preclude the testimony of Saertex's expert, Dr. Jorg Sebastian, and to strike his Report dated November 28, 2019. <u>See</u> Precision Mot. to Preclude Sebastian at 1 (Doc. No. 240). Dr. Sebastian holds an undergraduate diploma in chemistry and a Ph.D. in thermal analysis or chemical analysis, which he testifies is the type of analysis used for CIPP. <u>See</u> Sebastian Report at 24 (Doc. No. 240-2); <u>see also</u> Sebastian Depo. at 42-43 (Doc. No. 240-3). He currently runs a testing lab specializing in CIPP and serves as a Professor for chemical analysis at the Institute for Polymer Science in Germany. <u>See</u> Sebastian Depo. at 27, 42-43; <u>see also</u> Sebastian

---

[21] If, as Saertex argues, a reasonable jury could not reach a verdict in Precision's favor as to its product liability claim on the basis of Precision's evidence and the experts' testimony, that shortcoming is properly addressed through a motion for summary judgment or, failing that, through a motion for directed verdict—not through preclusion of relevant expert testimony. <u>See, e.g.</u>, <u>Daubert</u>, 509 U.S. at 595–96 ("in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment . . . ."). Saertex has filed a Motion for Summary Judgment, which the court addresses in a separate Ruling.

Report at 24.  In addition, Dr. Sebastian is currently a member of the DIBt, the German authority for CIPP products.  <u>See</u> Sebastian Report at 24 (Doc. No. 240-2); <u>see also</u> Sebastian Depo. at 43.  In his Report, he opines, based on a visual inspection of pieces of the failed liner, that water contacted uncured resin in the liner, causing a resin washout and leading to the liner's failure.[22]  <u>See</u> Sebastian Report at 18.

In support of its Motion, Precision does not contend that Dr. Sebastian is unqualified or that his opinions would not be relevant to assist the fact finder.  Rather, Precision argues that Dr. Sebastian's opinions are not reliable because they lack proper foundation and are supported by the mere <u>ipse</u> <u>dixit</u> of the expert.  <u>See</u> Precision Mem. in Support of Mot. to Preclude Sebastian at 6-10 (Doc. No. 240-1).  Precision also objects to the form of Saertex's expert disclosure, asserting that Saertex failed to produce Dr. Sebastian's publications or provide a list of his prior engagements as an expert witness over the previous four years.  <u>See id.</u> at 10; <u>see also</u> Fed. R. Civ. P. 26(a)(2)(B)(v).

_____

[22] Dr. Sebastian's Report consists primarily of sixteen pages of photographs. <u>See</u> Sebastian Report at 2-17. On the Report's final page, curiously preceded by a page labeled "Exhibit B", he offers his opinions, stating that the investigated liner pieces show "a deficit of resin material. Due to the contact of water . . . to the unpolymerized resin, this liquid phase is washed out." <u>Id.</u> at 18. He further notes that the photographs show "white areas of a mixture of water and unsaturated polyester resin", adding, in reference to figures 39, 40, and 42, "[i]f the amount of water in direct contact to the CIPP material increases prior to the reaction, the unpolymerized resin is washed out of the laminate." <u>Id.</u> He also observes defects in the outer foil in figures 34, 36, and 37, opining that these "defects with ground water from the outside" can cause "washing out of unpolymerized resin." <u>Id.</u> Finally, he points to "interlaminate separation of layers" in nine of the photographs, "due to the washing out of the unpolymerized resin by water." <u>Id.</u> He identifies this phenomenon because "if there is a resin/water emulsion or a complete washing out of the resin, there will be no material for polymerization left. Therefore, compounding of the glass layers will not occur and the layers appears [sic] separated when the air pressure is removed. When the laminate collapses, the shear stress leads to this layer separation effect." <u>Id.</u> He concludes: "In my point of view a damaged membrane causes the washing out of the liquid resin prior to the polymerization." <u>Id.</u>

1.      Reliability of Dr. Sebastian's Opinions

Precision argues that Dr. Sebastian did not reach his opinions through the application of reliable methods to the facts of the case.  While the Second Circuit has made clear that a court need not "admit opinion evidence which is connected to existing data only by the ipse dixit of the expert",  Nimely, 414 F.3d 381, 396 (internal quotation marks and citations omitted), courts do consider "the nature of the issue, the expert's particular expertise, and the subject of his testimony" when assessing whether opinion evidence is reliable.  See Kumho, 526 U.S. at 150; see also In re Fosamax Prod. Liab. Litig., 645 F. Supp. 2d 164, 179 (S.D.N.Y. 2009) ("The strength of an expert's qualifications provides circumstantial evidence of reliability").

With respect to Dr. Sebastian's methods, Saertex acknowledges that he reached his opinions "based solely upon his physical examination of the failed liner pieces." Saertex Opp'n to Precision Mot. to Preclude Sebastian at 11-14.  Dr. Sebastian admits that he undertook no testing of the liner segments, although such testing was possible. See Sebastian Depo. at 19, 145.  However, Dr. Sebastian also testified that he chose not to test the liner pieces because the signs of water contact with the liner were "so clear" upon visual inspection that to conduct any testing would have been a waste of time.  See id. at 144-45.  Furthermore, Dr. Sebastian testified that it was unnecessary for him to consider evidence beyond his observation of the liner pieces, including CCTV footage, because "[t]he question was just what happened to these pieces", and the obvious "contact with water" was "really clear", thus answering the question.  Id. at 83.

Saertex contends that Dr. Sebastian's factual findings and conclusions are reliable, emphasizing his experience with resin washout in UV CIPP liners, his history as an expert witness, and his educational and professional credentials.  See Saertex

Opp'n to Precision Mot. to Preclude Sebastian at 9-10.  The court agrees that Dr.

Sebastian's expertise is a strong indicator of his opinions' reliability. The "nature of the

issue" to which Dr. Sebastian is testifying—what happened to the liner pieces—was

such that he could observe the liner fragments and apply his "particular expertise"—

decades of training and experience related to CIPP—to reach a determination, to a

reasonable degree of engineering certainty, that water had contacted the liner and

caused washout.  See Kumho, 526 U.S. at 150 (stating that courts consider "the nature

of the issue, the expert's particular expertise, and the subject of his testimony" in

assessing testimony's reliability).  Dr. Sebastian drew upon his knowledge of CIPP

liners, having investigated "more than 35, 40, 45,000 liners in the last 20 years", see

Sebastian Depo. at 60, and possessing a Ph.D. in "thermal analysis or chemical

analysis . . . . [T]he analysis type we use for CIPP."  See id. at 42-43.  He applied his

expertise to his visual examination of the liner pieces and identified signs that water

contacted the liner and caused washout.[23]  In his Report, he identified photographs

showing layer separation as well as "white areas of a mixture of water and unsaturated

polyester resin."  See Sebastian Report at 18.  Thus, Dr. Sebastian's opinions are not

mere "ipse dixit", but rather are the result of the expert's applying his specialized

knowledge to his observations of the liner.  See, e.g., In re Puda Coal Sec. Inc., Litig.,

30 F. Supp. 3d 230, 257 (S.D.N.Y. 2014), aff'd sub nom. Querub v. Hong Kong, 649 F.

App'x 55 (2d Cir. 2016) (determining, where an expert had "personal experience with

_____

[23] For instance, at his deposition, Dr. Sebastian explained his understanding of Figure 35 in his
Report: "And you see these white areas going through the laminate. That shows me that the water is
going through the laminate. So we had water outside and we had water inside, and that caused the
washout." See Sebastian Depo. at 97-98.

the type and purpose of certain documents referenced as part of plaintiffs' case" that the expert's opinions regarding such documents were "not ipse dixit but instead based on his experience with these types of documents"); see also Nicholas, 376 F. Supp. 3d at 290.

Accordingly, the court will not exclude Dr. Sebastian's opinions for a lack of reliability.  Because Dr. Sebastian's opinions are adequately supported, see Amorgianos, 303 F.3d at 266, remaining questions regarding his methodology go to the weight, rather than the admissibility of Dr. Sebastian's testimony.  If Precision wishes to address any limitations in Dr. Sebastian's methods or the bases for his opinions, it will have the opportunity to do so on cross examination.

2.    Failure to Disclose Dr. Sebastian's Prior Testimony and Publications

Precision also seeks to preclude Dr. Sebastian's testimony on the ground that Saertex failed to disclose a list of the other cases in which Dr. Sebastian has testified over the last four years.  See Precision Mem. in Support of Mot. to Preclude Sebastian at 10.  Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  If the court determines that an omission was "substantially justified" or "harmless", preclusion is not mandatory.  Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2006)  To determine whether to impose the "extreme sanction" of preclusion of a witness, see Vioni v. Providence Inv. Mgmt., LLC, 750 F. App'x 29, 32 (2d Cir. 2018) (internal citation omitted), the court weighs four factors outlined by the

42

Second Circuit: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997) (commonly known as the "Outley factors").

Here, the Outley factors weigh against preclusion. As for the first factor, Saertex's explanation for its failure to comply with the requirement that it disclose Dr. Sebastian's previous testimony is lacking. Indeed, it appears to the court that Saertex has not explained the omission. However, the second and third factors both weigh heavily against preclusion. Dr. Sebastian's testimony regarding the liner's failure is central to Saertex's case on the issue of causation. More importantly, Precision has not shown how or whether it was prejudiced by this exclusion. At this stage, Precision has obtained Dr. Sebastian's Report, read his opinions, and deposed him regarding those opinions. Finally, the court does not anticipate a continuance in this long-running case. Thus, on balance, given the harmlessness of Saertex's failure to comply with the formalities of expert disclosure requirements, the court will not impose the harsh remedy of preclusion. To correct the omission, Saertex is ordered to supplement its expert disclosure to include any missing information regarding expert testimony by Dr. Sebastian over the last four years as required under Federal Rule of Civil Procedure 26(a)(2)(B)(v) within 21 days of this Ruling.[24]  Following that, Precision may notice Dr.

---

[24]The court observes that, in reviewing all of the expert reports at issue in this litigation, it appears that counsel paid little attention to the requirements of Federal Rule of Civil Procedure 26(a)(2) (governing expert disclosures).  The parties are advised that, at trial, the court expects that experts will testify to their

Sebastian's continued deposition—to take place within 30 days of the disclosure—

solely on the material to be disclosed. The expense of the deposition, including the cost

of transcripts and expert's fees, is to be borne by Saertex because of its failure to

disclose unilaterally as required by Rule 26, as well as its failure to explain the lack of

disclosure. See Fed. R. of Civ. P. 37(c)(1)(A) (authorizing the court to order the

payment of reasonable expenses, including attorney's fees, caused by a party's failure

to disclose).

Because Granite's failure to disclose Dr. Sebastian's prior testimony will cause

no harm after Granite's supplemental disclosure, and because Dr. Sebastian is qualified

and offers reliable and relevant testimony, the court denies Precision's Motion to

Preclude Dr. Sebastian in full.

E.   Precision Motion to Preclude Granite Experts Dr. Jericho Moll and Dr.
Antonios Vytiniotis (Doc. No. 243)[25]

Precision moves to preclude Granite's experts, Dr. Jericho Moll and Dr. Antonios

Vytiniotis, and to strike their joint Report as well as Dr. Moll's Supplemental Report.

───────────────────

opinions to a reasonable degree of professional certainty.  Each expert will state their opinion, per the party's expert disclosure, along with the reasons for that opinion, per the party's expert disclosure (as supplemented by the expert's deposition and any supplemental reports).  The court expects that an expert's qualifications will be subjected to examination before the expert testifies, and that counsel should lay a foundation to show that the matters to which the expert will testify are within the scope of the expert's qualifications.  Opposing counsel may object to any question that she or he views as outside the expert's qualifications or testimony.

[25] Granite argues that Precision's Motion is untimely, as the complete Motion and Exhibits were filed on June 2, 2021, after the June 1, 2021 filing deadline set by this court. See Scheduling Order (Doc. No. 227).  The docket indicates that Precision's counsel attempted to file the Motion and Exhibits on June 1, but encountered technical filing errors and uploaded only the Motion and accompanying Memorandum before midnight. See Doc. Nos. 241-45; see also Att'y Baldwin Decl. (Doc. No. 295); Error Message and Email to Court (Doc. No. 295-1). Under these circumstances, the court will not reject the Motion to Preclude as untimely. The court notes that Precision attempted to timely file the documents and contacted the courtroom deputy after receiving the filing system error message. These facts, along with the lack of any evidence of prejudice to Granite, justify the court's excusing the filing error and deeming the Motion to have been made on June 1, 2021. See Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd., 422 F.3d 72, 76 (2d Cir. 2005) (holding that a district court may "excuse failures to comply

See Mem. in Support of Precision Mot. to Preclude Granite Experts (Doc. No. 243-1).
Drs. Moll and Vytiniotis co-authored a 135-page Report under the name of their firm,
Exponent.  See Exponent Report (Doc. No. 243-2).  The two experts have different
fields of expertise: Dr. Moll holds a Ph.D. and an M.S. in Materials Science and
Engineering, and "routinely examines and investigates various polymer and composite
failure mechanisms", while Dr. Vytiniotis holds an M.S. and a Ph.D. in Civil and
Environmental Engineering, and "routinely evaluates soil and groundwater conditions" in
relation to the performance of pipelines.  See id. at 7-8.

In the Report, the experts offered several opinions in support of their theory that
resin migrated within the liner after manufacturing. See id. at 52-53. Their opinions
included findings, to a reasonable degree of engineering certainty, that puncture marks
in the liner's styrene barrier layer and cured resin on the exterior of the same layer
indicated installation error leading to resin migration in the liner, and that "[w]ater was
likely present within the host pipe during installation." See id. at 52-53.[26] They reached
their opinions on the basis of several analyses including: review of Granite's wet-out
process, examination of exemplar Type-S liner materials, inspection of the failed liner
samples, review of CCTV video, destructive laboratory examination of the failed liner,

---

with rules enforced by its local electronic case filing system for purposes of determining when a motion
was made"); see also District of Connecticut Electronic Filing Policies and Procedures, Technical Failures
§ V(D) (rev. Oct. 11, 2018) ("If counsel misses a filing deadline due to an inability to file electronically,
counsel may electronically submit the untimely filed document, accompanied by a declaration stating the
reason(s) for missing the deadline. The document and declaration must be electronically filed no later
than 12:00 noon of the first day on which the Court is open for business following the original filing
deadline.").

[26] The court restates the Exponent Report's opinions in full below.  See p. 51 n. 30, infra.

reference to peer-reviewed research, and review  of the revised manual for the installation of Saertex Type-S liners.  See id. at 1-42.

Dr. Moll also issued a second, Supplemental Report on May 28, 2021.  See Moll May 28, 2021 Supplemental Report (Doc. No. 243-3).  Her Supplemental Report refuted the deposition testimony of Precision's expert, Mr. Rahaim, that the viscosity of the liner's resin was high—"approximately a million centipoise"—making the resin unlikely to flow or migrate at the time of installation.  See id. at 1.  To contest Mr. Rahaim's statements, Dr. Moll tested two sample liners that Granite wet out on May 11, 2021, finding resin viscosities at or below 37,000 centipoise and determining that the liners' resin flowed during handling.  See id. at 2.

In support of its Motion to Preclude Dr. Moll's Supplemental Report, Precision has also filed a June 1, 2021 Declaration from Mr. Rahaim offering new opinions that "Granite Inliner is using a resin that fails to conform with the specifications set by Saertex" and that "Dr. Moll failed to recognize" the lack of conformity.  See Rahaim Decl. at ¶¶ 16, 24 (Doc. No. 243-7).  Granite seeks, in its Opposition to Precision's Motion to Preclude, to strike Mr. Rahaim's new Declaration.  See Granite Opp'n to Precision Mot. to Preclude Granite Experts at 18-20 (Doc. No. 261).

### 1.    Exponent's Joint Report

Precision first objects to Granite's failure to identify which expert offers which opinion in the joint Exponent Report.  See Mem. in Support of Precision Mot. to Preclude Granite Experts at 1.  Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires an expert's reports to disclose "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  As the Advisory Committee Commentary to the 1993 Amendments to Rule

26(a) explains, the Rule's purpose is to ensure parties' access to "certain basic information that is needed in most cases to prepare for trial or make an informed decision about settlement." Where, as here, one party fails to specify which opinions should be attributed to each of its two experts, such failure threatens to impede the opposing party's preparation of effective cross-examination.[27]

Here, the Exponent Report fails to disclose which opinion each witness will express at trial, violating Federal Rule of Civil Procedure 26(a)(2)(B)(i). Fed. R. Civ. P. 26(a)(2)(B)(i). As discussed herein, <u>see</u> pp. 42-43, <u>supra</u>, courts in this Circuit weigh the <u>Outley</u> factors to determine whether a party's failure to comply with the requirements of Rule 26 was "substantially justified" or "harmless": "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." <u>Softel</u>, 118 F.3d at 961. While Granite offers no explanation for its failure to submit a separate Report for each expert, the experts' opinions are central to Granite's case and its theory of resin migration. Furthermore, Precision has not been materially prejudiced by the joint Report. Precision deposed Dr. Moll for nearly seven hours, during which Dr. Moll distinguished her own opinions and Report sections from

---

[27] One court to consider the issue in this Circuit has held that joint authorship of an expert opinion does not, <u>per se</u>, violate Rule 26(a). <u>See</u> <u>Santaniello ex rel. Quadrini v. Sweet</u>, No. 3:04CV806 RNC (DFM), 2007 WL 214605, at *5 (D. Conn. Jan. 25, 2007) ("[T]he plaintiff argues that the experts impermissibly disclosed a single joint report rather than each disclosing their own report and that their opinions are cumulative. On the present record, the court does not find that the report violates Fed.R.Civ.P. 26(a)(2)."). This court agrees that a joint-authored Report might not violate Rule 26(a)(2) if, for example, it disclosed which opinions were attributable to each expert, giving the opposing party notice and permitting them to direct questioning to the appropriate expert. Here, however, the Exponent Report does not distinguish the opinions of Dr. Moll from those of Dr. Vytiniotis, complicating Precision's cross examination.

those of Dr. Vytiniotis.  <u>See</u> Moll Depo. at 95-96; 111-35 (Doc. No. 243-9).  Precision

also deposed Dr. Vytiniotis, who clarified which parts of the Report contain his opinions.

<u>See</u> Vytiniotis Depo. at 24-39 (Doc. No. 243-8).  Thus, although the court does not

anticipate a continuance, Precision will not, as it contends, face "litigation by ambush" or

be unable to prepare an effective cross-examination of the experts.  <u>See</u> Mem. in

Support of Precision's Mot. to Preclude Granite's Experts at 11.

      Because preclusion is, as the court has noted, an "extreme sanction." <u>See</u> <u>Vioni</u>,

750 F. App'x at 32 (internal citation omitted), the court will not preclude Dr. Moll and Dr.

Vytiniotis from offering their opinions where Precision's prejudice can be mitigated

through less drastic measures.[28]  Precision has deposed both experts and is not

materially prejudiced by the joint authorship of the Exponent Report.  However, Granite

is ordered to disclose a Supplemental Report identifying which opinions in the Exponent

Report are attributable to each expert.  The Supplemental Report should include, for

each opinion, citations to the expert's deposition where the expert has testified he or

she is responsible for the opinion. <u>Cf.</u> <u>Dan v. United States</u>, No. CIV. 01-

25MCA/LFGACE, 2002 WL 34371519, at *5 (D.N.M. Feb. 6, 2002) (requiring a party to

submit supplemental reports for each of its experts to replace a joint report).

---

[28] Even in the primary case upon which Precision relies in challenging the joint authorship, the court did not preclude the testimony of experts who authored a joint Report, but rather, "require[d] that Plaintiffs submit separate expert reports in full compliance with Rule 26 to Defendant." <u>Dan v. United States</u>, No. CIV. 01-25MCA/LFGACE, 2002 WL 34371519, at *5 (D.N.M. Feb. 6, 2002).  The Report in <u>Dan</u> contained other deficiencies not present here, as it was not signed by either of the proposed experts, it stated conclusions without bases, and it did not disclose the information the experts considered in formulating their opinions. <u>Id.</u>

Because Granite's Supplemental Report will mitigate any prejudice to Precision caused by the joint Report, the court denies Precision's Motion to Preclude the Granite Experts and to strike their Report on the ground of the Report's joint authorship.

2.   Dr. Moll's Qualifications[29]

Precision challenges Dr. Moll's qualifications as an expert, arguing that she lacks knowledge about CIPP liners, her testimony was substantively incorrect, she "has never installed a CIPP liner", and her Report referenced an article that relates to a product not at issue in this case. See Mem. in Support of Precision Mot. to Preclude Granite Experts at 8-10. However, Dr. Moll's CV as well as her deposition testimony indicate that she has sufficient "knowledge, education, experience, [and] skill" in the area of materials sciences and composite failure analysis to qualify as an expert in this matter. See Tin Yat Chin, 371 F.3d at 40; see also Exponent Report at 7.  The Second Circuit has indicated that Rule 702 does not require that a witness's expertise be perfectly tailored to the facts of the case.  See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997) (determining an expert in human-machine interactions was qualified to testify to alternative measure to make a baggage carousel safer).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  In re Zyprexa Prod. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007).

---

[29] Precision does not contest Dr. Vytiniotis' qualifications as a civil engineer.  See generally Mem. in Support of Precision Mot. to Preclude Granite Experts.

Here, Dr. Moll has four engineering-related degrees, including a Ph.D. in Materials Science and Engineering.  See Moll Depo. at 60; see also Exponent Report at 7. In the course of obtaining her Ph.D., she "[r]outinely looked at the resin content in composites", id. at 78, and "worked in the composite manufacturing lab" where she "routinely wet-out composites."  Id. at 57.  She has authored multiple publications regarding composites, see id. at 66, and has experience with "failure analysis of composites."  See id. at 64.  She has testified that her experience in composites is relevant to CIPP systems.  Id. at 61-62.  Thus, her education, experience, and knowledge sufficiently qualify her to testify in this case.

Furthermore, the fact that Dr. Moll cited one resource that, Precision claims, refers to a type of piping not at issue in this case, does not in and of itself disqualify her from testifying.  See Precision Mem. in Support of Mot. to Preclude Granite Experts at 8-10.  The Exponent Report references fifteen pieces of literature which the experts reviewed for the Report.  See Exponent Report Appendix A at 61-62 (Doc. No. 243-2). To the extent that one of those publications is not directly related to the issue at hand, it goes to the weight of her testimony rather than its admissibility.

Precision may cross-examine Dr. Moll about her experience, the accuracy of her opinions, and her reliance on the resource in question.  The court will not preclude her testimony on the ground of a lack of qualification.

### 3.  Reliability and Foundation of Dr. Moll's Opinions

Precision also challenges the reliability and foundation of Dr. Moll's opinions. See Mem. in Support of Precision Mot. to Preclude Granite Experts at 13.  Dr. Moll opined that punctures in the liner caused by installation, along with water in the host pipe, allowed for resin migration within the liner, weakening it and leading to its collapse.

See Exponent Report at 52-53.[30]  Precision contends that "Dr. Moll's methodology is

fatally flawed based [on] the fact that she did not analyze the flow rate of the resin

_____

[30] The court provides here the Exponent Report's opinions, as stated on pages 52-53, along with parenthetical citations to the experts' deposition testimony regarding which expert espouses each opinion:

1.  "Granite's wet-out system employs components of well-established composites manufacturing processes that are widely accepted and utilized within the composite industry." (Opinion of Dr. Moll. See Moll Depo. at 111; Vytiniotis Depo. at 24.).

2.  "Based on the objective data provided in Granite's manufacturing records, Granite utilized the specified resin formulation, mixed the resin according to the specification,  and selected and utilized the specified saturation time, wet-out speed and nip roller settings during wet-out of the subject liner. As a result of this documented adherence to  the specified manufacturing settings, Granite produced the subject liner with the specified amount of resin as established by the weight of the tail end and of the weight of the entire liner. No deficiencies or abnormalities were identified during resin preparation or wet-out of the subject liner. Further, Dr. Knight's own testing of samples, which he claims had lower than acceptable amounts of resin, in fact show that there was more resin on the interior than the exterior layers in 2 of 3 samples, establishing that the subject liner had been wet-out through the entire thickness of the liner, thus indicating that the vacuum was properly working." (Opinion of Dr. Moll. See Moll Depo. at 111-13; Vytiniotis Depo at 24-25.).

3.  "Based on the objective data, including Precision's own installation records, Precision did not follow all specifications in the "Installation Instructions for Saertex-Liner" while installing the subject liner. Specifically, Precision did not utilize the specified inflation pressure for the subject liner type and thickness. Further, based on testimony presented in this matter, including Precision 30(b)6 witness' testimony stating that all evidence removed from the subject pipe was transferred to and retained in the Precision warehouse, and Precision's failure to present the glide foil for inspection, it follows that Precision did not follow specified installation procedures when then they failed to use a glide foil during subject liner installation." (Opinion of Dr. Moll. See Moll Depo. at 113. Dr. Vytiniotis authored a portion of the report which also refers to groundwater pressure and how it related to inflation pressure. See Vytiniotis Depo. at 29.).

4.  "Parameters, such as cure temperature and rate, employed by Precision during subject liner curing cannot be objectively evaluated due to a hard drive failure in equipment utilized by Precision." (Opinion of Dr. Moll. See Moll Depo. at 113; Vytiniotis Depo. at 29.).

5.  "Fractures and displaced joints were present in the host pipe, as shown by the objective data in CCTV examinations and reports provided by Precision and Inland Waters Inc." (Opinion of both experts, but primarily Dr. Vytiniotis. See Moll Depo. at 113 ("[M]ight overlap a bit with both of us based on the CCTV examinations, but I would say it's mostly [Dr. Vytiniotis']"); Vytiniotis Depo. at 29.).

before opining on the migration of the resin."  Mem. in Support of Precision Mot. to

Preclude Granite Experts at 13.

---

6.  "Based on examination and testing of components of the subject liner, resin migrated to the exterior of the styrene barrier layer prior to cure, establishing that changes occurred to the liner's as-manufactured condition. Further objective evidence establishing post-manufacturing resin migration includes: witness marks and punctures in retained portions of the subject liner; and no evidence of completely dry and flexible glass fibers in the subject liner." (Opinion of Dr. Moll. See Moll Depo. at 113; Vytiniotis Depo. at 30.).

7.  "Puncture marks with coincident pre-cure deformation of the subject liner, coupled with cured resin identified on the exterior of the subject styrene barrier layer, establish that these breaches in the styrene barrier layer occurred as the result of the installation process." (Opinion of Dr. Moll. See Moll Depo. at 113-14; Vytiniotis Depo. at 30-31.).

8.  "Punctures observed in the styrene barrier layer provided a pathway for resin migration in the subject liner causing non-uniform resin distribution and localized areas with a lack of resin, resulting in decreased strength and ultimately the collapse of the subject liner from forces acting on the subject liner such as ground water pressure and gravity." (Opinion of Dr. Moll. See Moll Depo. at 114; Vytiniotis Depo. at 31-33.).

9.  "Water was likely present within the host pipe during installation. The source of such water was water flowing from lateral pipe connections and/or groundwater within the sandy and silty soils infiltrating through the numerous cracks of the host pipe or via the manhole walls." (Opinion of Dr. Vytiniotis. See Moll Depo. at 114; Vytiniotis Depo. at 35-36).

10. "Water present during installation, coupled with breaches in the outer styrene barrier of the subject liner, is consistent with the conditions outlined in literature that contribute to or accelerate resin migration." (Opinion of Dr. Moll, formed on the basis of Dr. Vytiniotis' opinion, in paragraph nine, that water was likely present in the pipe. Moll Depo. at 114-16 ("[Dr. Moll's] opinion relates to the second half of that sentence, 'is consistent with the conditions outlined in literature that contribute to or accelerate resin migration.' [Dr. Vytiniotis'] portion of the opinion is establishing that the water was likely present."); Vytiniotis Depo. at 36-37).

See Exponent Report at 52-53 (numbering added; parentheticals attributing opinion to expert and citing to deposition added). In their depositions, the experts attributed to Dr. Vytiniotis the ninth opinion, that water was present in the host pipe. See Vytiniotis Depo. at 35. They further stated that the fifth opinion, that fractures and displaced joints were present in the host pipe, was primarily Dr. Vytiniotis' opinion, but that Dr. Moll also analyzed the CCTV video and thus responsibility for the opinion "might overlap" between the two experts. See Moll Depo. at 113. The remainder of the opinions were attributed to Dr. Moll, although the tenth opinion, that water present during installation, paired with breaches in the liner's outer layer, is "consistent with the conditions outlined in literature that contribute to or accelerate resin migration", relied on Dr. Vytiniotis' opinion, stated at paragraph 9, that water was likely present in the host pipe during installation. See Moll Depo. at 114-16; Vytiniotis Depo. at 36-37.

However, Dr. Moll's testimony is neither "speculative" nor "conjectural", and it does not warrant preclusion.  See Boucher, 73 F. 3d at 21.  She explained that she formed her opinions on the basis of her observations of "objective evidence" including puncture marks and cured resin on the exterior of the liner's styrene barrier layer.  See Exponent Report at 52-53.  Her analysis included visual inspection of the subject liner pieces at the Precision warehouse in Schenectady, New York; comparison with exemplar pieces of Saertex liner; and destructive examination of liner pieces. See id. at 25-39.  She also tested samples of resin droplets on the outside of liner pieces using Fourier transform infrared (FT-IR) spectroscopy analysis in accordance with ASTM E573: Standard Practices for Internal Reflection Spectroscopy.  See id. at 37-39. Thus, Dr. Moll used testable, published techniques to assess the liner pieces and resin droplets, meeting two of the Daubert factors.  See Amorgianos, 303 F.3d at 265 (quoting Daubert, 509 U.S. at 593–94).

Furthermore, Dr. Moll applied her expertise and education in materials science to identify signs of resin migration in the failed liner pieces. See Nicholas, 376 F. Supp. 3d at 290.  With respect to the resin's viscosity, she explained: "I saw evidence of the resin on the outside of the styrene barrier. So it was able to migrate, regardless of whatever the actual viscosity value was."  Moll. Depo. at 154-55.  Thus, to the extent that Dr. Moll did not test the viscosity of the resin in the subject liner, the omission goes to the "degree of credibility to be accorded to the evidence, not to the question of its admissibility."  Royal Ins. Co. of Am., 208 F. Supp. 2d at 426.

The court therefore denies Precision's Motion to Preclude Dr. Moll's opinions on the ground of insufficient reliability or foundation.

4.     Reliability and Relevance of Dr. Vytiniotis' Opinion

Precision contends that Dr. Vytiniotis' ninth opinion—that water was likely present in the pipe during installation—lacks reliability and relevance, because it is speculative and unhelpful to the jury.  See Mem. in Support of Precision Mot. to Preclude Granite Experts at 21-22.[31]

As an expert in this case, Dr. Vytiniotis offers his opinion on "the potential sources of water within the host pipe at the time of the liner installation."  See Vytiniotis Depo. at 10 (Doc. No. 268-5).  His education and experience qualify him to opine on water infiltration of pipe systems; Dr. Vytiniotis has a Ph.D. in Civil and Environmental Engineering, see Exponent Report Appendix C at 70-73 (Doc. No. 243-2), and has "done a lot of work throughout [his] almost ten years now of professional experience in assessing [the] condition of pipelines."  Vytiniotis Depo. at 54.  In his deposition, Dr. Vytiniotis explained how he applied his expertise and knowledge to the evidence to identify "conditions on the host pipe that provide a basis to say that there were sources of infiltration within the host pipe."  Id. at 54.

To determine whether water was present in the pipe during installation, Dr. Vytiniotis reviewed "the local precipitation records" as well as "local geotechnical records. . . ."  Id. at 59-60.  In addition, he examined "soil water and groundwater

---

[31] Precision raises no arguments regarding Dr. Vytiniotis' fifth opinion, that "[f]ractures and displaced joints were present in the host pipe, as shown by the objective data in CCTV examinations and reports provided by Precision and Inland Waters Inc." See Exponent Report at 52. However, the court's analysis in this section finding Dr. Vytiniotis' ninth opinion reliable applies with equal force to his fifth opinion.  Dr. Vytiniotis applied his experience and expertise in assessing pipeline conditions to analyze the CCTV video and identify flaws in the host pipe. Such flaws are relevant to the finder of fact in that they tend to make the presence of water in the host pipe in the pipe more likely and thus, tend to make a resin migration or resin washout theory of the liner's failure more likely.

conditions in that area", "looking at local topography" and "where the local brooks are", as well as "where the local borings are." Id. at 101.  He also assessed "the drawings", "the depth", and "the locations of the VCP system." Id. at 120.[32]  Like several of the experts in this case, Dr. Vytiniotis also watched the pre-installation CCTV video, where he observed "water coming through a few host pipe [sic]" as well as "staining, which is indicative of continuous water infiltration."  He also identified "a few cracks within the host pipe", as well as "some relatively displaced joints within the host pipe laterals." Id. at 62.  He explained the significance of a displaced joint: "a displaced joint is something that is not uncommon in these VCP pipes, and a displaced joint provides an additional pathway for water outside the pipe, be it groundwater or precipitation water (unintelligible) very quickly, to infiltrate through the pipe." Id. at 62.  He noted areas of wetness, staining, and "water coming from laterals", which can have "two sources, which can be sewage water or can also be groundwater penetrating through the laterals." Id. at 63.  He opined that "the openings in cracks and joints provide one more additional pathway of water to infiltrate into the pipe, and this can be a really hairline or it can be larger, but the water infiltration and exfiltration in VCP pipes is actually a common problem in the industry because of the way these pipes are connected." Id. at 103.  He added:  "My opinion is that the host pipe has a few lateral pipe connections, and with reasonable certainty, we can expect that some of this lateral pipe connections will actually transfer some sewage water within the host pipe" Id. at 150-51.[33]

---

[32] Dr. Vytiniotis explained at his deposition that the host pipe in this case was comprised of "VCP", or vitrified clay piping. See Vytiniotis Depo. at 41.

[33] These observations are also discussed in the Exponent Report. See generally Exponent Report at 18-21.

Ultimately, Dr. Vytiniotis opined in the Exponent Report: "the available data document perched water and groundwater within the soils, active inflow via the manhole walls in multiple manholes, multiple cracks in the original sewer pipe and lateral connections that were actively used during construction.  Hence, water was very likely present within the pipe during the liner installation."  Exponent Report at 21; see also id. at 53 (stating, in the Report's final "Opinions and Summary" section: "Water was likely present within the host pipe during installation.  The source of such water was water flowing from lateral pipe connections and/or groundwater within the sandy and silty soils infiltrating through the numerous cracks of the host pipe or via the manhole walls.").  At his deposition, Dr. Vytiniotis acknowledged that he did not determine which of several possible sources contributed the most water to the pipe, but opined that "all of this [sic] mechanisms together make it very clear that there was likely water within the pipe."  Id. at 153.

While courts exclude expert testimony grounded in "subjective belief or unsupported speculation", see Daubert, 509 U.S. at 590, "the fact that an expert witness speaks in probabilities (e.g., it would be unlikely), rather than certainties, does not by itself make his testimony unreliable."  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d 448, 472 (S.D.N.Y. 2010).  Here, the phrasing of Dr. Vytiniotis' opinion—that water was "likely" present—suggests speculation.  However, despite his use of the term "likely", Dr. Vytiniotis' deposition testimony makes clear that he did not speculate, but rather applied his specialized knowledge to evaluate and analyze the available data and reach an opinion to a degree or reasonable engineering certainty.  See, e.g., In re Puda Coal Sec. Inc., Litig., 30 F.

Supp. 3d at 257, aff'd, 649 F. App'x 55 (an expert's opinions may be "based on his experience" with similar facts or data); see also Nicholas, 376 F. Supp. 3d at 290.  He assessed conditions present in and around the host pipe—including signs of water, cracks, soil borings showing groundwater tables, and lateral connections—to opine to a reasonable degree of engineering certainty based on actual signs of water in the pipe, that water was present.[34]  While he does not opine as to the amount of water in the pipe, this omission goes to the weight rather than the admissibility of his testimony.[35]

Precision also offers two arguments that Dr. Vytiniotis' ninth opinion—that water was likely present in the pipe—is unhelpful to the trier of fact and irrelevant.  First, Precision contends that "the average juror is capable of reviewing the pre-installation video" to "view for themselves whether there is any water infiltrating into the host pipe." See Precision Mem. in Support of Mot. to Preclude Granite Experts at 22.  Second, Precision proposes that the presence of an unquantified amount of water has "no bearing on" Granite's theory that resin migration caused the liner's failure.  See Precision Reply in Support of Mot. to Preclude Granite Experts at 8-9 (Doc. No. 295).

_____

[34] Dr. Vytiniotis' opinion is distinguishable from the speculative testimony of Mr. Rahaim, who opined that if certain conditions were present (Granite's nip rollers, vacuum, or other machinery were incorrectly aligned or miscalibrated), then those hypothetical conditions could have caused another condition (the incorrect amount of resin could have been applied to the liner during the wet out) that could have caused the liner's collapse. Mr. Rahaim offered only speculation that Granite's machinery could have been incorrectly aligned.  See pp. 21-24, supra.  Dr. Vytiniotis, on the other hand, opined that conditions were actually present (cracks, joints, lateral connecting pipes, and groundwater were present) and, to a reasonable degree of engineering certainty, these conditions likely caused another condition for which he identified actual evidence (water in the pipe, evidenced by staining and CCTV video) facilitating resin migration, causing the liner's collapse.

[35] Dr. Vytiniotis' testimony at trial, like that of each expert, will be admissible only if he can state his opinions to a reasonable degree of engineering certainty, and not speculate as to what is "likely" or to "possibilities." If he cannot do so, he will not be permitted to testify.

Dr. Vytiniotis' opinion, however, is relevant.  "It is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'"  Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 1122 (1962)). However, expert testimony may be "admissible where it synthesizes or summarizes data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion."  Lassen v. Hoyt Livery, Inc., No. 13-CV-1529 (VAB), 2016 WL 7165716, at *11 (D. Conn. Dec. 8, 2016) (internal citation and quotation marks omitted).  Furthermore, evidence, including expert testimony, is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Here, Dr. Vytiniotis offers testimony that extends beyond "primary facts" accessible to the average juror: parsing the results of soil samples; opining as to the significance of staining on the host pipe; and identifying sources of water infiltration in the host pipe. Dr. Vytiniotis' testimony offers insights that could not be gleaned by an average juror watching pre-installation CCTV footage. Because Dr. Vytiniotis "synthesizes" and "summarizes" the data indicating water infiltration based on his expertise, his testimony should help the jury make sense of the evidence, "avoiding unnecessary confusion." Lassen, 2016 WL 7165716, at *11.

Furthermore, Dr. Vytiniotis' opinion that water infiltrated the host pipe is relevant in that it tends to make Granite's resin migration theory more probable. See Fed. R. Evid. 401.  While Precision argues that water is not necessary to Granite's resin

migration theory, <u>see</u> Precision Reply in Support of Mot. to Preclude Granite Experts at 8-9, the Exponent Report makes clear that water exacerbates resin migration.  <u>See, e.g.</u>, Exponent Report at 53 ("Water present during installation, coupled with breaches in the outer styrene barrier of the subject liner, is consistent with the conditions outlined in literature that contribute to or accelerate resin migration.").  Thus, the presence of water tends to make a theory of resin migration more likely, which, in turn, tends to make a theory of installation error more likely.  Indeed, the testimony of Precision's own expert, Dr. Knight, undermines Precision's argument that the presence of water is irrelevant; in his Report, Dr. Knight points to the purported <u>absence</u> of water to support his opinion that installation error was not to blame for the liner's failure.  <u>See</u> Knight Nov. 3, 2020 Report at 10-12 (stating that the liner was installed in an "ideal host pipe" with "no evidence of significant ground water infiltration.").  Accordingly, because Dr. Vytiniotis' testimony about water infiltration tends to make Granite's theory of causation more likely, it is relevant.

The court therefore will not preclude Dr. Vytiniotis' opinions for a lack of reliability or relevance.

### 5. Dr. Moll's May 28, 2021 Supplemental Report

Precision also seeks to strike Dr. Moll's May 28, 2021 Supplemental Report, in which she conveyed the results of sample liner testing to rebut testimony offered by Precision's expert, Mr. Rahaim at his May 3, 2021 deposition.  <u>See</u> Mem. in Support of Precision Mot. to Preclude Granite Experts at 2.  Precision contends that Dr. Moll's Report is untimely and violates Federal Rule of Civil Procedure 26(e).

The court agrees with Precision that Dr. Moll's Supplemental Report should be stricken for a failure to comply with disclosure requirements.  Precision disclosed Mr.

Rahaim's initial Report far in advance of the court-set February 12, 2021 deadlines, on

November 13, 2020.  <u>See</u> Rahaim Nov. 13, 2020 Report at 1.  Mr. Rahaim's two

Supplemental Reports, disclosed February 1 and 12, 2021, also met the court's

February deadline.  Rahaim Feb. 1, 2021 Report at 1, Rahaim Feb. 12, 2021 Report at

1.  Likewise, Granite timely disclosed its initial Exponent Report on February 22, 2021,

meeting the court's February 22, 2021 deadline for defendants' expert disclosures. <u>See</u>

Exponent Report at 1; <u>see</u> Scheduling Order (Doc. No. 21).  However, the Exponent

Report included no testing to determine the viscosity of the liner's resin.  <u>See</u> <u>id.</u>  Dr.

Moll was asked about the resin's viscosity at her May 12, 2021 deposition, where she

acknowledged that she had not determined the viscosity of the resin in the failed liner at

the time of installation.  <u>See</u> Moll Depo. at 154-55.  Granite did not submit Dr. Moll's

Supplemental Report with resin testing until May 28, 2021—the last business day

before the June 1, 2021 deadline to file motions to preclude expert witnesses and more

than three months after Granite's expert disclosure deadline.  <u>See</u> Am. Scheduling

Order (Doc. No. 227).

　　　　Dr. Moll's "Supplemental Report" exceeds the bounds for supplemental

disclosures established by Federal Rule of Civil Procedure 26. While Rule 26 creates a

duty for an expert to supplement her report when she learns of information that was

"previously unknown or unavailable", it does not permit an expert to "bolster its earlier

submission."  <u>Levinson v. Westport Nat. Bank, No.</u> 3:09-CV-1955 VLB, 2013 WL

3280013, at *4 (D. Conn. June 27, 2013); <u>see also</u> <u>In re Bear Stearns Companies, Inc.</u>

<u>Sec., Derivative, & ERISA Litig.</u>, 263 F. Supp. 3d 446, 451 (S.D.N.Y. 2017) ("Rule 26(e)

is not . . . a vehicle to permit a party to serve a deficient opening report and then remedy

the deficiency through the expedient of a 'supplemental' report." (internal quotation marks and citation omitted)).  Here, Dr. Moll, Granite's own expert, conducted belated testing of resin samples provided by Granite.  Because Granite could have produced these samples to its own expert at any point, results of Dr. Moll's late May, 2021 tests were not "unavailable" within the meaning of Rule 26(e) when she authored the Exponent Report in February 2021.  See, e.g., Beyer v. Anchor Insulation Co., No. 3:13 CV 1576 (JBA), 2016 WL 4705447, at *3 (D. Conn. Sept. 8, 2016) (determining an expert's supplemental report violated Rule 26(e) when the plaintiff's expert tested samples in the plaintiff's possession after the disclosure deadline and failed to make arrangements for such testing prior to the deadline).  Thus, Dr. Moll's May test results do not warrant a Supplemental Report under Rule 26(e) and would only improperly "bolster" her initial opinions.

Granite argues that Dr. Moll's Supplemental Report is merely a response to Mr. Rahaim's "sandbagging" statements at his May 3, 2021 deposition, where he contended that the liner's resin had a high viscosity of "approximately a million centipoise" and was unlikely to move.  See Rahaim Depo. at 91.  However, as the court has discussed, see pp. 12-16, supra, Mr. Rahaim did not "sandbag" Granite by offering opinions regarding the viscosity of the liner's resin.  Rather, Granite affirmatively solicited those statements from Mr. Rahaim by pressing him to address Granite's theory that resin migrated within the liner, rather than examining his opinions regarding Granite's manufacturing processes.  See id.  Thus, Mr. Rahaim's deposition statements do not justify Granite's untimely submission of Dr. Moll's Supplemental Report.

61

Further, a weighing of the <u>Outley</u> factors indicates that the failure of Dr. Moll's Supplemental Report to comply with Rule 26(e) was neither "substantially justified" nor "harmless." <u>See</u> Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  As to the first factor, "the party's explanation for the failure to comply with the [disclosure requirement]", neither excuse— new and previously unavailable information nor Mr. Rahaim's May 3, 2021 deposition statements—would, even if true, justify Dr. Moll's issuing of new test results and opinions in her May 28, 2021 Supplemental Report.  <u>See</u> <u>Softel</u>, 118 F.3d at 961; <u>see also</u> pp. 60-61, <u>supra</u> (discussing Dr. Moll's testing and Mr. Rahaim's deposition statements).  The second factor, "the importance of the testimony of the precluded witness[es]", also weighs in favor of striking Dr. Moll's Supplemental Report.  <u>See</u> <u>Softel</u>, 118 F.3d at 961. While the Supplemental Report's resin test results help advance Dr. Moll's theory, they are not necessary to her testimony, as she stated at her deposition.  <u>See</u> Moll Depo. at 155 ("[The resin] was able to migrate, regardless of whatever the actual viscosity value was").  With respect to the third factor—"the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony", <u>see</u> <u>Softel</u>, 118 F.3d at 961—the Supplemental Report was produced only three calendar days before the June 1, 2021 deadline for Motions to Preclude ordered by this court.  <u>See</u> Am. Scheduling Order (Doc. No. 229).  Finally, the fourth factor counsels in favor of preclusion, because the court anticipates little "possibility of a

continuance" in this case, which has been pending since 2019.  See Softel, 118 F.3d at 961.

Accordingly, the court grants Precision's Motion to Strike Dr. Moll's May 28, 2021 Supplemental Report.

a.     Mr. Rahaim's June 1, 2021 Declaration

Precision filed a Declaration from Mr. Rahaim dated June 1, 2021, in support of its Motion to Strike Dr. Moll's Supplemental Report. See Rahaim June 1, 2021 Declaration (Doc. No. 243-7).  Granite argues that Mr. Rahaim's Declaration should be stricken.  See Granite Opp'n to Precision Mot. to Preclude Granite Experts at 18-20. To the extent that Precision seeks to admit Mr. Rahaim's new opinions from his June 1, 2021 Declaration, the court will strike the Declaration, because it offers new expert testimony, unrelated to Mr. Rahaim's original November 13, 2021 Report (or his subsequent supplemental Reports) about Granite's manufacturing processes, after the close of discovery.  See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC, 477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020), aff'd, No. 20-2805-CV, 2022 WL 151302 (2d Cir. Jan. 18, 2022) (excluding a declaration drafted and filed after the close of discovery).  Such a declaration may be precluded when, as here, it "exceed[s] the bounds of the expert's report."  Id. (citation omitted).  Here, preclusion is the proper sanction, because there is "no substantial justification and the failure to disclose is not harmless." See Design Strategy, Inc, 469 F.3d at 294.

Furthermore, the four Outley factors weigh in favor of preclusion, because: (1) Precision's explanation for Mr. Rahaim's Declaration—to respond to Dr. Moll's Supplemental Report—is now moot because the court is precluding Dr. Moll's Supplemental Report; (2) the Declaration is not important to Mr. Rahaim's testimony,

given that the court has stricken Dr. Moll's Supplemental Report to which the

Declaration responds; (3) the introduction of the Declaration after the close of expert

discovery would unduly prejudice Granite, which has not had the opportunity to depose

Mr. Rahaim regarding his new opinions; and (4) the court does not anticipate a

continuance in this case now that discovery has closed.  See Softel, 118 F.3d at 961.

On balance, factors two, three, and four outweigh Precision's now-moot explanation for

the Declaration, warranting preclusion.  Thus, the court strikes Mr. Rahaim's June 1,

2021 Declaration.[36]

In sum, the court grants Precision's Motion to Preclude Granite's Experts in part

as to Dr. Moll's May 28, 2021 Supplemental Report.  The remainder of the Motion is

denied.  Construing Granite's Opposition as a Motion to Strike Mr. Rahaim's June 1,

2021 Declaration, the court grants the Motion and strikes the Declaration.

F.     Precision Motion to Preclude MDC Damages Expert Mr. Vincent Vizzo
       (Doc. No. 239)

Precision also moves to preclude MDC's damages expert, Vincent Vizzo and

strike his January 29, 2021 Report. See Precision Mot. to Preclude Vizzo (Doc. No.

239).  When the sewer liner failed, raw sewage seeped onto adjacent properties,

causing flooding and damaging homes and yards.  MDC issued payments in the

amount of $1,053,540.15 to reimburse homeowners for their damages.  MDC now

seeks to recoup these damages from Precision. See MDC Opp'n to Precision Mot. to

Preclude Vizzo (Doc. No. 260).

---

[36] The court has ordered that Precision file a Supplemental Report regarding Mr. Rahaim's testimony at his May 3, 2021 Deposition.  See p. 15 n. 7, supra.  To be clear, Precision's Supplemental Report should not extend beyond Mr. Rahaim's Deposition testimony, as his now-stricken June 1, 2021 Declaration does.

MDC's expert, Mr. Vizzo, a licensed Public Adjuster, analyzed MDC's payments to homeowners affected by the sewage backup.  See Vizzo Jan. 29, 2021 Report (Doc. No. 239-3).  Mr. Vizzo's Report explained that the damages fell into four categories: (1) mitigation of sewage  water, or cleaning and removing sewage from homes and yards; (2) structural or building repair; (3) personal property; and (4) additional living expenses. See id. at 1-2.  He opined as to the methodologies applicable to handling each type of claim.  Mitigation claims, structural repairs, and living expenses, he stated, are typically paid dollar-for-dollar.  See id.  On the other hand, he opined that personal property claims may either be paid according to replacement cost or actual cash value of the destroyed items; Mr. Vizzo opined that the choice between replacement cost or actual cash value is "policy dependent."  See id.  After reviewing MDC's payments to homeowners, he opined that MDC applied "commonly accepted" methods to repay mitigation, structural repair, and living expense claims.  See id. at 2.  With respect to personal property, however, he opined that MDC "applied commonly accepted methodologies for the homeowners that had policies which dictated replacement cost for personal property items but did not apply commonly accepted methodologies for the homeowners that had policies which dictated actual cash value for personal property." Id.  To calculate actual cash value, he stated, MDC "would have needed to ask the homeowner for the purchase date" of property or applied a depreciation factor to the personal property items.  Id.  In reaching his opinion, Mr. Vizzo reviewed a spreadsheet of homeowner claims; twenty-three claim files for homeowners affected by flooding and property damage; and the deposition testimony of MDC's Rule 30(b)(6) designees regarding homeowners' claims.  See id.

1.      Mr. Vizzo's Qualifications

Mr. Vizzo is qualified to testify as an expert in this case.  He is a licensed public adjuster and has "worked as consultant to attorneys" to adjust claims against third parties which, like the instant claims, are not governed by insurance contracts.  See Vizzo Depo. at 33.[37]  He has adjusted hundreds of flooding claims, as well as over a hundred claims involving sewage.  Id. at 75-76.  While he stated at his deposition he is "licensed to adjust first-party [insurance-based] claims[,] not third-party claims", he also clarified that no separate license is available to adjust third-party claims.  See id. at 33; 51.  In Mr. Vizzo's role as an adjuster, he has acquired the training and experience to determine whether there is an adequate "basis for the payment" made to a claimant. See id. at 142.  Mr. Vizzo is therefore qualified by his experience and knowledge in the field of claims adjustment to opine as to whether MDC correctly evaluated homeowners' claims in this case.  See Tin Yat Chin, 371 F.3d at 40.

2.      Reliability of Mr. Vizzo's Opinions

Precision argues that Mr. Vizzo's opinions lack reliability.  However, Mr. Vizzo's Report and deposition testimony demonstrate that he applied his specialized experience and training to assess sufficient facts and data to develop his opinions.  See Nicholas, 376 F. Supp. 3d at 290.  He considered claim files, photographs of the damage, deposition testimony regarding homeowner claims, and contractor estimates and invoices to form his opinion that MDC's payments for mitigation, structural repairs, and additional living expenses were justified.  See Vizzo Depo. at 159 (photographs,

---

[37] Mr. Vizzo defines third-party clams as claims where a homeowner "wants to make a claim against someone who caused damages to the home", whereas a first-party claim is a claim where a homeowner has a claim "against an insurance company."  Vizzo Depo. at 33-34.

contractor estimates and invoices); 186 (photographs, estimates, amounts paid); Vizzo

Report at 1-2 (spreadsheet of homeowners claims, claim files, deposition testimony of

David Rutty and Richard Freeman).  On the basis of the same data, he stated that

MDC's payments for personal property were paid on a replacement cost basis, and that

MDC would have needed additional information to repay homeowners for the actual

cash value of their destroyed personal property. See Vizzo Report at 2.  Because Mr.

Vizzo formed his opinions by applying his training to the facts and data of the case, his

opinions are not "speculative" or "conjectural" and should not be precluded on that

ground.  See Boucher, 73 F. 3d at 21.

Precision also contends that Mr. Vizzo's opinions are unreliable because he

allegedly "applied the wrong measure of damages – replacement value instead of actual

cash value."  See Precision Mem. in Support of Mot. to Preclude Vizzo at 7.  However, it

is clear from Mr. Vizzo's Report as well as his deposition that he did not "apply"

replacement value.  Rather, he acknowledged that MDC repaid homeowners' personal

property claims on a replacement cost basis.  See Vizzo Jan. 29, 2021 Report at 1-2.

Indeed, his Report states that MDC "did not apply commonly accepted methodologies"

for cash value repayments, because MDC "would have needed to ask the homeowner

for the purchase date" of property or applied a depreciation factor to the personal

property items.  Id.  The court therefore will not preclude Mr. Vizzo's opinions on the

ground that he allegedly applied the incorrect measure of damages, because he did not

do so.[38]

_____

[38] The court is puzzled by Precision's Motion to Preclude, as it seeks to exclude the entire Report
and testimony of Mr. Vizzo, yet only raises an argument that applies to one type of damages Mr. Vizzo
discusses: personal property damages. Precision has not argued that MDC or Mr. Vizzo applied the

3.      Relevance of Mr. Vizzo's Opinions

Precision also argues that Mr. Vizzo's opinions are not relevant and would not be helpful to the trier of fact.  Courts have held that a damages expert's testimony should be precluded where such "analysis would not assist in understanding the evidence or determining a fact in issue", or where his "methodology reflects the sort of 'apples and oranges' comparison that should be rejected as irrelevant on the issue of damages." Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 392 F. Supp. 3d 382, 400–01 (S.D.N.Y. 2019) (precluding an expert who employed the incorrect methodology to calculate damages) (citation and quotation marks omitted).  As discussed in the following subsections, some of Mr. Vizzo's opinions invite such 'apples and oranges' comparisons and warrant preclusion.

a.      Inadmissible or Partially Admissible Opinions

Because they will not assist the trier of fact, the court will preclude some limited aspects of Mr. Vizzo's testimony as irrelevant.  First, to the extent that Mr. Vizzo offers testimony regarding homeowners' insurance policies, his opinions are irrelevant to the instant case.  See, e.g., Vizzo Report at 2 ("personal property reimbursement is policy dependent . . .").  MDC provided no insurance policy to homeowners and did not issue its payments pursuant any such policy.  See MDC Opp'n to Precision Mot. to Preclude Vizzo at 7.  While MDC argues that "Mr. Vizzo should still be allowed to reference the principle that is applicable under various scenarios and the negotiation process that occurs in adjusting", the court's exclusion of his testimony regarding homeowners'

---

improper standard for assessing the other three kinds of damages Mr. Vizzo identifies in his Report: structural repair, mitigation claims, or living expenses.

policies does not bar him from discussing relevant adjusting methods; Mr. Vizzo may explain the principles and processes relevant to adjusting claims without referencing the individual insurance contracts of the homeowners, which have no bearing on this case. See id.  Therefore, Mr. Vizzo's testimony regarding the insurance contracts held by homeowners is precluded as irrelevant.  See Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful." (citation and quotation marks omitted)).

Furthermore, to the extent that MDC would seek to have Mr. Vizzo opine that a particular method for assessing damages is the correct measure of damages in this case, he oversteps his role as an expert witness.[39]  While expert testimony is relevant where it "assist[s] the trier of fact", see Daubert, 509 U.S. at 591, an expert may not communicate "a legal standard—explicit or implicit—to the jury." Hygh, 961 F.2d at 364; see also In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (collecting cases) (precluding expert testimony on purported ethical standards for pharmaceutical companies).  Whether the proper measure of personal property damages in this case is actual cash value or replacement cost is a matter of law and is not within the province of expert testimony. See, e.g., In United States ex rel. N. Maltese & Sons, Inc. v. Juno Construction Corp., 759 F.2d 253, 255 (2d Cir.1985) ("Although the

---

[39] At his deposition, Mr. Vizzo correctly maintained that he could not testify to the appropriate measure of damages in this case:

> Precision Counsel: And is that an appropriate measure of damages in this case where there's no insurance policy in place?
>
> Mr. Vizzo: I believe that's a legal question that I don't think I'm obligated –- I can't answer that question.

Vizzo Depo. at 19.

amount of recoverable damages is also a question of fact, the measure of damages upon which the factual computation is based is a question of law." (citations omitted)); The Topps Co. v. Cadbury Stani S.A.I.C., No. 99 CIV. 9437 (CSH), 2006 WL 176995, at *6 (S.D.N.Y. Jan. 20, 2006) (holding that an expert's opinion that damages were "best measured" by "reasonable royalty" rather than other methods expressed an opinion on a question of law.).  Accordingly, Mr. Vizzo may not opine that "replacement cost", "actual cash value", or "dollar-for-dollar" repayment is the correct measure for any particular category of damages.  However, he may offer his opinions as to whether MDC's "factual computation" of damages was correct or in conformity with standard adjusting practices given the applicable legal measure of damages as determined by the court. For instance, he may opine as to the types of payments that MDC actually made to homeowners; whether claims were categorized properly; and whether the payments made for claims in each of those categories conformed with standard adjusting practices on the basis of his experience. See Vizzo Report at 1-2.

b.    Admissible Opinions

Mr. Vizzo's opinions regarding the dollar amounts of MDC's personal property reimbursements to homeowners and the methods that MDC employed to determine those dollar amounts are admissible, because they are relevant to the fact finder's damages determination.

Here, the correct measures of damages are established by Connecticut law.[40] For personal property claims, Connecticut courts measure damages according to the

---

[40] In Precision's Motion for Summary Judgment as to the measure of personal property damages and MDC's Opposition, the parties have briefed the relevant measure of personal property damages. See Doc. Nos. 254 and 278.  The parties have not, however, submitted briefing as to the correct measure of

actual cash value of the lost property.  See Wasko v. Manella, 87 Conn. App. 390, 399 (2005) ("Where total loss of personal property has occurred, damages are measured by the fair value of the property at the time that it was destroyed."). Mr. Vizzo's opinions regarding personal property claims are relevant to the fact finder's damages assessment.  Mr. Vizzo opines that MDC paid $209,392.77 in personal property claims; that MDC's personal property damages payments were made on a replacement cost basis; and that MDC would have needed further information to pay actual cash value. See id.  This information is helpful to the trier of fact for at least two reasons.  First, it explains the basis upon which MDC actually issued payments to claimants.  Second, replacement value may be used to determine actual cash value, when depreciation is accounted for.  See, e.g., R & P Realty Co. v. Peerless Indem. Ins. Co., 193 Conn. App. 374, 377 (2019) ("Generally, the 'actual cash value' of a loss is the cost of repairing or replacing the loss, less depreciation, whereas the 'replacement cost' of a loss is the actual cost of repairing or replacing the loss without a deduction for depreciation."). Because these opinions will be helpful to the finder of fact in assessing the issue of damages, they are relevant and the court will not preclude them for a lack of relevance.[41]

---

the other categories of damages.  Moreover, in its Motion to Preclude, Precision objects to Mr. Vizzo's application of "replacement cost", which Mr. Vizzo discussed only in relation to personal property damages.  See Precision Mot. to Preclude Vizzo at 7-9.  The court therefore only addresses the relevance of Mr. Vizzo's opinions pertaining to personal property damages in this Ruling.

[41] To the extent that Precision contends that MDC cannot prove personal property damages on the basis of Mr. Vizzo's opinion—i.e., that MDC does not have sufficient facts or data to determine the actual cash value of the destroyed personal property—this is properly addressed in a Motion for Summary Judgment, not a Motion to Preclude expert testimony.  Precision has filed such a Motion, see Precision Mot. for Summary J. Against MDC (Doc. No. 254), which the court addresses in its Ruling on the pending Motions for Summary Judgment.

In sum, the court grants in part Precision's Motion to Preclude Mr. Vizzo's testimony, precluding his testimony regarding homeowners' insurance policies and the proper measure of damages in this case. As to the remainder of Mr. Vizzo's opinions, Precision's Motion to Preclude is denied.

G.    MDC Motion to Preclude Precision Damages Expert Mr. John J. Fleming (Doc. No. 238)

MDC moves to preclude Precision's damages expert, licensed independent claim adjuster John J. Fleming. See MDC Mot. to Preclude Fleming (Doc. No. 238). Like Mr. Vizzo, Mr. Fleming offered opinions as to the propriety of MDC's damages payments to homeowners affected by the sewage backlog. In his Report dated November 13, 2020, he opined that "(1) [MDC] did not obtain critical information about the personal property being claimed; (2) [MDC] paid replacement cost instead of actual cash value, which is completely inconsistent with Connecticut adjustment practices and proper claims handling and management; and (3) [MDC] failed to mitigate any damages." See Fleming Report at 3 (Doc. No. 238-2). To reach these opinions, he referenced a spreadsheet of homeowner claims, the deposition statements of MDC's Rule 30(b)(6) witnesses, and documents produced by MDC related to MDC's payments to homeowners. Id. at 2-3. Mr. Fleming also opined at his May 6, 2021 deposition that the amount MDC should have paid homeowners in damages was between $500,000 and $550,000. See Fleming Depo. at 134-35 (Doc. No. 238-3).[42]

---

[42] After Mr. Fleming's May 6, 2021 deposition (Doc. No. 231-3), MDC filed a Motion to Compel testimony and documents it alleged Precision withheld during the deposition. The court issued an Order on July 6, 2021, granting in part MDC's Motion and permitting MDC's counsel to depose Mr. Fleming again regarding "the questions posed on pages 155 line 11-13 and 161 line 17-20 of John Fleming's May 6, 2021 deposition transcript." See Order (Doc. No. 292). The court presumes that MDC therefore has had the opportunity to depose Mr. Fleming regarding those questions: (1) "[W]ere you told by counsel to exclude your opinion as to value from the report" and (2) "[W]ho asked you after you filed your report to

MDC does not argue that Mr. Fleming is unqualified to offer his opinions, and the court agrees that he is qualified to testify to the issue of damages in this case on the basis of his experience as a licensed claim adjuster.  See Fleming CV at 9 (Doc. No. 238-2).  Rather, MDC contends that Precision and Mr. Fleming attempted to "sandbag" MDC by intentionally excluding Mr. Fleming's damages estimate of $500,000 to $550,000 from his Report and failing to submit any Supplemental Report.  MDC thus seeks a "limited preclusion" of Mr. Fleming with regard to his testimony "as to the value of the damages suffered by the affected homeowners due to the collapse of the sanitary sewer liner, an opinion that is not contained in his November 13, 2020 report."  See MDC Mem. in Support of Mot. to Preclude Fleming at 12 (Doc. No. 238-1).

The court agrees that, because Mr. Fleming offered no opinion regarding the amount of Precision's damages in his Report and has provided no reasons or basis for the dollar value he offered during his deposition, he should be precluded from offering such opinions at trial.  Nowhere on the record has Mr. Fleming provided an explanation for the $500,000 and $550,000 values he cited at his deposition.  See Fleming Depo. at 134-35.  While Precision was ordered to produce documents regarding Mr. Fleming's opinion as to the cash value of claims, those documents are not before the court, and thus, the court cannot determine that he relied on sufficient facts or data or employed a reliable methodology to reach his opinion.  See Order (Doc. No. 292).  He has not filed

---

provide an opinion as to the value of the MDC claim after the November -- after the filing of the November 2020 expert disclosure report?" See Fleming Depo at 155, 161. Furthermore, Precision was ordered to produce the documents responsive to MDC's Motion to Compel on or before July 30, 2021. See Order (Doc. No. 292). In the absence of any filings to the contrary, the court presumes that Precision has complied with the court's Order and that MDC is now in possession of any relevant documents. However, no such documents appear to have been docketed or entered into the record before the court.

a supplemental report pursuant to Federal Rule of Civil Procedure 26(a).  See Fed. R.

Civ. P. 26(a)(2)(E) (creating a duty to supplement).  Thus, the court has no grounds on

which to find his opinion reliable and admissible, or to determine that it extends beyond

mere speculation.  See, Riegel, 451 F.3d at 127 ("An expert opinion requires some

explanation as to how the expert came to his conclusion and what methodologies or

evidence substantiate that conclusion.").[43]

        While MDC's Motion is limited to seeking preclusion of the dollar value of Mr.

Flemming's assessment of MDC's damages, "[t]he Court has the authority to raise

Daubert concerns sua sponte in order to fulfill [its gatekeeping] obligation." ROMAG

Fasteners, Inc. v. Fossil, Inc., Civil No. 3:10cv1827(JBA), 2014 WL 1246554, at *2 (D.

Conn. Mar. 24, 2014); Brenord v. Catholic Med. Ctr. of Brooklyn & Queens, Inc., 133 F.

Supp. 2d 179, 188 & n.4 (E.D.N.Y. 2001) (engaging in analysis of expert under Daubert

sua sponte and collecting cases where courts did the same). To the extent that Mr.

Fleming testifies to the "proper standard" for adjusting personal property loss claims,

see Fleming Nov. 13, 2020 Report at 2, he effectively offers an opinion as to the legal

standard applicable to determining damages in this case.  See pp. 68-71, supra

(precluding MDC's expert, Mr. Vizzo, from offering an opinion regarding the proper

measure of damages in this case).  The court will therefore preclude Mr. Fleming's

opinion that actual cash value rather than replacement value is the "proper measure" of

damages in this case.

---

        [43] Precision's failure to comply with Rule 26 also warrants the strict sanction of preclusion on the basis of the Outley factors. While the value of homeowners' damages is important to Precision's case, Precision has not explained its failure to comply.  Furthermore, MDC has been prejudiced by Mr. Fleming's last-minute and partial disclosure, which ultimately required MDC to file and litigate a Motion to Compel. The court also does not anticipate a continuance. See Softel, 118 F.3d at 961.

Accordingly, MDC's Motion to Preclude a limited portion of Mr. Fleming's testimony is granted as to Mr. Fleming's estimate of the dollar value of damages MDC should have paid to homeowners.  Mr. Fleming is also precluded from opining as to the correct legal measure of damages in this case.

## V.   CONCLUSION

As explained above, the Motions are resolved as follows:

Granite's Motion to Preclude Precision's Expert Kaleel Rahaim (Doc. No. 233) is granted in part and denied in part.  The Motion is granted in part as to the following opinions listed in Rahaim's November 13, 2021 Report: the fourth (insufficient calibration of machinery at Granite's facilities, except that Mr. Rahaim may testify as to the QA/QC protocols pertaining to calibration), and the sixth (that the liner was not properly saturated with resin at "certain points" during the wet out).  Granite's Motion is also granted to the extent that it seeks to strike Mr. Rahaim's June 28, 2021 Report.  Furthermore, to the extent that Precision intends, on direct examination at trial, to elicit from Mr. Rahaim an opinion as to his May 3, 2021 deposition statements regarding resin viscosity, the court orders Precision to file a supplemental disclosure in compliance with Rule 26 with regard to the opinion as Mr. Rahaim stated it during his deposition, along with citations to the deposition.  The Motion to Preclude is denied as to the remainder of Mr. Rahaim's opinions and testimony.

Granite's Motion to Preclude Precision's Expert Mark Knight (Doc. No. 234) is granted in part and denied in part.  The Motion is granted in part as to Dr. Knight's twelfth opinion on page 29 of his November 13, 2020 Report, that "[t]he evidence establishes that there [sic] nothing that Precision did that would have caused or

contributed to the liner failure", and his opinion on page 26 of his November 13, 2020 Report that "the evidence establishes that Precision did not do anything that would have created the issue that resulted in the liner failure." Further, to the extent that Precision intends to elicit opinions regarding Dr. Knight's deposition testimony as to puncture holes or resin on the liner's exterior, the court orders Precision to file a Supplemental Report stating Dr. Knight's opinions as he stated them during his deposition. The Motion is denied as to the remainder of Dr. Knight's testimony.

Saertex's Motion to Preclude Precision's Experts Mark Knight and Kaleel Rahaim (Doc. No. 237) is granted in part and denied in part. The Motion is granted in part to the same extent that Granite's Motions to Preclude Kaleel Rahaim and Dr. Mark Knight are granted. The remainder of the Motion to Preclude is denied.

Precision's Motion to Preclude Granite's Experts Dr. Jericho Moll and Dr. Antonios Vytiniotis (Doc. No. 243) is granted in part and denied in part. The Motion is granted as to Dr. Moll's May 28, 2021 Supplemental Report. Further, Granite is ordered to file a Supplemental Report identifying which opinions in the Exponent Report are attributable to each expert. The Supplemental Report should include, for each opinion, citations to the expert's deposition where the expert has testified he or she is responsible for the opinion. The remainder of the Motion is denied. Construing Granite's Opposition (Doc. No. 261) as a Motion to Strike Mr. Rahaim's June 1, 2021 Declaration, the court grants the Motion and strikes the Declaration.

Precision's Motion to Preclude MDC's Damages Expert Vincent Vizzo (Doc. No. 239) is granted in part as to his testimony regarding homeowners' insurance policies

and the proper measure of damages in this case.  As to the remainder of Mr. Vizzo's opinions, Precision's Motion to Preclude is denied.

MDC's Motion to Preclude Precision's Damages Expert John J. Fleming (Doc. No. 238) is granted in part as to Mr. Fleming's estimate of the dollar value of damages MDC should have paid to homeowners.  Mr. Fleming is also precluded from opining as to the correct measure of damages in this case.  The remainder of the Motion is denied.

Granite's Motion to Seal (Doc. No. 262) portions of certain exhibits (Doc. Nos. 261-2, 261-9) is granted, because the court did not rely upon the redacted information in resolving the underlying Motion to Preclude (Doc. No. 243).

**SO ORDERED.**

Dated at New Haven, Connecticut this 28th day of February 2022.


  /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge