**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PRECISION TRENCHLESS, LLC, | : | CIVIL CASE NO. |
| ET AL., | : | 3:19-CV-0054 (JCH) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SAERTEX MULTICOM LP, ET AL., | : | FEBRUARY 28, 2022 |
| Defendant. | : | |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 246, 253, 254, 255, & 256) AND MOTION TO FILE A SUR-REPLY (DOC. NO. 309)**

## INDEX

I.      Introduction ................................................................................. 2

II.     Background ................................................................................. 3

III.    Legal Standard ........................................................................... 5

IV.     Discussion .................................................................................. 6

    A.   Granite's Motion for Summary Judgment (Doc. No. 246) as to Precision's Complaint (Doc. No. 1) ............................................................... 6

    B.   Saertex's Motion for Summary Judgment (Doc. No. 256) as to Precision's Complaint (Doc. No. 1) ............................................................. 13

    C.   Precision's Cross Motion for Summary Judgment (Doc. No. 253) as to the Insurance Companies' Intervenor Complaint (Doc. No. 67) .................... 42

    D.   Precision's Motion for Partial Summary Judgment against MDC as to Personal Property Damages (Doc. No. 254) ........................................... 56

    E.   Ludlow's Motion for Partial Summary Judgment (Doc. No. 255) as to MDC's First Amended Complaint (Doc. No. 92) ...................................... 62

V.      Conclusion ............................................................................... 87

I.    **INTRODUCTION**

This consolidated action arises out of property damage caused by the failure of a newly installed pipe liner that was supposed to rehabilitate and reinforce an existing sewer pipe in West Hartford, Connecticut.  The parties to this action are: (1) the Metropolitan District Commission ("MDC"), the specially chartered Connecticut municipal corporation that commissioned the pipe repair project; (2) Ludlow Construction Company, Inc. ("Ludlow"), MDC's general contractor; (3) The Charter Oak Fire Insurance Company ("Charter Oak") and Travelers Property Casualty Company of America ("TPCCA") (collectively, "the Insurance Companies"),[1] Ludlow's insurers; (4) Precision Trenchless, LLC ("Precision"), Ludlow's subcontractor; and (5) Saertex multiCom LP ("Saertex") and Granite Inliner, LLP ("Granite"), the manufacturers of the failed liner.  The parties have filed various multi-count Complaints and counterclaims against each other, as well as several Motions to preclude expert testimony.  The court has addressed seven pending Motions to Preclude in a separate Ruling.  See Feb. 28, 2022 Ruling on Motions to Preclude (Doc. No. 320).

---

[1] As the court has observed previously, in briefing, the Insurance Companies obfuscate the relationship between Charter Oak and TPCCA by designating "Travelers" as the shorthand reference for Charter Oak, forgoing a shorthand reference for TPCCA, but then also designating "Travelers" as the shorthand for referring to Charter Oak and TPCCA collectively.  See, e.g., The Insurance Companies' Opp'n to Precision Mot. for Summary J. as to the Insurance Companies at 1 (Doc. No. 277).

Although the Insurance Companies argue in their Opposition that "Charter Oak, a subsidiary of Travelers, issued the payments at issue", they also contend (erroneously, in this court's view), that "[Charter Oak] and [TPCCA] are one in [sic] the same." Id. at 13. Curiously, the Insurance Companies then acknowledge on the very same page that the two entities are distinct "subsidiaries of The Travelers Indemnity Company." See id. Therefore, the court continues to address Charter Oak and TPCCA as separate entities, each of which issued distinct policies to Ludlow.  See id. In future briefing, the court expects that counsel for the Insurance Companies will clearly distinguish between Charter Oak and TPCCA.

Now before the court are: (1) Granite's Motion for Summary Judgment (Doc. No. 246) as to Counts Two, Five, and Six of Precision's Complaint against Granite (Doc. No. 1) sounding in product liability, indemnification, and negligence; (2) Saertex's Motion for Summary Judgment (Doc. No. 256) as to Counts One, Two, Three, Four, Five and Six of Precision's Complaint (Doc. No. 1) against Saertex sounding in breach of contract, product liability, breach of the warranty of merchantability, breach of the implied warranty of fitness, common law indemnification, and negligence; (3) Precision's Cross Motion for Summary Judgment (Doc. No. 253) as to all ten Counts of the Insurance Companies' Intervenor Complaint (Doc. No. 67) sounding in failure to indemnify, failure to defend, failure in performance, negligence, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, common law indemnification, failure to procure or provide third-party insurance coverage, and equitable subrogation; (4) Precision's Motion for Summary Judgment against MDC as to personal property damages (Doc. No. 254); and (5) Ludlow's Motion for Partial Summary Judgment (Doc. No. 255) as to Counts One, Eight, and Ten of MDC's First Amended Complaint (Doc. No. 92) sounding in failure of performance, equitable subrogation, and common-law indemnification. The court also addresses (6) the Insurance Companies' Motion to File a Sur-Reply (Doc. No. 309).

## II.    BACKGROUND

The factual and procedural background relevant to this Ruling have largely been laid out in the court's September 22, 2021 Ruling on the Insurance Companies' Motion for Partial Summary Judgment as to Precision (Doc. No. 102), MDC's Motion for Partial Summary Judgment as to Ludlow (Doc. No. 122), and MDC's Motion for Partial Summary Judgment as to Precision (Doc. No. 129).  See Sept. 22, 2021 Ruling on

Mots. for Summary J. at 2-10 (Doc. No. 310).  Assuming the parties' familiarity with the facts and posture of this case, the court will provide only a short overview here.

A.     Factual Background

On September 27, 2016, MDC, a specially chartered Connecticut municipal corporation, hired Ludlow, a Massachusetts construction company, as its general contractor to perform sanitary sewer rehabilitation on certain sewer lines within MDC's system.  Ludlow subcontracted with Precision, a New York company specializing in the trenchless rehabilitation of pipes, to perform water and sanitary sewer main replacement on MDC's behalf.  Precision, in turn, contracted with Saertex, a North Carolina company, to manufacture a liner to be used in the pipe repair.  Saertex made the liner, then shipped it to Granite,[2] a manufacturer in Indiana, to complete the manufacturing process by infusing the liner with resin—a process referred to as "wetting out."  Precision installed the Type-S Saertex UV-liner with infused resin inside the existing sewer pipe on May 14, 2018.  Less than five months later, on October 3, 2018, the liner collapsed, resulting in sewer blockages and sewer water backup into nearby homes and yards, causing property damage.

B.     Procedural Background

Because the procedural history of this matter is detailed in the court's prior Ruling the court provides only a short list of its prior Rulings.  See Sept. 22, 2021 Ruling on Mots. for Summary J. at 2-10. To date, the court has issued three Rulings on various parties' Motions for Summary Judgment and Reconsideration.  First, on March 12,

---

[2] Granite was formerly known as Layne Inliner. For the purposes of this Ruling, the court refers to the entity as Granite.

2020, the court issued a Ruling on Ludlow's Motion for Partial Summary Judgment as to Precision.  Mar. 12, 2020 Ruling on Ludlow's Mot. for Partial Summary J. as to Precision (Doc. No. 89).  Precision filed a Motion for Reconsideration, which the court denied in a March 31, 2020 Ruling.  See Mar. 31, 2021 Ruling on Precision's Mot. for Reconsideration (Doc. No. 99).  Lastly, the court issued its September 22, 2021 Ruling on the Insurance Companies' Motion for Partial Summary Judgment as to Precision, MDC's Motion for Partial Summary Judgment as to Ludlow, and MDC's Motion for Partial Summary Judgment as to Precision.  See Sept. 22, 2021 Ruling on Mots. for Summary J.

Now, the court considers five Motions or Cross Motions for Summary Judgment.t.

## III.   LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all

ambiguities and draw all inferences in favor of the party against whom summary judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

"[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning."  Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  Under Connecticut law, "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . .  Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms."  Valente v. Securitas Security Servs., USA, 152 Conn. App. 196, 209 (2014); see also Cruz v. Visual Perceptions, LLC, 311 Conn. 93, 101 (2014) ("When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact.  Where there is definitive contract language, however[,] the determination of what the parties intended by their contractual commitments is a question of law." (citation and brackets omitted)).

## IV.   DISCUSSION

A.   Granite's Motion for Summary Judgment (Doc. No. 246) as to Precision's Complaint (Doc. No. 1)

Granite seeks summary judgment as to Counts Two, Five, and Six of Precision's Complaint (Doc. No. 1) sounding in product liability, indemnification, and negligence. See Granite Motion for Summary J. as to Precision (Doc. No. 246).  In support of its Motion, Granite contends that Precision's claims in Counts Two, Five, and Six are

insufficiently pled, see id. at 8-12, and that Precision has failed to introduce sufficient evidence to prove that the liner was defective when manufactured.  See id. at 12-18.

      1.      Whether Precision's Claims in Counts Two, Five, and Six are Properly Pled

           a.        Counts Two and Six: Product Liability and Negligence

Granite first argues that summary judgment is warranted because Precision pled its product liability and negligence claims separately rather than pleading them together under the Connecticut Product Liability Act ("CPLA"), Section 52-572m et. seq. of the Connecticut General Statutes.  See Granite Mot. for Summary J. as to Precision at 10-12.  Under Connecticut law, the CPLA provides the "exclusive remedy" for products liability claims, and "bars separate common law causes of action" in product liability cases.  See Fraser v. Wyeth, Inc., 857 F. Supp. 2d 244, 252 (D. Conn. 2012).  However, where a plaintiff alleges multiple, separate product liability counts, courts generally read those counts "as though they had been pled together under the CPLA."  See Liberty Mut. Ins. Co. v. Howmet Casting & Servs., Inc., No. 3:15-CV-01408 (VAB), 2016 WL 5661999, at *2 (D. Conn. Sept. 29, 2016) (collecting cases); see also Densberger v. United Techs. Corp., 297 F.3d 66, 70 (2d Cir. 2002) ("Common law theories . . . rather than being preempted by the CPLA, are incorporated into the statute unless they are expressly inconsistent with it."); LaMontagne v. E.I. Du Pont De Nemours & Co., Inc. ("LaMontagne II"), 41 F.3d 846, 855–56 (2d Cir.1994) (holding that the common law provides theories for recovery under the CPLA, and that "the CPLA . . . apparently was not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail"); Lamontagne v. E.I. Du Pont de Nemours & Co. ("LaMontagne I"), 834 F. Supp. 576, 587 (D. Conn. 1993) ("it is clear that the CPLA

7

preserves the common law theories of product liability that were available before its

passage"), aff'd, 41 F.3d 846 (2d Cir. 1994); Bourke v. MAN Engines & Components,

Inc., 303 F. Supp. 3d 227, 231 (D. Conn. 2018) (treating plaintiff's two separate breach

of warranty claims as one CPLA claim, even where plaintiff asserted no express CPLA

claim).  The court will, therefore, follow the same practice and construe Precision's

standalone product liability and negligence claims in Counts Two and Six as a single

claim under the CPLA asserting two different theories of liability.

Granite also contends that Count Two is inadequately pled because it contains

no allegations against Granite.[3]  See Granite Mot. for Summary J. as to Precision at 9.

However, the Count's heading—"Product Liability – Saertex and Inliner"—makes clear

that the allegations pertain to Granite—whose full name is Granite Inliner—as well as

Saertex.  See Precision Compl. at p. 6.  Furthermore, the Complaint's body, which

Precision incorporates into Count Two, alleges that "Saertex contracted with Inliner to

perform the wet-out (infusion) process for the Liner", and that, "[a]s a result of Saertex

and/or Inliner's negligent manufacture of the Liner, the Liner collapsed and caused

---

[3] Where, as here, defendants argue that they are entitled to summary judgment because a claim is insufficiently pled, courts evaluate the motion under the Rule 12(b)(6) standard. See Myers v. Moore, 326 F.R.D. 50, 59 (S.D.N.Y. 2018) (gathering cases). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the non-movant's favor. See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020). However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678.

The court notes, however, that Precision's counsel inexplicably asserts that the proper pleading standard is found in Conley v. Gibson, 355 U.S. 41 (1957).  See Precision Opp'n to Granite Mot. to Dismiss.  Of course, the Supreme Court abrogated Conley in Twombly in 2007.  Twombly, 550 U.S. 544; see also Iqbal, 556 U.S. 662.  Citing an overruled case is a violation of counsel's duty as to this court. The court applies the correct standard here.

sanitary sewer back-up and substantial property damage." See Precision Compl. at ¶¶ 25, 33. Thus, drawing all reasonable inferences in Precision's favor, the product liability claim in Count Two (which the court construes as part of a CPLA claim) contains plausible allegations against Granite and is adequately pled.

b.      Count Five: Common Law Indemnification

Precision's common law indemnification claim in Count Five of the Complaint is also sufficiently pled.[4] Under Connecticut law, a party alleging common law indemnification must plead the following four elements:

> (1) the [third] party against whom the indemnification is sought was negligent; (2) [the third] party's active negligence, rather than the defendant's own passive negligence, was the direct, immediate cause of the accident and the resulting [harm]; (3) the [third] party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the [third] party's negligence, had no reason to anticipate it, and reasonably could rely on the [third] party not to be negligent.

Pellecchia v. Connecticut Light & Power Co., 139 Conn. App. 767, 771 (2012). Precision has alleged that Granite's negligence in manufacturing the liner was the direct, immediate cause of the damages arising from the liner's failure. See Precision Compl. at ¶¶ 69-72. Factual allegations in the body of the Complaint support Precision's allegations of manufacturing negligence, including allegations that the liner had insufficient resin as a result of manufacturing errors. See id. at ¶¶ 31-32. Precision has further alleged that Granite controlled the manufacturing process to the exclusion of Precision, and that Precision did not know of Granite's negligence. See id. at ¶¶ 73-74.

---

[4] The CPLA has not abrogated common law indemnification within the context of product liability claims. See Malerba v. Cessna Aircraft Co., 210 Conn. 189, 196 (1989); cf. Kyrtatas v. Stop and Shop, Inc. 205 Conn. 694 (1988) (holding that the CPLA abrogated common law indemnification actions between co-defendant product sellers, like Granite and Saertex in this action).

Thus, Precision has plausibly stated a claim for common law indemnification in Count Five.

        2.        Substantive Grounds for Summary Judgment

Turning to the substance of Precision's claims, Granite contends that the record contains no evidence on the basis of which a reasonable juror could determine that (1) a defect existed at the time of the liner's manufacture, or (2) the liner reached Precision with no change in condition.  <u>See</u> Granite Mem. in Support of Mot. for Summary J. as to Precision at 13-18.

        a.        <u>Whether the Liner was Defective at the Time of Manufacture</u>

Both theories of product liability asserted by Precision in Counts Two (strict product liability) and Six (negligence) require a showing that the product was defective. A product liability claim requires proof of five elements:

> (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in the condition.

<u>Giglio v. Connecticut Light & Power Co.</u>, 180 Conn. 230, 234 (1980).  Whether such a product liability claim is brought under a theory of strict liability or negligence, the plaintiff must prove that the product was defective.  <u>Bifolck v. Philip Morris, Inc.</u>, 324 Conn. 402, 438 (2016).

Precision's common law indemnification claim in Count Five also requires a showing of the defendant's negligence.  <u>See</u> <u>Sherman v. Corcella</u>, No. 3:19-CV-1889 (CSH), 2021 WL 4441937, at *2 (D. Conn. Sept. 28, 2021) ("A plaintiff may only prevail on a claim for common law indemnification against another tortfeasor who is liable for

negligence"). Precision's allegations against Granite in support of its common law indemnification claim in Count Five sound in negligent manufacturing. See Precision Compl. at ¶ 72 ("[Granite's] negligence in manufacturing the Liner . . . was the direct, immediate cause of the damages . . . ."). To prove Granite's negligence in manufacturing the liner—a necessary element of Precision's Count Five common law indemnification claim—Precision must show that the product was defective. See Bifolck, 324 Conn. at 438.

Granite contends that evidence in the record—including records showing machine settings during the liner's wet-out process and the weight of the liner after production—proves that the liner was not defective when it left Granite's facilities. See id. at 14. Further, Granite argues that a lack of "competent expert proof dooms Precision's claims in this resin science case." See id. at 13. However, this court has declined to preclude much of the testimony of Precision's expert's, Dr. Knight and Mr. Rahaim. See Feb. 28, 2022 Ruling on Motions to Preclude (Doc. No. 320). Admissible testimony of Precision's experts creates a genuine issue of material fact as to whether the liner was defective at the time of manufacture. For instance, Dr. Knight opines that "the [liner's] low resin content is consistent with a defect in the liner wet out process performed by Granite Inliner that occurred prior to the shipment of the liner to the site for installation by Precision. This conclusion is supported by the large variation in resin content, density and flexural properties found in the testing of the failed liner during this investigation and visual observation of the failed liner sections." See Knight Nov. 13, 2020 Report at 29 (Doc. No. 234-1). Thus, a reasonable juror could determine on the

basis of evidence in the record, including expert testimony, that the liner was defective at the time it left Granite's manufacturing facilities.

b.      <u>Whether the Liner's Condition Changed Before Reaching Precision</u>

Granite also contends that there is no genuine issue of material fact as to whether "[t]he liner was punctured by Precision during installation. There was a substantial change in the liner's as-manufactured condition." <u>See</u> Granite Mem. in Support of Mot. for Summary J. as to Precision at 13-18. However, the cause and significance of puncture marks in the liner is disputed. As Precision's expert, Dr. Knight testified at his deposition, although holes were evident on the liner, those holes were indicative of "sections of liner that had no resin." <u>See</u> Knight Depo. at 139-140 (Doc. No. 234-2). He further opines that the post-installation liner video showed the liner to be "in good condition and properly installed." <u>See</u> Knight Nov. 13, 2020 Report at 29. "Precision properly installed and cured the liner" he offers, citing the results of his flexural, density, and strength measurements of the liner. <u>See id.</u> at 17-25. Thus, there is a genuine issue of material fact as to whether the liner's condition changed substantially after manufacture, and evidence in the record upon which a reasonable juror could find that it did not.

Accordingly, because genuine issues of material fact exist, and because the record contains sufficient evidence upon which a reasonable fact finder could determine that (1) the liner was defective when manufactured, and (2) the liner reached Precision

and was installed without a substantial change in condition, Granite's Motion for Summary Judgment is denied.[5]

B.   Saertex's Motion for Summary Judgment (Doc. No. 256) as to Precision's Complaint (Doc. No. 1)

Saertex moves for summary judgment as to Precision's Complaint.  See Saertex Mot. for Summary J. as to Precision (Doc. No. 256).  In its Complaint, Precision asserts six causes of action against Saertex related to the manufacture of the liner: (1) Breach of Contract; (2) Product Liability; (3) Breach of Implied Warranty of Merchantability; (4) Breach of Implied Warranty of Fitness for a Particular Purpose; (5) Common Law Indemnification; and (6) Negligence. See Precision Compl. (Doc. No. 1).

In its Motion, Saertex seeks summary judgment on several grounds. First, Saertex argues that the law of North Carolina, rather than Connecticut, should govern Precision's claims arising from its agreement to purchase the liner from Saertex (the

―――――――――――――

[5] In its Reply, Granite argues that Precision's Response to Granite's Statement of Facts violates Local Rule 56 and, thus, paragraphs 8, 9, and 12 of Granite's Statement of Facts should be deemed admitted for the purpose of this Motion.  See Granite Reply to Precision Opp'n to Granite Mot. for Summary J. as to Precision at 1-2 (Doc. No. 297).

Paragraph eight states that Granite's wet-out notes for the liner indicate that Granite set the machine to the correct Saertex specifications, that the wet-out speed was set to .8 m/min, that the nip rollers were set to a gap of 17 mm, and that the tower saturation time was 5 minutes.  See Precision Reply Statement of Facts at ¶ 8 (Doc. No. 280).  Paragraph nine states that Granite "confirmed the liner was infused with the specified amount of resin by comparing the resin weight in the tail end of the liner and the total amount of resin added to the liner with the specification." Id. at ¶ 9.  The twelfth paragraph states that "on October 3, 2018, approximately five months after installation, a section of the liner approximately collapsed."  Id. at ¶ 12.  In its response, Precision denied the eighth and ninth paragraphs, stating "[t]here is no way to verify any of the machine settings for the wet-out process", see ¶ 8, and, perfunctorily, "disputed", see ¶ 9.  However, Precision failed to provide a specific citation to a witness's affidavit or other admissible evidence as required by Local Rule of Civil Procedure 56(a)3, citing only generally to Mr. Rahaim's deposition. See id. at ¶¶ 8, 9.  In response to the twelfth paragraph, Precision responded only, "??????" and cited no evidence.  See id. at ¶ 12.

Precision's responses do not comply with the requirements of Local Rule 56.  However, the court has concluded that, even if paragraphs 8, 9, and 12 of Granite's Statement of Facts were admitted, Dr. Knight's and Mr. Rahaim's reports would still raise genuine issues of material fact as to whether the liner was defective when manufactured and whether it reached Precision without a substantial change in condition.  See pp. 10-13, supra.

"Sales Agreement").  <u>See</u> Saertex Mem. in Support of Mot. for Summary J. as to

Precision at 6-13.  Second, Saertex argues that, if Connecticut law applies, Precision's

Complaint is deficiently pled, because Precision asserts no claims under the CPLA.

<u>See</u> <u>id.</u> at 16-17.  Finally, Saertex argues that there are no issues of material fact and

the evidence in the record could not support a reasonable juror's finding in Precision's

favor with respect to any Count.  <u>Id.</u> at 6.

        1.        The Sales Agreement Between Saertex and Precision

The parties dispute which terms are included in the Sales Agreement, although

several documents passed between Saertex and Precision over the course of

Precision's purchase of the liner.  On March 13, 2018, Precision emailed a purchase

order ("Purchase Order #987") to Saertex for the liner.  <u>See</u> Precision Local Rule

56(a)(2) Statement of Facts ("Precision SOF") at ¶ 1; <u>see also</u> Purchase Order #987

(Doc. No. 265-8).  Purchase Order #987 specified the product,  price, and quantity

purchased by Precision.[6]  Six days later, on March 19, 2018, Saertex emailed Precision

an order confirmation ("Order Confirmation #3902367") for Purchase Order #987.  <u>See</u>

Precision SOF at ¶ 2; <u>see</u> <u>also</u> Order Confirmation #3902367 (Doc. No. 265-6).

Precision contends that the sale of the liner was completed on March 19, 2018,

with the exchange of Purchase Order #987 and Order Confirmation #3902367.  <u>See</u>

Precision SOF at ¶ 6.  Saertex, however, contends that it sold the liner to Precision on

May 8, 2018, when it shipped the liner to Precision.  <u>See</u> Saertex SOF at ¶ 6; Saertex

Invoices (Doc. No. 256-4 at 4, 6) (dated May 07, 2018, and May 08, 2018).  The parties

---

[6] Purchase Order #987 specified the following: the unit price ($67.82/foot),  the product (Saertex-LINER Type S, DN 675 (27")/WT 7, UV-Liner with UP Resin), and the quantity (684.00 linear feet). <u>See</u> Purchase Order #987.

agree that Saertex emailed Precision four invoices, as well as the Terms and Conditions, on May 16, 2018—after the liner's May 14, 2018 installation.  See Precision SOF at ¶¶ 6, 9; Saertex Invoices (Doc. No. 256-4).

Two of the invoices attached to Saertex's May 16, 2018 email reference Purchase Order #987: Invoices 9002980 (May 07, 2018) and 9002981 (May 08, 2018). See Saertex Invoices at 4, 6.  At the bottom of each invoice, a short paragraph states: "We thank you for placing this order.  We confirm your order regarding the exclusive validity of our general business conditions which are attached on the backside of the order confirmation."  Id.  at 5, 7.  Along with the invoices, Saertex's May 16, 2018 email included a document titled "Saertex multiCom LP – Terms and Conditions of Sale and Services" ("Terms and Conditions"), which contained the following choice-of-law provision (the "Choice-of-Law Provision"):

> 17. Choice of Law, Forum, Venue, and Consent to Jurisdiction. Any dispute or claim relating to PRODUCTS sold shall in all respects be governed by and construed according to the laws of the State of North Carolina, excluding its conflict of law principles . . . .

Terms and Conditions at ¶ 17 (Doc. No. 256-4 at 13).

### 2.    Choice of Law

Saertex contends that North Carolina law should govern the Sales Agreement and any claims arising from the Sales Agreement, pursuant to the Choice-of-Law Provision.  See id. at 8-13; see also Terms and Conditions at ¶ 17.  Precision, by contrast, argues that Connecticut law should apply, because (1) the Choice-of-Law Provision was not properly incorporated into the Sales Agreement between Precision and Saertex; (2) the Terms and Conditions do not form a part of the Sales Agreement under Section 2-207 of the Uniform Commercial Code; (3) the liner was already

installed by the time Precision received the Terms and Conditions; and (4) no evidence of the parties' course of dealing indicates that the Terms and Conditions govern Precision's claims.  See 22-30.  Thus, Precision argues, Connecticut Law should apply under the "most significant relationship test" set forth in the Restatement (Second) Conflict of Laws.  See Precision Opp'n to Saertex at 20 (Doc. No. 284).

Because the product liability laws of North Carolina and Connecticut conflict, the court must determine which state's law applies.  See Rosenthal v. Ford Motor Co., 462 F. Supp. 2d 296, 304 (D. Conn. 2006) ("Considering that North Carolina does not recognize strict liability for product liability claims while Connecticut has retained it as a theory for recovery, the court must" conduct a conflict-of-law analysis).  The court will follow Connecticut's conflict-of-law rules, because the court sits in diversity jurisdiction. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Connecticut law generally respects parties' contracted-for choices of law.  See Elgar v. Elgar, 679 A.2d 937 (Conn. 1996) (adopting Restatement (Second) of Conflict of Laws § 187); see also Wylie v. Powerscreen Int'l Distribution, Ltd., No. 3:16-CV-00464 (CSH), 2018 WL 4854625, at *4 (D. Conn. Oct. 5, 2018) (same).  Here, Precision argues that the Choice-of-Law Provision was not properly incorporated into the Sales Agreement and does not govern the parties' claims.  See Precision Opp'n to Saertex Mot. for Summary J. as to Precision at 22-30.  Therefore, before applying the Choice-of-Law Provision, the court must determine whether the Provision was actually incorporated into the Sales Agreement between Precision and Saertex, either by reference or through the parties' prior course of dealings.

a.      Incorporation by Reference of the Choice-of-Law Provision

As a threshold matter, the Choice-of-Law Provision does not govern which state's law applies to resolve the incorporation question.  As the Second Circuit has observed, "[t]he validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."  Fin. One. Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 332 (2d Cir. 2005). "Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."  Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012); see also Edmundson v. City of Bridgeport Bd. of Educ., No. CV196083811S, 2019 WL 5066951, at *2 (Conn. Super. Ct. Sept. 18, 2019) (same).  Thus, the court applies the law of the "relevant forum", here Connecticut, to determine whether the Choice-of-Law Provision was incorporated into the parties' Sales Agreement.  Fin. One, 414 F.3d at 332; see also Laterra v. GE Betz, Inc., No. 3:17-CV-00057-VAB, 2017 WL 3485505, at *5 (D. Conn. Aug. 14, 2017) (collecting cases in which courts look to the choice-of-law rules of the forum state to resolve the question of a contract's formation).  In this instance, however, the court need not resolve the "typically thorny choice-of-law question", see Laterra, 2017 WL 3485505, at *5, because North Carolina and Connecticut courts take substantively similar approaches to analyzing contract formation.

i.      Ambiguity in Incorporating Language

Under the law of both states, a contact incorporates documents it expressly references.  See Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 637 (2016) ("When a contract expressly incorporates a document by reference . . .

17

that document becomes a part of the parties' agreement."); <u>566 New Park Assocs., LLC</u> <u>v. Blardo</u>, 97 Conn. App. 803, 810–11 (2006) ("Generally, incorporation by reference of existing documents produces a single contract which includes the contents of the incorporated papers.").  However, both Connecticut and North Carolina courts require the language of the contract to express the parties' intent to incorporate the terms of the additional document.  As the Supreme Court of Connecticut has held :

> Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties . . . . The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. <u>The question is not what intention existed in the minds of the parties but what intention is expressed in the language used</u>.

<u>See</u> <u>E & F Construction Co., Inc. v. Rissil Construction Associates, Inc.</u>, 181 Conn. 317, 319–20 (1980) (emphasis added); <u>see also</u> <u>Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.</u>, 362 N.C. 269, 273–74 (2008) ("[a]n ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations . . . ."); <u>see also</u> <u>Montessori Children's House of Durham</u> 244 N.C. App. at 637 (2016) (declining to find that a tuition agreement incorporated terms on a school's website where the tuition agreement did not expressly refer to the website).

Here, the language incorporating the Terms and Conditions into the Sales Agreement between Precision and Saertex is, at best, ambiguous as to the parties' intent.  Twice over the course of the liner's sale, Saertex emailed Precision documents containing a short paragraph stating, "[w]e thank you for placing this order.  We confirm your order regarding the exclusive validity of our general business conditions which are

attached on the backside of the order confirmation." <u>See</u> Saertex Invoices at 5, 7;

Saertex Order Confirmation #987.  Saertex first sent the paragraph printed on the liner's

Order Confirmation on March 1, 2018.  <u>See</u> Order Confirmation #3902367.  The parties

agree, however, that no "general business conditions", nor any other documents, were

attached to that email or on the back side of the Order Confirmation.  <u>See</u> Saertex

Reply SOF at ¶ 8 (Doc. No. 304-1).  Saertex did not send Precision any further

language purporting to incorporate any conditions until its May 16, 2018 email—

delivered after the liner's installation in West Hartford—containing the liner's invoices.

<u>See</u> Precision SOF at ¶¶ 6, 9; Saertex Invoices at 5, 7.  The invoices contained the

same short paragraph, ending: "[w]e confirm your order regarding the exclusive validity

of our general business conditions which are attached on the backside of the order

confirmation." <u>See</u> Saertex Invoices at 5, 7.  Attached to this May 16, 2018 email were

Saertex's Terms and Conditions, titled "Saertex MultiCom LP – Terms and Conditions of

Sale and Services." <u>See</u> Terms and Conditions; Precision SOF at ¶¶ 6.

Saertex's vague language confirming Precision's order "regarding the exclusive

validity of our general business conditions which are attached on the backside of the

order confirmation" offers little guidance as to the parties' intent.  No conditions

whatsoever were attached to the March 1, 2018 Order Confirmation.  <u>See</u> Saertex

Reply SOF at ¶ 8.  While Saertex did attach its Terms and Conditions of Sale and

Services to the May 16, 2018 email, the only language purporting to incorporate terms

or conditions referred to Saertex's "general business conditions which are attached on

the backside of the order confirmation." <u>See</u> Saertex Invoices at 5, 7.  The May 16,

2018 email contained no order confirmation, but rather four <u>invoices</u>.  <u>See</u> Saertex

19

Invoices.  Again, no conditions were attached to the <u>Order Confirmation</u>, which Saertex

sent on March 1.  Furthermore, to the extent that the phrase "attached on the backside

of the order confirmation" could reasonably be construed to refer to the Terms and

Conditions attached to the May 16, 2018 email containing <u>invoices</u>, the May 16 email

containing such Terms and Conditions was delivered after the liner's May 14, 2018

installation in West Hartford.  <u>See</u> Precision SOF at ¶¶ 6, 9; Saertex Invoices (Doc. No.

256-4).  Thus, the "circumstances connected with the transaction" do not reflect an

intention to incorporate the terms by reference into the agreement.  <u>See</u> <u>E & F</u>

<u>Construction Co.</u>, 181 Conn. at 320.  Thus, the court cannot determine, on summary

judgment, that the parties intended to incorporate the Terms and Conditions or the

Choice-of-Law Provision into their Sales Agreement.

ii.      Section 2-207 of the Uniform Commercial Code

Even if the language purporting to incorporate the Terms and Conditions into the

Sales Agreement were not ambiguous, courts in Connecticut and North Carolina limit

the circumstances under which a party can unilaterally add new terms to an agreement.

To that end, both states have adopted Section 2-207 of the Uniform Commercial Code,

commonly referred to as the "battle of the forms."[7]  Under Section 2-207, additional

terms sent from one merchant to another generally become part of the contract, even in

the absence of the receiving party's express consent.  <u>See, e.g.</u>, <u>Frances Hosiery Mills,</u>

<u>Inc. v Burlington Industries, Inc.</u>, 285 N.C. 344, 356 (1974) ("When, as is stipulated

---

[7] Saertex's argument that the Terms and Conditions are the only "form" that passed between the
parties is without merit.  <u>See</u> Saertex Reply to Precision Opp'n to Saertex Mot. for Summary J. as to
Precision at 5.  The parties undisputedly exchanged Order Confirmation #3902367 and Purchase Order
#987 before Saertex sent the invoices and Terms and Conditions to Precision.  <u>See</u> pp. 14-15, <u>supra</u>.

here, the parties to the contract are 'merchants,' . . . , all such proposed additional

terms, to which the other party does not object in due time, become part of the contract,

unless 'they materially alter it.'") (citing N.C. Gen. Stats. § 25-2-207); Cnty. Fire Door

Corp. v. C.F. Wooding Co., 202 Conn. 277, 287 (1987) ("General Statutes § 42a–2–

207(2) provides: 'The additional terms are to be construed as proposals for addition to

the contract. Between merchants such terms become part of the contract unless: (a)

The offer expressly limits acceptance to the terms of the offer; (b) they materially alter it;

or (c) notification of objection to them has already been given or is given within a

reasonable time after notice of them is received.'").  Crucially, though, such additional

terms do not become a part of the contract if they "materially alter it."  Id.

Here, Saertex emailed Precision an invoice, after the liner had been

manufactured, shipped, and installed, which contained a paragraph stating "[w]e confirm

your order regarding the exclusive validity of our general business conditions which are

attached on the backside of the order confirmation."  See Saertex Invoices.  Attached to

the same email were the Terms and Conditions, including the Choice-of-Law Provision.

See Precision SOF at ¶ 7; Saertex Invoices.  The Terms and Conditions were not

attached to Saertex's earlier, March 1, 2018 email containing Order Confirmation #987

for the liner's purchase.  See Saertex Reply SOF at ¶ 8.  North Carolina and

Connecticut courts have held the belated addition of a clause limiting the scope or

forum of a party's future claims constitutes a "material alteration."  See, e.g., Frances

Hosiery Mills, Inc., 285 N.C. 344, 355-358 (holding, where an arbitration clause was

included in an invoice sent by the seller, and the buyer neither signed the invoice nor

manifested consent to the new terms, the terms were additional terms that materially

altered—and thus did not become a part of—the agreement between the parties); <u>see also</u> <u>Nesbitt Div., Mestek, Inc. v. Magnolia</u>, No. CV 980579571S, 1998 WL 951026, at *4 (Conn. Super. Ct. Dec. 21, 1998) (determining a forty-five-day limitation for submission of claims on the reverse side of a letter acknowledging receipt of a purchase order was a material alteration when the limitation was excluded from the earlier purchase order and accompanying documents).  In this case, the record contains no evidence that the parties agreed—over the course of their communications regarding the liner before Saertex sent the invoices on May 16th, 2018—to adjudicate their claims under North Carolina law.  <u>See</u> Order Confirmation #987; Saertex Reply SOF at ¶ 8. Thus, because a reasonable juror could determine that the Choice-of-Law Provision materially altered the parties' agreement and that Precision did not manifest consent to its terms, the court cannot determine as a matter of law that the Provision was incorporated into the Sales Agreement by reference.

b.      <u>Incorporation by Course of Dealing of the Choice-of-Law Provision</u>

Although evidence in the record could support a reasonable juror's finding that the Terms and Conditions are not incorporated by reference into the Sales Agreement, the court must also consider whether the Terms and Conditions are included in the Agreement by virtue of the parties' prior course of dealing.  Both North Carolina and Connecticut law recognize a course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  Conn. Gen. Stat. § 42a-1-303; N.C. Gen. Stat. § 25-1-303 (same).  A course of dealing may bind a buyer to the terms of a contract where a

manufacturer repeatedly sends a buyer order confirmations or invoices containing the same standard language, even if the buyer does not respond.

To establish that a course of dealing existed between the parties, Saertex offers the deposition testimony of Zach Halter, Saertex's employee responsible for processing purchase orders and order confirmations.  See Halter Depo. at 164-65 (Doc. No. 285-1). He attests that he produced "approximately 190" invoices for liners purchased by Precision.  Further, he states that "all of the[ invoices]" included the Terms and Conditions sent to Precision in connection with the West Hartford pipe repair project. See id.; see also Saertex Mem. in Support of Mot. for Summary J. as to Precision at 10.

Precision, however, points out that Mr. Halter expressed some uncertainty as to where Saertex's general business conditions could be found.  See Halter Depo. at 97-98; 122-124.  More importantly, Mr. Halter did not testify as to when or how the prior invoices were allegedly sent.  Nor does Mr. Halter's testimony or the record evidence indicate that the parties have ever invoked any of the Terms and Conditions over the course of their relationship.  Thus, the court cannot determine that there is no material issue of fact as to whether Saertex's purported repeated sending of the Terms and Conditions "establish[ed] a common basis of understanding or interpreting" the instant Sales Agreement. Conn. Gen. Stat. § 42a-1-303; N.C. Gen. Stat. § 25-1-303 (same); cf. RBC Nice Bearings, Inc. v. SKF USA, Inc., 318 Conn. 737, 757, 123 A.3d 417, 429 (2015) (upholding the trial court's finding that parties' course of dealing indicated an intent to waive contractual terms when one party undisputedly waived the terms in six of the previous eight years of the parties' business relationship);  GATX Logistics, Inc. v. Lowe's Companies, Inc., 143 N.C. App. 695, 699, 548 S.E.2d 193, 196 (2001)

(determining that a contract entered into after the disputed agreement did not evince a course of dealing, nor could the court determine whether the terms of another, earlier contract were sufficiently similar to establish a course of dealing as a matter of law).

Given the issues of fact as to the circumstances of Precision and Saertex's previous agreements for liners, the court cannot conclude as a matter of law that the Terms and Conditions are incorporated into the Sales Agreement in accordance with the parties' prior course of dealings.  Because the court cannot determine that the Terms and Conditions are incorporated into the Sales Agreement, the court cannot conclude that the Choice-of-Law Provision in the Terms and Conditions applies to the Sales Agreement.  Thus, at the summary judgment stage, the court cannot rely on the Choice-of-Law provision to determine which law governs the parties' contract.

c.       "Most Significant Relationship" Test

In the absence of a choice-of-law provision, the court must follow Connecticut's choice-of-law rules and apply the Second Restatement's "Most Significant Relationship" test.  See  W. Dermatology Consultants, P.C. v. VitalWorks, Inc., 322 Conn. 541, 552, 153 A.3d 574, 581 (2016) ("the most significant relationship test outlined in §§ 6 (2) and 145 of the Restatement (Second) of Conflict of Laws is the proper test to apply in tort actions to determine which state's law applies.").  To assess which state has the most significant relationship to the instant action, courts consider seven overarching factors set forth in Section 6(2) of the Second Restatement:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Am. States Ins. Co. v. Allstate Ins. Co., 282 Conn. 454, 467 (2007).  Section 145 of the

Second Restatement offers further guidance in applying Section 6 to tort disputes,[8]

establishing five contacts to consider:

> "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

Restat. 2d, § 145(2).

Weighing the Section 145(2) contacts, the injury occurred in Connecticut, where

the liner collapsed.  See Saertex SOF at ¶ 10.  As for Section 145(2)(b), "the place

where the conduct causing the injury occurred", Precision's product liability claims are

based on the allegation that the liner was defective when manufactured in North

Carolina and wet-out in Indiana.  See Precision Compl. at ¶¶ 45-49.  Therefore, the

products liability claim is premised on acts that occurred, in part, in North Carolina, and

not in Connecticut.  With regard to the third contact, the parties' places of business,

incorporation or domicile, Saertex is a North Carolina entity with its principal place of

business in North Carolina, see Saertex Answer to Precision Compl. at ¶ 4 (Doc. No.

17), while Precision is a New York entity with its principal place of business in New

York.  Precision Compl. at ¶ 2.  Neither party has an "enduring relationship" with

Connecticut.  See Restat.2d, § 145 at cmt. e.  As for the final factor, where the

relationship between the parties is centered, the liner was ordered and manufactured for

---

[8] Saertex concedes that North Carolina and Connecticut law do not conflict with respect to breach of contract claims. Thus, a conflict-of-law analysis is not warranted for Precision's breach of contract claims. Furthermore, Saertex's contention that "North Carolina law should nonetheless govern Precision's breach of contract claim" makes little sense, given that Saertex admits there is no distinction between North Carolina law and Connecticut law governing such claims. See Saertex Mem. in Support of Mot. for Summary J. at 7 n. 2.

the West Hartford pipe repair project, and Precision ultimately took possession of it and installed it in Connecticut.  See Saertex SOF at ¶¶ 1, 8.  Thus, considering the relevant contacts, the first and fourth appear to favor Connecticut, while the second and third favor North Carolina.

However, "it is the significance, and not the number, of § 145(2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach."  W. Dermatology Consultants, 322 Conn. at 560 (2016).  Thus, the court must also apply the relevant Section 6 guidelines, (a) through (f), to evaluate the "relative importance" of each Section 145(2) contact "with respect to the particular issue."  Id.; See also Rosenthal v. Ford Motor Co., 462 F. Supp. 2d 296, 303 (D. Conn. 2006).  Here, the particular issue is whether Precision may assert a theory of strict product liability against Saertex.  Because Sections 6 (d), (e), and (f) are "of lesser importance in the field of torts",  Restat.2d, § 145 at cmt. b, the four remaining factors that are listed in Section 6 "assume greater importance."  Id.[9]  Thus, this court will consider factors 6 (a), (b), and (c) most closely in its choice-of-law analysis.

Section 6(a), the "needs of the interstate and international systems", aims, in part, "to facilitate commercial intercourse between [the states]." Restat.2d, § 6(a) & cmt. d.  However, in this case, it is "doubtful that this court's choice of law decision will have any bearing on this goal", see Rosenthal, 462 F. Supp. 2d at 303, given that the parties' dispute arises from a single transaction for the liner, and its resolution is unlikely to either dissuade or encourage future buyers and sellers. Therefore, factors (b) and (c),

---

[9] The Second Restatement also makes clear that Section 6(g), ease in determination and application of the law to be applied, "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results." Restat.2d, § 6 at cmt. j.

the relevant policies of the forum state and other interested states, are most

determinative here.

With respect to the policies of the forum state, Connecticut, the place where the

injury occurred, has a strong interest in applying its standards to Precision's claims.[10]

The Restatement prescribes a presumption in favor of applying the law of the place of

property injury. See id. at § 147.[11]  In such cases:

> [T]he place where the injury occurred is a contact that, as to most issues,
> plays an important role in the selection of the state of the applicable law
> . . . . This is so for the reason among others that persons who cause injury
> in a state should not ordinarily escape liabilities imposed by the local law of
> that state on account of the injury.

Restat.2d, § 145 at cmt. e.[12]  Here, the law of Connecticut permits plaintiffs to bring a

CPLA count alleging multiple theories of liability, including strict liability.  See Conn.

Gen. Stats. § 52-572m (defining a product liability claim to include "[s]trict liability in

tort").  North Carolina law, by contrast, precludes causes of action for strict liability.  See

N.C. Gen. Stat. Ann. § 99B–1.1 ("There shall be no strict liability in tort in product

liability actions").  Thus, applying North Carolina law here would produce a result

---

[10] The court notes that while the Second Restatement specifies that the place of injury may not
weigh heavily where it "can be said to be fortuitous" or to "bear[ ] little relation to the occurrence and the
parties with respect to the particular issue",  Restat.2d, § 145 at cmt. e, the liner's installation and failure
in Connecticut was anything but arbitrary.  Rather, the liner was manufactured on request by Saertex for
Precision for use in the West Hartford pipe repair project.  See Saertex SOF at ¶¶ 1-9; see also Purchase
Order #987 (Doc. No. 285-2) (stating the job title "MDC Montcla[ ]ir and Linbrook"—the names of the
streets where the liner was installed).

[11] "In an action for an injury to land or other tangible thing, the local law of the state where the
injury occurred determines the rights and liabilities of the parties unless, with respect to the particular
issue, some other state has a more significant relationship under the principles stated in § 6 to the
occurrence, the thing and the parties, in which event the local law of the other state will be applied."
Restat.2d, § 147.

[12] Finally, applying the law of Connecticut, the place of injury "furthers the choice-of-law values of
certainty, predictability and uniformity of result and, since the state where the injury occurred [is] readily
ascertainable, of ease in the determination and application of the applicable law." See Restat.2d, § 147
cmt. e.

contrary to Connecticut's public policy, which seeks to defray the costs to persons injured by a manufacturer's injured products.  See Bifolck v. Philip Morris, Inc., 324 Conn. 402, 414 (2016) ("A primary justification for imposing strict liability has been that, as between the injured consumer and the manufacturer who has derived the economic benefits from the sale of the product, the latter is better able to insure against the risk and can pass that cost along to all consumers.").

North Carolina, the state where the liner was manufactured, has a lesser interest than Connecticut in applying its law in the present case.  This court has considered North Carolina's interests in declining to adopt a strict product liability regime in a prior decision, explaining:

> [T]hough not recognizing strict liability, North Carolina's product liability law "expresses no interest in regulating the conduct of the defendant, but rather limits the liability exposure to which his conduct subjects him." O'Connor, 201 Conn. at 654, 519 A.2d 13. As comment e to Restatement § 146 (relating to personal injury)[13] advises, an important factor in the "most significant relationship" analysis is to look at the purpose sought by the particular tort rule:
>
> [I]f the relevant local rule of the state where the injury occurred would impose absolute liability upon the defendant, it is probable that this state is seeking by means of this rule to insure compensation for the injured person . . . . If, on the other hand, the defendant would enjoy a special immunity for his conduct under the local law of the state of injury, it is not clear that the interests of this state would be furthered by application of its rule.
>
> Restat.2d, § 146 at cmt. e (emphasis added). Although North Carolina's rejection of strict liability does not actually create a "special immunity," it does theoretically serve as an immunity by protecting defendants against product liability claims based on strict liability.

---

[13] While Comment e to Restatement § 146 applies to personal injury actions, Comment e of Section 147, pertaining to injuries to tangible things, also instructs that the purpose sought to be achieved by the tort rule should be considered "[f]or reasons stated in § 146." See Restat.2d § 146 cmt. e.

See Rosenthal, 462 F. Supp. at 305.  The North Carolina General Assembly's Legislative Research Division has explained that the purpose of North Carolina's Products Liability Act is to protect business interests within the state.[14] See Washington v. Trinity Indus., Inc., No. 1:15-CV-517, 2017 WL 752166, at *7 (M.D.N.C. Feb. 27, 2017) (collecting cases).  While Connecticut's strict liability regime creates a mechanism to hold manufacturers responsible for harms to persons and property and to compensate those injured in the state, North Carolina's rule offers an escape valve, frustrating the purpose of Connecticut's strict liability policy.

Finally, applying the law of Connecticut, the place of injury, "furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the state where the injury occurred [is] readily ascertainable, of ease in the determination and application of the applicable law."  See Restat.2d, § 147 cmt. e.

On balance, the court concludes that Connecticut has the "most significant relationship" to the instant claims, and Connecticut law must be applied to the products liability claims at issue in the Motion for Summary Judgment.

---

[14] In a 1981 Report to the North Carolina General Assembly, the Legislative Research Division explained:

> In response to rapidly escalating premiums for products liability insurance and to potential non-availability of such coverage, the 1979 General Assembly enacted comprehensive legislation to remedy these problems . . . . By codifying North Carolina's case law, . . . the General Assembly intended to guarantee the continued availability of products liability insurance coverage to North Carolina manufacturers, wholesalers, and retailers; and thereby assure that these persons would be able to continue their businesses without the fear of large monetary losses and resultant insolvencies, bankruptcies, and cessation of operations.

Products Liability Report to the 1981 General Assembly of North Carolina, at 2. (Jan. 14, 1981) (cited in Washington v. Trinity Indus., Inc., No. 1:15-CV-517, 2017 WL 752166, at *7 (M.D.N.C. Feb. 27, 2017)).

3.     Applying Connecticut Law

Saertex argues that summary judgment is warranted under Connecticut law on all six counts of Precision's Complaint.  As explained below, the court denies summary judgment in full, because the record raises genuine issues of material fact.

a.     CPLA: Product Liability

First, Saertex argues that no reasonable juror could find in favor of Precision on its product liability, breach of contract, negligence, or implied warranty claims because: (1) Precision failed to plead these claims in a single count under the CPLA; and (2) Precision has not offered evidence that the liner was defective at the time of sale or that the liner reached Precision without substantial change in condition.  See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 16-36.

i.     Whether Precision's Claims are Barred Because Precision Failed to Assert a Single CPLA Claim

The court has already considered and rejected Saertex's first argument—that Precision's claims fail because they were not asserted under one CPLA count—in relation to Granite's Motion for Summary Judgment, concluding that the CPLA's exclusivity provision permits multiple theories of product liability under one cause of action.  See pp. 7-8, supra (determining that the court will construe Granite's product liability and negligence counts as one CPLA count asserting two different theories of liability); see also LaMontagne II, 41 F.3d at 855–56 (2d Cir.1994); Lamontagne I, 834 F. Supp. at 587 (D. Conn. 1993) aff'd, 41 F.3d 846 (2d Cir. 1994).   For the same reasons, the court will construe Precision's claims in Counts Two (product liability), Three (breach of implied warranty of merchantability), Four (breach of implied warranty of fitness for a particular purpose) and Six (negligence), as a single cause of action

30

under the CPLA asserting five distinct theories of liability.  Count Five (common law indemnification) does not fall within the scope of the CPLA's exclusivity provision, and the court therefore regards it as a standalone Count.  See p. 9 n. 4, supra.

As to Count One (breach of contract), Saertex appears to argue that Precision's breach of contract claim falls within the scope of the CPLA. Saertex Mem. in Support of Mot. for Summary J. as to Precision at 17; see also Conn. Gen. Stats. § 52-572m(b) (stating that the CPLA provides an exclusive cause of action for products liability claims, including, but not limited to: "Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."  Saertex offers no substantive argument as to why the breach of contract claims should be considered under the CPLA, and the CPLA does not expressly include actions in breach of contract.  The Connecticut Supreme Court has discussed the scope of the CPLA's exclusivity provision to determine whether the statute excluded claims under the Connecticut Unfair Trade Practice Act. See Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 128 (2003).  The Gerrity court established a test for the exclusivity of product liability claims under the CPLA: "[T]he language of the exclusivity provision makes clear that the product liability act was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect. The language of the exclusivity provision, however, suggests that it was not designed to serve as a bar to additional claims . . . either for an injury not caused by the defective product, or if the party is not pursuing a claim for personal injury, death or property damage." Id. (Internal quotation marks omitted).  Accordingly, the Gerrity court

determined that a plaintiff's claims fell outside of the CPLA's scope when the plaintiff pled "financial injury" that was distinct from a claim of personal injury or property damage. See id. at 130-31 (plaintiff forced to pay higher cigarette price because of defendants' deceptive conduct is financial injury and does not fall under CPLA); Ulbrich v. Groth, 310 Conn. 375, 410 (2013) ("[T]he economic loss doctrine [of the CPLA] bars negligence claims that arise out of and are dependent on breach of contract claims that result only in economic loss"); Iodice v. Ward Cedar Log Homes, No. CV126013844S, 2012 WL 6743600, at *2–3 (Conn. Super. Ct. Dec. 5, 2012) (applying Gerrity's reasoning to breach of contract claims).

Here, Precision's breach of contract claim asserts that Precision has suffered damages, see Precision Compl. at ¶ 44, and Precision's prayer for relief seeks money damages. See id. at p. 10. The breach of contract count largely sounds in an action to recover for injuries caused by the defective liner. Thus, for the purposes of this Motion, the court will construe the breach of contract claim as a theory of product liability falling within the scope of the CPLA for the purposes of resolving the instant Motion. However, the determination is of little consequence to the instant motion; the court would not grant summary judgment on Precision's breach of contract claim whether it fell within the scope of the CPLA or not, because the record raises genuine issues of material fact as to whether Saertex breached its contract. See pp. 34-36, infra. Accordingly, summary judgment is not warranted on the ground of Precision's failure to properly plead a CPLA claim.

ii.     Whether the Liner Was Defective at the Time of Sale
or Reached Precision Without Substantial Change in
Condition

The court has also already determined that genuine issues of fact exist as to

whether the liner was defective at the time of sale and reached Precision without

substantial change in condition.  See pp. 10-13, supra (identifying factual issues and

concluding that the record contains evidence from which a reasonable juror could find in

favor of Precision).  Thus, the court declines to grant summary judgment on the ground

of insufficient evidence of either the liner's functionality at the time of sale or its

condition before and after delivery to Precision.

iii.     Theories of Liability

In support of its Motion, Saertex also puts forth several arguments related to

each theory of product liability, which the court addresses in the following subsections.

(a)     Negligence

Saertex contends that Precision has failed to "identify or state what Saertex did

that was negligent and breached its alleged duty to Precision in the manufacture of the

liner."  See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 18-19.

Specifically, Saertex argues that neither of Precision's experts, Dr. Mark Knight and Mr.

Kaleel Rahaim, offers an opinion that Saertex caused the failure.  See Knight Depo. at

203 (responding "I can't answer that question" when asked whether he was prepared to

offer any opinions that Saertex caused the failure); Rahaim Depo. at 142 (answering

"No sir I am not" in response to counsel's question as to whether he was offering any

opinions about Saertex's actions in this matter).

Saertex plainly misrepresents whether Dr. Knight offers any opinions as to

Saertex's negligence.  His Report compares the failed liner samples to Saertex's

33

specifications and ultimately opines that "the root cause of the liner failure is due to Saertex and/or Granite's improper manufacture of the liner . . . ." See Exponent Report at 25 (Doc. No. 243-2).  Because there is evidence in the record raising a genuine issue of material fact as to whether and to what extent Saertex caused the liner's failure, the court denies summary judgment on this ground.[15]

(b)     Breach of Contract

Saertex also moves for summary judgment as to Precision's breach of contract theory.  In its Complaint, Precision alleges that the parties entered into a purchase order agreement, see id. at ¶ 39.  Pursuant to the parties' agreement, Saertex was allegedly responsible for "furnishing a liner consistent with the details set forth in the purchase order" which, Precision claims, included providing "a liner infused with the correct amount of resin to achieve typical manufacturer specified and liner design mechanical properties."  Id. at ¶¶ 40-41.  Saertex argues that undisputed evidence in the record undermines Precision's allegations that Saertex agreed to provide a liner infused with the proper amount of resin.  See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 20-24.

To prove a breach of contract under Connecticut law, a party must prove five elements: "formation of an agreement, performance by one party, breach of the agreement by the other party[,] damages", Chiulli v. Zola, 97 Conn.App. 699, 706-07

---

[15] The court is puzzled as to why, on pages 34-38 of its Opposition to Saertex, Precision addresses alleged issues with Granite's manufacturing process and argues that "Granite's argument fails" without putting forth an argument as to why Granite's shortcomings should support a finding of negligent manufacture as to Saertex.  See Precision Opp'n to Saertex Mot. for Summary J. as to Precision at 34-38.  Nonetheless, the court has concluded that evidence in the record raises genuine issues of material fact with respect to Saertex's own actions in manufacturing the liner.

(2006) (internal quotation marks omitted), and  "causation."  Meadowbrook Ctr., Inc. v.

Buchman, 149 Conn. App. 177, 186 (2014).

The actual terms in the emails between the parties are sparse.  Order

Confirmation #3902367, which Saertex sent to Precision on March 19, 2018, to confirm

the liner order, contains only one reference to resin: "UV-Liner with UP-Resin."  Order

Confirmation #3902367.  However, the Order Confirmation as well as the Purchase

Order for the liner contained terms including price, quantity, and limited physical

specifications for the liner's weight and length.  See Purchase Order # 987; Order

Confirmation #3902367; see also Saertex Reply SOF at ¶ 4 ("Purchase Order #987

contained the physical details for the liner to be purchased by Precision").  On the face

of the contract, based on the record before the court, Saertex provides no guarantee of

a "proper amount of resin."

However, even if Saertex did not agree to provide a liner containing a specified

amount of resin, it is undisputed that Saertex did agree to provide a liner with a standard

thickness of 7 millimeters.  See Saertex Reply SOF at ¶ 2.  Precision expert Dr. Knight's

report indicates that his measurement of the liner samples showed deviation from the

7mm standard:  "The installed Saertex Type-S liner is shown on the Precision Invoices

to have a wall thickness of 7mm. Field measurements of the liner indicate that the

installed wall thickness was typically 8 to 10mm which is greater than 7mm."  See

Exponent Report at 24.  Thus, notwithstanding any question as to whether Saertex

agreed to furnish a Liner with appropriate levels of resin, Precision's breach of Contract

claim is supported by evidence in the record upon which a reasonable juror could find

that Saertex did not deliver a liner that conformed to the undisputedly agreed-upon 7-

millimeter specifications.  Accordingly, the court denies summary judgment as to Precision's breach of contract claim.

> (c)     Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose

Saertex also moves for summary judgment as to Precision's theories sounding in breach of the implied warranties of merchantability and fitness for a particular purpose. Under Connecticut law, both implied warranties are created by statute.  <u>See</u> Conn. Gen. Stat. §§ 42a-2-315, 42a-2-315.[16]  To establish breach of the implied warranty of fitness for a particular purpose, a party must establish: "(1) that the seller had reason to know of the intended purpose and (2) that the buyer actually relied on the seller." <u>Hartford Cas. Ins. Co. v. PureTech Waters of Am.</u>, LLC, No. CV116021419S, 2012 WL 1435221, at *2 (Conn. Super. Ct. Mar. 30, 2012).  As for the implied warranty of merchantability, a

---

[16] The statutes state:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose.

Conn. Gen. Stat. § 42a-2-315 (Implied warranty of fitness for a particular purpose)

(1) Unless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any.
(3) Unless excluded or modified as provided by section 42a-2-316 other implied warranties may arise from course of dealing or usage of trade.

Conn. Gen. Stat. § 42a-2-314 (Implied warranty of merchantability)

party must prove: "(1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, and (3) injury and damages to the plaintiff or his property (4) [were] caused approximately and in fact by the defective nature of the goods, and (5) [that] notice [was given] to the seller of injury."  See 1 J. White & R. Summers, Uniform Commercial Code (4th Ed.1995) § 9–7, pp. 510–11 (cited as "listing elements required to prove breach of implied warranty of merchantability" in Krack v. Action Motors Corp., 87 Conn. App. 687, 693 (2005)).

Saertex argues that Precision cannot prove it notified Saertex of the liner's failure.  See Saertex Mem. in Support of Summary J. as to Precision at 24-26. However, evidence in the record raises genuine issues of material fact as to whether Precision notified Saertex.  An email dated Sunday, October 7, 2018—four days after the Liner's October 3, 2018 failure—from Saertex employee Mark Hallett [17] states that Precision's onsite Superintendent was in contact with Mr. Hallett after the liner's failure:

> Precision Trenchless had a Saertex Liner fail on their MDC West Hartford, CT project sometime [on] Wednesday, causing severe flooding of the area and many homes. There are very few details available at this time. What I know so far is a 27" Saertex liner installed sometime in June, 2018 by Precision, collapsed. I have been in contact with the onsite Superintendent from Precision but there is very little known as to why the liner collapsed . . . .

See Saertex Email (Doc. No. 285-33) (emphasis added).  Moreover, Thomas Adams, Granite's 30(b)(6) witness, acknowledged receiving the email from Mr. Hallett, on October 7.  See Adams Depo. at 122-25 (Doc. No. 285-5). Thus, evidence in the record

---

[17] The record is unclear as to what position Mr. Hallett held at Saertex at the time the email was sent.  However, Zach Halter, a Precision employee, testified that Mr. Hallett's title was Vice President, and he was in charge of the Saertex facility before leaving Saertex. See Halter Depo. (Doc. No. 285-1)

could support a reasonable juror's finding that Saertex was given notice of the liner's failure by Precision.

Saertex also contends that the warranty provided by Saertex for the liner was limited to the contractual language found in the Terms and Conditions. <u>See</u> Saertex Mem. in Support of Mot. for Summary J. as to Precision at 26. However, the court has already concluded that it cannot determine as a matter of law that the Terms and Conditions incorporated by reference into the Sales Agreement between Precision and Saertex. <u>See</u> pp. 17-24, <u>supra</u>. Thus, the court cannot determine, as a matter of law, that the warranty provision contained in the Terms and Conditions is not incorporated into the Sales Agreement to limit the extent of Saertex's warranty.

The remainder of Saertex's arguments as to Precision's warranty theory have already been addressed by this court, namely: (1) the court construes the warranty theory as adequately pled under the CPLA, <u>see</u> pp. 30-32, <u>supra</u>; (2) Precision has offered Dr. Knight's expert testimony as evidence of Saertex's contribution to the liner's failure, <u>see</u> pp. 33-34, <u>supra</u>; (3) issues of material fact exist as to whether the liner was defective when delivered to Precision, <u>see</u> p. 33, <u>supra</u>. Accordingly, the court denies Saertex's Summary Judgment Motion as to Precision's warranty theories.

(d)    Strict Product Liability

Saertex also seeks summary judgment as to Precision's theory of strict product liability. As the court has discussed in relation to Granite's Motion for Summary Judgment, <u>see</u> p.10, <u>supra</u>, a product liability claim must show:

(1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product

was expected to and did reach the consumer without substantial change in the condition.

Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 234 (1980). "Whether a product is unreasonably dangerous is a question of fact to be determined by the jury . . . . [T]he jury can draw their own reasonable conclusions as to the expectations of the ordinary consumer and the knowledge common in the community at large." Giglio v. Connecticut Light & Power Co., 180 Conn. at 235. Furthermore, "[i]t is not necessary that the plaintiff in a strict tort action establish a specific defect as long as there is evidence of some unspecified dangerous condition." Living & Learning Centre, Inc. v. Griese Custom Signs, Inc., 3 Conn.App. at 664.

Saertex argues that Precision cannot prove that the liner was defective and unreasonably dangerous to the user, nor that Precision used (installed) the liner in a manner that was intended and expected by Saertex. However, the expert testimony of Dr. Knight again raises genuine issues of material fact as to whether Precision properly installed the liner. See Knight Report at 25-26 (opining that "[r]eview of the post liner installation video shows that it was properly installed, and that there were no sags or liner section's [sic] that were improperly cured."). Saertex contends that the findings of Granite's expert, Dr. Jericho Moll, and Saertex's expert, Dr. Sebastian, prove that water penetrated the liner, causing resin washout. See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 28. However, the conflicting expert testimony, along with non-expert evidence in the record, see, e.g. Jones Depo. at 58-59 (Doc. No. 256-10) ("there was an infiltration" of water); Woznack Depo. at 81-82 (Doc. No. 285-30) (Precision's light train operator agreeing that there were "no water infiltration issues"), creates a genuine issue of material fact.

Saertex also argues that evidence in the record supports a reasonable juror's finding that Precision caused the liner's failure.  In support of its position, Saertex contends that multiple witnesses testified that Precision failed to use gliding foil to carry out the installation as required by Saertex's standards.  See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 29-30.  However, Saertex cites to only one statement, made by expert Dr. Knight, that he understood that glide foil was not used. See Knight Depo at 216 (stating "my understanding is glide foil was not used during the installation . . . .").  Another witness, Precision employee Mr. Nappi, stated that he could not recall whether glide foil had been used.  See Nappi Depo. at 35 (Doc. No. 285-31). Further, Mr. Woznack, Precision's light train operator, stated that he believed glide foil was used, although he could not specifically recall.  See Woznack Depo. at 51-52 (Doc. No. 285-30).

Lastly, Saertex argues that Precision failed to use proper air pressure of 400 millibars or preserve data pertaining to the installation.  See Saertex Mem. in Support of Mot. for Summary J. as to Precision at 32.  However, whether Precision used proper air pressure is an issue of disputed fact, see Woznack Depo. at 35 ("We know what the liners are supposed to look like as they are curing and the 400 millibars in this particular job is rough. It was acceptable if it was as low as 350 or possibly as high as 450. There was a variation that's allowable.").  As to whether Precision preserved data, Precision does not dispute that the hard drive bearing installation data failed in July 2018.  See Precision Opp'n to Saertex Mot. for Summary J. as to Precision at 39.  However, it is unclear what bearing this has on Precision's product liability claim, and Saertex has cited no authority to explain the relevance of the failed hard drive.

The conflicting evidence in the record cannot be resolved by the court at the summary judgment stage.  Because factual issues exist, the finder of fact must determine whether the liner was defective and whether Precision used the liner in an unintended manner.

### b.  Common Law Indemnification

Saertex seeks summary judgment as to Precision's common law indemnification claim on two grounds.  First, it argues that Precision cannot prove that Saertex was negligent in the manufacture of the liner.  As the court has already addressed, see pp. 33-34, supra, there is evidence in the record that could support a reasonable juror's finding of Saertex's negligence, but the issue turns on questions of disputed material fact. Therefore, the court will not grant summary judgment on this ground.

### c.  Commercial Losses

Lastly, Saertex argues that Precision's claims under the CPLA must fail because Precision alleges to have suffered only commercial losses.  It is true that the CPLA bars recovery for commercial losses.  See Conn. Gen. Stats. § 52–572n(c) ("harm" does not include "commercial loss" caused by a product).  However, as the Connecticut Supreme Court has clearly held, "the term 'commercial loss' does not encompass costs incurred by a commercial party in repairing or replacing a defective product, or in repairing property damage caused by a defective product."  Sylvan R. Shemitz Designs, Inc. v. Newark Corp., 291 Conn. 224, 237–38 (2009).  The losses alleged by Precision thus fall squarely outside the scope of "commercial loss" as defined by the CPLA, because Precision seeks damages stemming from the repair and replacement of the defective liner and from repairing property damage to homes flooded in the wake of the liner's failure.

Saertex inexplicably failed to cite this controlling caselaw to the court in its Memorandum in Support of its Motion for Summary Judgment.  Moreover, Saertex's argument in its Reply—that the <u>Shemitz</u> case does not govern the instant case because Precision has not reimbursed homeowners for repairs nor suffered property damage to products it owns—is unavailing.  <u>See</u> Saertex Reply to Precision Opp'n to Saertex Mot. for Summary J. as to Precision at 10.  The <u>Shemitz</u> Court expressly rejected a lower court's decision that, "because the plaintiff did not own the property that had been damaged", its losses were commercial and outside the scope of the CPLA.  <u>Sylvan R. Shemitz Designs, Inc.</u>, 291 Conn. 224 at 233 (2009) (reasoning that "the [CPLA] expressly contemplates and provides for the allocation of liability along a product's chain of distribution").  Thus, under <u>Shemitz</u>, Precision's losses are not commercial losses and are not barred under the CPLA.

For the reasons explained above, the court denies Saertex's Motion for Summary Judgment as to Precision's Complaint in full.

C.  <u>Precision's Cross Motion for Summary Judgment (Doc. No. 253) as to the Insurance Companies' Intervenor Complaint (Doc. No. 67)</u>

Precision seeks summary judgment as to all ten Counts of the Insurance Companies' Intervenor Complaint (Doc. No. 67) on the grounds that the Insurance Companies are not subrogated to Ludlow and the subcontract between Precision and Ludlow excludes damage to "the work itself."  <u>See</u> Precision Mem. in Support of Mot. for Summary J. as to the Insurance Companies at 1, 10 (Doc. No. 253-1).[18]

---

[18] Because the Insurance Companies have failed to submit a Local Rule 56(a)2 Statement with their opposition papers, Precision's facts, to the extent that they are supported by evidence in the record, are deemed admitted for the purposes of this Motion.  <u>See</u> D. Conn. L. Civ. R. 56(a)1 ("[a]ll material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.").

In resolving this Motion, the court is mindful that the Insurance Companies are two separate entities: Charter Oak and TPCCA.  See Intervenor Compl. at ¶ 5. Furthermore, the court has already granted in part the Insurance Companies' Motion for Summary Judgment (Doc. No. 107) as to Count One of the Insurance Companies' Intervenor Complaint, sounding in failure to indemnify against Precision.  See Sept. 22 Ruling on Mots. for Summary J. (Doc. No. 310).  In its prior Ruling, the court held that Precision owes a duty to indemnify Charter Oak as Ludlow's subrogee.  See id. at 13. The court also held that TPCCA is not subrogated to Ludlow, because the Insurance Companies have "come forward with no evidence that TPCCA made any payments to Ludlow under the Commercial Excess Liability (Umbrella) Policy."  See id. at 12-13. Thus, the court denied the Insurance Companies' summary judgment Motion on the issue of Precision's duty to indemnify TPCCA.  Id.  The court also denied summary judgment as to the issue of damages owed by Precision to Charter Oak. Id. at 14.

       1.     TPCCA

In accordance with the court's September 22, 2021 Ruling, the court grants Precision's Motion for Summary Judgment (Doc. No. 253) as to TPCCA.  As the court noted in its September 22, 2021 Ruling, the Insurance Companies have offered no evidence that TPCCA extended payments to Ludlow under its Commercial Excess Liability Policy.  See Sept. 22, 2021 Ruling on Mots. for Summary J. at 12-13.   Because there is no evidence in the record supporting TPCCA's claim for indemnity, there is no genuine issue of material fact that TPCCA is not subrogated to Ludlow and cannot

"stand in [Ludlow's] shoes" to bring this action. Thus, Precision's Motion for Summary Judgment as to the Intervenor Complaint is granted in full as to TPCCA.

        2.    Charter Oak

The court also grants Precision's Motion for Summary Judgment as to Precision's liability to Charter Oak.  The court determined, in its prior Ruling, that Charter Oak is subrogated to Ludlow, and that Precision owes Ludlow (and Charter Oak, as Ludlow's subrogee) a duty to indemnify.  <u>See</u> Sept. 22, 2021 Ruling on Mots. for Summary J. at 13 (determining that Charter Oak is subrogated to Ludlow and "Precision . . . owes this duty to Charter Oak . . . .").  However, because Precision filed its Cross Motion for Summary Judgment on June 10, 2021, before the court's September 22, 2021 Ruling, the court addresses Precision's arguments that Charter Oak is not properly subrogated to Ludlow.

First, Precision argues that Charter Oak is not subrogated to Ludlow because Charter Oak made "voluntary payments" for damages not covered by Charter Oak's General Commercial Liability Policy (the "Policy Agreement"), which does not extend to "cost to repair or replace the defective work." <u>See</u> Precision Mem. in Support of Mot. to Preclude at 8.  Second, Precision contends that, even if Charter Oak is subrogated to Ludlow, Precision's duty to indemnify Ludlow does not extend to costs to repair or replace the failed liner.  Therefore, Precision argues, Charter Oak, as Ludlow's subrogee, may not recover from Precision costs for the liner's repair or replacement. <u>See</u> Precision Reply to the Insurance Companies' Opp'n to Precision Mot. for Summary

J. as to the Insurance Companies at 4-5; Precision Mot. for Summary J. as to the

Insurance Companies at 10-11.

As the court explained in its September 22, 2021 Ruling, traditional principles of

subrogation allow insurers to step into the shoes of their insured to recover payments

owed to the insured by a liable third-party:

> "Subrogation actions are often brought by insurers . . . . In this context, subrogation is the right of the insurer to be put in the position of its insured so that it may pursue recovery from third parties who are legally responsible to the insured for a loss paid by the insurer." Albany Ins. Co. v. United Alarm Servs., Inc., 194 F. Supp. 2d 87, 93 (D. Conn. 2002). "The general rule is that an insurer's right to subrogation attaches, by operation of law, on paying an insured's loss." Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992). "At that time, the insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, and the insurer succeeds to all the procedural rights and remedies possessed by the insured." Id.

Sept. 22, 2021 Ruling on Mots. for Summary J. at 11-12.  Thus, the court must

determine (1) whether Charter Oak may stand in Ludlow's shoes pursuant to Charter

Oak's Policy Agreement with Ludlow, and (2) whether Precision is "legally responsible"

to Ludlow for a loss paid by Charter Oak.

a.      Whether Charter Oak's Right to Subrogation Attached

First, with respect to Charter Oak's right to act as Ludlow's subrogee, as the

court noted in its September 22, 2021 Ruling, Charter Oak is subrogated to Ludlow

because Charter Oak paid Ludlow $319,109.41 on its claim for reimbursement.  Id. at

12-13.  Charter Oak's Commercial General Liability Policy agreement with Ludlow

plainly refers to a right to subrogation, stating: "If the insured has rights to recover all or

part of or any payment we have made under this Coverage, those rights are transferred

to us." See Charter Oak Commercial General Liability Policy at p. 12, Section IV(8).[19]

Thus, Charter Oak is properly subrogated to Ludlow as to its claims against Precision.

i.      Standing

To the extent that Precision contends that Charter Oak's right to subrogation has

not attached because Charter Oak made "voluntary payments" for damage not covered

by the Policy Agreement, Precision lacks standing to challenge the contract between

Charter Oak and Ludlow. To have standing, a party must face an "injury in fact" that is

both "concrete and particularized." See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

(2016) (internal citation omitted). Here, however, Charter Oak, as Ludlow's subrogee, is

entitled to recover from Precision only to the extent of Ludlow's rights against Precision.

Were Charter Oak not subrogated to Ludlow, then Ludlow would have the same rights

to seek recovery from Precision. See Gibbs v. Hawaiian Eugenia Corp., 966 F.2d at

106.  In other words, Charter Oak's subrogation to Ludlow does not affect Precision's

ultimate obligation to pay damages arising out of or resulting from the performance of

Precision's subcontract with Ludlow.  See Sept. 22, 2021 Ruling at 12-13; cf. Williams v.

Ocwen Loan Servicing, LLC, No. 19-CV-2187 (KAM)(LB), 2020 WL 5757640, at *4

(E.D.N.Y. Sept. 27, 2020) (determining that a plaintiff lacked standing to bring a third-

---

[19] When, as here, parties use boilerplate language to refer to the right to subrogation, the right is not contractual but rather legal or equitable. As the Connecticut Supreme Court has explained, "insurers that are obligated by a preexisting contract to pay the losses of an insured proceed in a subsequent action against the responsible party under the theory of equitable subrogation, and not conventional subrogation . . . . [I]n the absence of express contractual language indicating an intention to depart from the default rules, [t]he contract ... is not the source of the right, but rather is a reference to those rights that may exist at law or in equity. . . . Thus, although a right of true [equitable] subrogation may be provided for in a contract . . . the exercise of the right will . . . have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing." Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency, Inc., 309 Conn. 449, 455–56 (2013) (internal quotation marks and citations omitted).

party challenge to the validity of a mortgage assignment, given that assignments are agreements to transfer a debt between two creditors that do not affect the obligation of the plaintiff, the mortgagor, to pay); J.P. Morgan Chase Med. Benefits Plan v. Swiatowiec, No. CV065003605S, 2009 WL 2506355, at *6 (Conn. Super. Ct. July 20, 2009) (citing cases supporting the proposition that "a third party may only bring a claim against a tortfeasor's insurer if the third party is in privity with the insurance contract"). Thus, Precision has no standing to challenge Charter Oak's subrogation to Ludlow under the Policy Agreement, because Precision has suffered no injury or threat of injury resulting from the subrogation.

### ii.    Voluntary Payments

Even if Precision did have standing to bring such a challenge, the court is not persuaded by Precision's argument that Charter Oak cannot recover in a subrogation action against Precision because Charter Oak's payments to Ludlow, its insured, were "voluntary." See Precision Mem. in Support of Mot. for Summary J. as to the Insurance Companies at 8-10.  Indeed, the primary case that Precision cites in support of this position weighs against Precision's theory.  In Westport Insurance v. St. Paul Fire and Marine Insurance Co., the District Court noted that "an insurer may not recover in a subrogation action if it pays a debt for which it is not liable." 375 F.Supp.2d 4, 8 (D. Conn. 2005).  However, in the same opinion, the court held, in view of the broad scope of the duty to defend under Connecticut Law, "this Court believes that the Connecticut Supreme Court would permit subrogation actions where an insurer pays a loss for which it reasonably may be liable, even if its obligation under its policy is in dispute." See Westport Ins., 375 F. Supp. 2d at 9 (citing 16 Couch on Ins. § 223:27 ("[I]nsurance payment is not voluntary if it is made with reasonable or good faith belief in obligation or

47

personal interest in making that payment. This standard is met when an insurer has acted in good faith to discharge a disputed obligation, even if it is ultimately determined that its insurance policy did not apply.")); see also Am. States Ins. Co. v. Allstate Ins. Co., 94 Conn. App. 79, 85 (2006), aff'd, 282 Conn. 454 (2007) (finding the District Court's reasoning in Westport persuasive, and reiterating that Connecticut Law permits subrogation actions where an insurer pays a loss for which it reasonably may be liable).

Here, undisputed evidence in the record supports the court's conclusion that Charter Oak paid Ludlow for its losses on a reasonable and good-faith basis.  Most notably, the deposition testimony of the Insurance Companies' 30(b)(6) witness, Joey Celis, explains that "Travelers" investigated Ludlow's claims to determine whether they fell within policy coverage.  See Celis Depo. at 28, 40-43, 51 (Doc. No. 253-9).[20] Several individuals at the Insurance Companies reviewed the claims, including Mike Machado, who adjusted and approved Ludlow's claims, and the Insurance Companies' engineer Gregory Kereakoglow, who inspected the site of the liner's failure in August 2019. [21] Id. at 75-76, 82.  Because Charter Oak acted reasonably and in "good faith" to discharge the obligations that Precision now disputes, the court concludes that Charter

---

[20] While, for the purposes of this Motion, the court takes the facts in Precision's Rule 26(a)1 Statement as true where they are supported by record evidence, Precision's assertion that Mr. Celis "confirmed that the Policy does not cover damage to property on which direct subcontractors, like Precision, were working", see Precision SOF at ¶ 19, taken as true, does not controvert the evidence, discussed above, that Charter Oak reasonably issued its payments to Ludlow under Connecticut's liberal standard recognizing an insurer's good-faith payments might not be voluntary, "even if it is ultimately determined that its insurance policy did not apply."  Westport Ins., 375 F. Supp. 2d at 9

[21] Mr. Celis also testified that the Insurance Companies sought to mitigate the damages, explaining: "We then tendered over to Precision to let them know, hey, something is wrong with this. Are you guys going to come in and fix it? We did not receive a response from Precision. As an insurance carrier for Ludlow, we have a responsibility to our insured. As such, when MDC demanded that Ludlow finish the job correctly, they did it. We looked over it. We reviewed coverage. Found out what they did to repair the failed system installed by Precision was correct, so we paid them. Now we are pursuing Precision under the subcontract between Ludlow and Precision." Celis Depo. at 65-66.

Oak's payments were not voluntary and do not bar Charter Oak's subrogation to Ludlow in this action.

b.      Whether Precision is "Legally Responsible" to Ludlow for Costs that Charter Oak Paid

While Charter Oak is subrogated to Ludlow, Charter Oak's rights against Precision are limited to the rights that Ludlow, as subragor, would otherwise have against Precision.  See Allstate Ins. Co. v. Palumbo, 296 Conn. 253, 260 (2010) ("[a] subrogee has no rights against a third person beyond what the subrogor had"); see also Gibbs, 966 F.2d at 106 ("the insurer is subrogated in a corresponding amount to the insured's right of action against . . . [the entity] responsible for the loss").  Ultimately, the question is whether, under Ludlow's subcontract with Precision ("the Subcontract"), Ludlow has a right of action against Precision for the losses that Charter Oak paid;  if Ludlow has no right to recover from Precision, then Charter Oak has no such right as Ludlow's subrogee.

The indemnity provision of the subcontract between Ludlow and Precision (the "Subcontract") provides:

> [Precision] shall indemnify . . . . [Ludlow] . . . . from and against all injuries, claims, damages, losses and expenses . . . . arising out of or resulting from performance of [Precision's] Work under this Subcontract, provided that such claim, damage, loss or expense is attributable to . . . injury or destruction of tangible property (other than the Work itself) . . . .

See Subcontract, Article 10 (Doc. No. 253-3) (emphasis added).  The court has previously concluded that claims by MDC and injured homeowners against Ludlow for damages to homeowners' property flooded in the wake of the liner's failure "arise, directly or indirectly, out of [Precision's] Work under the Subcontract", triggering Precision's duty to indemnify and defend Ludlow."  See Mar. 12, 2020 Ruling on Ludlow

Mot. for Summary J. as to Precision at 5-12.  However, the court has not yet resolved

the instant matter: whether the Subcontract's exception, in Article 10, for claims,

damages, losses, or expenses attributable to destruction of "the Work itself" limits the

scope of Precision's duty to indemnify Ludlow for the costs of repairing and replacing

the damaged liner.

The court now concludes, based on the record presented by Precision in its

undisputed Local Rule 56(a)1 statement and supported by record evidence, that the

exception for "the Work itself" in Article 10 of the Subcontract absolves Precision of a

duty to indemnify Ludlow for costs to repair or replace the damaged liner ("the Work

itself").  As the Supreme Court of Connecticut has explained, "[i]ndemnity clauses in

contracts entered into by businesses, particularly in construction contracts, should be

viewed realistically as methods of allocating the cost of the risk of accidents apt to arise

from the performance of the contract." Cirrito v. Turner Const. Co., 189 Conn. 701, 705

(1983) (quoting Laudano v. General Motors Corporation, 34 Conn.Sup. 684, 688 (1977).

Here, two sophisticated construction companies—Ludlow and Precision—have entered

into an indemnity agreement that carves out any "claim, damage, loss or expense . . .

attributable to . . . destruction of . . . the Work itself."  Subcontract, Article 10.[22]  A

_____

[22] In a subsequent Ruling, and relying on the March Ruling, the court held there was a duty to indemnify by Precision to Ludlow in Article 10.  However, no party—neither the Insurance Companies nor Precision—nor the court addressed the "Work itself" exception to Precision's indemnification duty under Article 10, likely because the parties disputed the damages sought by Charter Oak.  See September 22, 2021 Ruling at 14.  Indeed, the court directed supplemental briefing on the issue of damages because it was unclear what the damages were.  Id. at 32.  In holding that Precision owed Ludlow a duty to indemnify, the court cited to its March Ruling, in which it construed the unambiguous clause in the Subcontract in concluding Precision owed Ludlow a duty to indemnify for damages to the property of others.  Id. at 13 (citing March 12, 2020 Ruling at 13).  Now that the record reflects the damages Charter Oak seeks as Ludlow's subrogee and that such damages are for the destruction of "the Work itself", the court concludes as a matter of law that the Contract bars recovery of those damages from Precision by Ludlow, and thus by its subrogee, Charter Oak.

Connecticut Superior Court considered an indemnity provision containing an exclusion for "the Work itself" in <u>Forest Manor, LLC v. Travelers C & S Co</u>, No. X06UWYCV156029923, 2018 WL 1146892, at *8 (Conn. Super. Ct. Jan. 30, 2018).  In <u>Forest Manor</u>, the court explained that the terms of the parties' contract, including the indemnity provision, were drawn from the American Institute of Architects' boilerplate General Conditions of the Contract for Construction.  <u>Id.</u>, at *1 n. 5, *8 n. 22 (citing AIA Document A201–2007).[23]  Citing the AIA contract general conditions commentary regarding the indemnity provision, the court explained, "this provision does not cover injury or damage to the Work itself nor does it cover a claim by the Owner that the Contractor has failed to construct the building according to the Contract documents." <u>See</u> <u>id.</u> at 8.  Courts outside of Connecticut have likewise held that similar indemnity provisions excluding claims for damage to "the Work itself" "cover situations where the indemnitees are sued by a third party for physical injury or property damage occurring as a result of the subcontractor's work, but not when the claim challenges the subcontractor's work itself." <u>Bd. of Managers of 125 N. 10th Condo. v. 125North10, LLC</u>, 51 Misc. 3d 585, 594 (N.Y. Sup. 2016) (citing <u>Board of Mgrs. of the Baxter St. Condominium v. Baxter St. Dev. Co. LLC</u>, 2013 N.Y. Slip Op. 30209(U), 2013 WL

---

[23] The indemnity provision at issue in <u>Forest Manor</u> was nearly identical to that in Article 10 of the Subcontract. The <u>Forest Manor</u> clause stated, in relevant part:

> [T]he Contractor shall indemnify . . . the Owner. . . from and against claims, damages, losses and expenses . . .  arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to . . .  injury to or destruction of tangible property (other than the Work itself) . . .

<u>Forest Manor, LLC</u>, Am. Compl. at ¶ 29 (Doc. No. 2), 2016 WL 11583979 (Conn.Super. Jan. 19, 2016).

486506 (Sup.Ct., New York County 2013) (same, but as to the work of a contractor where the project's owner was the indemnitee).

As the court held in its March 12, 2020 Ruling on Ludlow's Motion for Summary Judgment as to Precision, "[t]he unambiguous language of the Subcontract makes clear that both the liner and the installation of the liner fall within the ambit of "[Precision]'s Work" for the purposes of the indemnity clause in Article 10. See Mar 12, 2020 Ruling on Ludlow Mot. for Summary J. as to Precision at 7 (citing Subcontract, Article 10). The same definition of "the Work" applies to the exception for destruction of "the Work itself" contained in the same indemnity clause; "the Work itself" refers to the liner and Precision's installation of the liner. Therefore, the indemnification provision does not require Precision to indemnify Ludlow for claims, damages, losses, or expenses attributable to destruction of the liner.

Moreover, the record reflects that Ludlow sought reimbursement from Charter Oak not for damage to third-party property damage, but for "labor and expenses as a result of the work to replace the failed liner." See Precision SOF at ¶ 16; M. Pio Depo at 200. Joey Celis, the Insurance Companies' 30(b)(6) deponent, confirmed the only costs that Charter Oak paid to Ludlow were to replace and remediate the failed liner. See Precision SOF at ¶ 18; Celis Depo. at 55 (responding "correct" to counsel's question: "The only claim you paid was . . . to repair and replace the failed liner in the pipe at Linbrook Road . . . . ?"); Celis Aff. at ¶ 6 (Doc. No. 277 at ) ("Ludlow incurred costs and expenses totaling $319,09.41 to repair and remediate the liner failure/collapse."); Charter Oak Letter Agreeing to Indemnify Ludlow to M. Pio (Doc. No. 277 at 54) (agreeing to indemnify Ludlow for costs that "include, but are not limited to, Ludlow's

labor, bypass pump rentals and fuel for pumps, labor for pump watch duty, excavation and backfilling, preparation of signs and cones, police flaggers, reinstallation of new liner in failed section, removal of bypass pumping equipment, cleanup of driveways, and restoration of lawns"). Now, the only costs that Charter Oak seeks to recover from Precision are the same liner repair and replacement costs, which are for losses attributable to the destruction of "the Work itself." See Precision SOF at ¶ 17; Celis Depo at 38 ("We are seeking the damages related to the sewer line that was installed . . . . About [$]300,000 is what it costs to replace that sewer line."); id. at 55 ("There is another claim where the backup also damaged the homeowner's property. That's a separate claim that we are not pursuing.").

The court is perplexed by the Insurance Companies' briefing on the issue of the "the Work itself" exception. See Insurance Companies Opp'n to Precision's Mot. for Summary J. as to the Insurance Companies at 10-13. First, the Insurance Companies fail to distinguish between an exception in the Policy Agreement (between Charter Oak and Ludlow) for "your work" (i.e., Ludlow's work) and the exception in the Subcontract between (Ludlow and Precision) for "the Work itself" (i.e., Precision's work). The Insurance Companies baselessly argue that Joey Celis testified "that the 'your work' or 'the work itself' exclusion was 'not applicable in this claim.'" See id. at 10 (citing Celis Depo. at 29). Mr. Celis' testimony cited by the Insurance Companies, however, addresses only the "your work" exception in the Policy Agreement and does not discuss the scope of the "the Work itself" exception in the Subcontract, which is at issue in connection with this Motion for Summary Judgment. See Celis Depo. at 29. Second, the Insurance Companies argue that they seek to recover "costs incurred by Ludlow, to

53

access the failed pipe, as a result of this failed liner." Id.  The Insurance Companies

then state that they reimbursed Ludlow for costs including "Ludlow's labor" and

"reinstallation of new liner in failed section", before stating that they "did not pay Ludlow

for any labor or work relating to replacing or installing the failed liner, as this work was

completed by Precision" and that "the breakdown of work and cost being claimed does

not include any work for replacing or installing the failed liner." Id. at 11.  However, even

if, as the Insurance Companies argue, Precision did install the replacement liner, the

Insurance Companies nonetheless concede that Ludlow "had to complete certain work

in order for the failed system that was installed by Precision to be repaired", incurring

costs to access the pipe so that Precision could replace the failed liner.  Id. at 12.

Ultimately, the Insurance Companies conclude that it is "beyond dispute that the

costs and expenses incurred by Ludlow to repair and remediate the failed / collapsed

pipe liner directly or indirectly arise out of an act or omission by Precision in its

performance of Precision's work pursuant to the Subcontract."  Id.  However, in referring

to the Subcontract, the Insurance Companies do not acknowledge the "the Work itself"

exception.  Indeed, the Insurance Companies' excerpt of the Subcontract's indemnity

provision, on page 4 of their Opposition, conveniently and misleadingly omits the "the

Work itself" exception, replacing it with an ellipsis. See id. at 4.

In light of the Insurance Companies' convoluted briefing and their failure to

submit a Rule 56(a)2 statement, the court concludes that the Insurance Companies'

briefing does not identify a genuine issue of material fact as to either of two issues: (1)

whether "the Work itself" exception applies to release Precision from an obligation to

indemnify Ludlow for losses attributable to the destruction of the failed liner, or (2)

whether Charter Oak's payments to Ludlow were for costs attributable to the destruction of the liner.

Thus, Ludlow sought and obtained from Charter Oak only costs to remedy damage to the liner that Precision installed, or "the Work itself."  Under the terms of the indemnity provision between Ludlow and Precision, given the exclusion for losses attributable to destruction of "the Work itself", Precision has no duty to indemnify Ludlow for such costs.  Consequently, Precision has no duty to indemnify Charter Oak, as Ludlow's subrogee, for Charter Oak's payments to Ludlow in connection with the repair or replacement of the liner.  Because Charter Oak exclusively paid Ludlow for costs related to repairing or replacing the failed liner, Charter Oak cannot recover from Precision under the indemnity provision of the Subcontract.  Summary Judgment is therefore granted to Precision as to Count One of the Insurance Companies' Intervenor Complaint.[24]

As to the remaining nine Counts of Traveler's Intervenor Complaint, Precision has put forth no substantive argument in favor of summary judgment.  In the absence of such briefing, the court denies summary judgment as to the remaining nine Counts.  See, e.g., Venghaus v. City of Hartford, No. 3:06CV01452 DJS, 2012 WL 1050014, at *1 (D. Conn. Mar. 27, 2012) ("The court will not resolve an issue in a motion for summary judgment that has not been briefed by either party") (quoting

---

[24] This Ruling is not in conflict with the court's March 12, 2020 Ruling on Ludlow's Motion for Summary Judgment as to Precision, where the court determined that Precision has a duty to indemnify Ludlow.  See March 12, 2020 Ruling at 9-10.  Precision does have such a duty, insofar as Ludlow seeks indemnity that does not fall within "the Work itself" exception; for instance, Precision has a duty to indemnify Ludlow for claims arising from third-party property damage. Id.

<u>Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC</u>, 438 F.Supp.2d 1174,

1180 n. 4 (E.D.Cal.2006)).

Accordingly, Precision's Motion for Summary Judgment is granted in part as to

Count One of the Intervenor Complaint as to Charter Oak, and denied as to Counts Two

through Ten as to Charter Oak. Precision's Motion is granted in full as to TPCCA.

D.   <u>Precision's Motion for Partial Summary Judgment against MDC as to
     Personal Property Damages (Doc. No. 254)</u>

Precision moves for partial summary judgment against MDC, seeking an Order

stating that MDC's recovery for its personal property damages claims shall be limited to

a <u>de minimus</u> amount.  <u>See</u> Precision Mot. for Summary J. as to MDC (Doc. No. 254).

After the sewer liner failed, homes adjacent to the pipe were flooded with feet of

wastewater.  <u>See</u> MDC Opp'n to Precision Mot. for Summary J. as to MDC at 9.  When

homeowners filed claims, MDC handled those claims "in house" and paid replacement

cost for personal property items that had been destroyed.  <u>Id.</u>

Precision contends that MDC should have reimbursed homeowners for the actual

cash value of their damaged property rather than issuing the full replacement cost.  <u>See</u>

Precision Mot. for Summary J. as to MDC at 1.  Furthermore, Precision argues that the

record lacks sufficient evidence to allow MDC to prove the actual cash value of the

property lost.  <u>Id.</u>  In opposition, MDC argues that Precision's Motion does not comply

with Rule 56 of the Federal or Local Rules of Civil Procedure, and that disputed issues

of material fact underlie the value of the destroyed personal property and the proper

amount of damages.  <u>See</u> MDC Opp'n to Precision Mot. for Summary J. as to MDC at

1-2.

1.    Procedural Propriety of Motion for Summary Judgment on Issue of
Damages

MDC first argues that Precision's Motion fails to comply with Rule 56 of the

Federal Rules of Civil Procedure, because Precision has not identified a "claim or

defense" on which it seeks summary judgment.  See id.; see also Fed. R. Civ. P. 56.

However, parties may move for, and courts may grant, summary judgment on the issue

of damages.  See, e.g., Maier–Schule GMC, Inc. v. General Motors Corp (GMC Truck

and Bus Group), 154 F.R.D. 47, 56 (W.D.N.Y.1994)  ("[A] defendant may prevail on a

motion for summary judgment where the plaintiff fails to provide evidence of damages,

especially where damages are an essential element of a cause of action, such as

breach of contract.").  Indeed, courts have denied summary judgment on the issue of

liability while at the same time granting summary judgment on the issue of damages.

See id.  While Precision seeks summary judgment as to only one kind of damages—

personal property damages—a party may move for partial summary judgment.  See

Fed. R. Civ. Pr. 56(a) (permitting summary judgment on "part of a claim or defense").

Thus, Precision's Motion for Summary Judgment as to personal property damages is

not procedurally improper under Federal Rule of Civil Procedure 56.

MDC then argues that Precision failed to file a Statement of Undisputed Material

Facts with its Motion pursuant to Local Rule 56(a)1.  "In this Circuit, a movant's failure to

comply with a district court's relevant local rules on a motion for summary judgment

permits, but does not require, a court to dispose of that motion."  Tross v. Ritz Carlton

Hotel Co., 928 F. Supp. 2d 498, 503 (D. Conn. 2013) (citing Tota v. Bentley, 379 F.

App'x 31, 32–33 (2d Cir. 2010)).  "Courts in this District generally look at whether the

motion, despite technical non-compliance, substantially complies such that it would be

fair to decide the motion on the merits." Conley v. Brysgel, No. 3:17-CV-322 (VAB), 2018 WL 5315237, at *1 (D. Conn. Oct. 26, 2018).  Here, Precision has belatedly submitted a Statement of Material Facts after submitting its initial Motion.  See Precision's Local Rule 56(a)1 Statement (Doc. No. 305-2).  Given that Precision has filed a Statement of Facts, and in light of the extensive record before the court, the court will exercise its discretion to turn to the merits of Precision's Motion.[25]

### 2.    Whether a Genuine Issue of Material Fact Exists

Precision argues that MDC cannot meet its burden of proof as to the fair market value of the personal property it paid to replace.  See Precision Mot. for Summary J. as to MDC at 1.  Precision contends that the court should limit damages to a de minimis amount as a matter of law, because the record does not contain evidence from which a reasonable juror could determine the actual cash value of personal property damages. Id.

Under Connecticut law, "Where total loss of personal property has occurred, damages are measured by the fair value of the property at the time that it was destroyed. Therefore, the extent of the right of the [property owner] as against the defendant is to recover the fair market value of the destroyed items." Wasko v. Manella, 87 Conn. App. 390, 399 (2005) (internal citation omitted). In Wasko, the party seeking

---

[25] The court distinguishes Precision's belated filing of its 56(a)1 statement (in connection with Precision's Motion for Summary Judgment as to MDC) from the Insurance Companies' abject failure to file a Local Rule 56(a)2 Statement (in connection with Precision's Motion for Summary Judgment as to the Insurance Companies, see pp. 42 n.18, supra).  The court also notes, however, that this is not the only filing error committed by Precision's counsel over the course of this litigation.  See, e.g. Feb. 28, 2022 Ruling on Motions to Preclude at 44 n. 25. The court does not intend to exercise its discretion to excuse any further delayed or non-compliant filings by Precision or any other party to this case.

damages was an insurance company who had reimbursed homeowners for the replacement cost of personal property destroyed in a fire. The insurer brought a subrogation action against a third party who had caused the fire.  At trial, the insurer introduced evidence regarding the personal property's replacement value, but not the property's fair market value at the time of its destruction. Id.[26]  The Wasko trial court awarded damages, but on appeal, the Appellate Court of Connecticut reversed the judgment as to damages with direction to render judgment awarding nominal damages as to personal property loss.  Id. at 400.  The Court explained:

> Nominal damages are recoverable where there is a breach of a legal duty or the invasion of a legal right and . . . such damages are not proven.  To obtain an award of more than nominal damages, facts must exist that afford a basis for measuring the plaintiff's loss with reasonable certainty.  The evidence must be such that the jury may find the amount of this loss by reasonable inferences from the facts established, not by conjecture, speculation and surmise.

Id. at 400 n. 8 (emphasis added).  However, the Wasko court did note the discretionary nature of damages, which should be "left largely to the sound discretion of the trier."  Id. at 397; see also Label Sys. Corp. v. Aghamohammadi, 270 Conn. 291, 323 (2004) ("The amount of a damage award is a matter peculiarly within the province of the trier of fact").

Here, Precision argues that MDC, like the plaintiff insurer in Wasko, has failed to produce any evidence to establish the actual cash value of the destroyed personal property.  However, viewed in the light most favorable to the non-movant, MDC, the

---

[26] The Appellate Court noted that the record showed no evidence of the personal property's fair market value, its original cost, or its age "in the way of transcript, exhibit or other record references", id. at 399, and that the record revealed "the list submitted into evidence consisted exclusively of replacement cost figures." Id. at 399 n. 7.

record evidence creates genuine issues of material fact with respect to the proper amount of personal property damages, as well as evidence upon which a reasonable juror could find in favor of MDC.

First, MDC has offered the expert testimony of licensed insurance adjuster Vincent Vizzo.[27]  See Vizzo Jan. 29, 2021 Report (Doc. No. 239-3).  Mr. Vizzo analyzed MDC's reimbursements to homeowners, breaking homeowners' claims into four categories: mitigation of sewage water; structural repair; personal property; and additional living expenses.  See id. at 1-2.  With respect to personal property damage, he found that MDC paid $209,925.88 to homeowners on a replacement cost basis.  See id.  To calculate actual cash value of the destroyed property, he testified, MDC would need to know the property's purchase date or depreciate the personal property items on a case-by-case basis. See id.  Mr. Vizzo also testified that actual cash value could be calculated by the "expected life and age at the time [of destruction]", although he did not know the age or condition of homeowners' property.  See Vizzo Depo at 62, 157 (Doc. No. 278-9).  Mr. Vizzo's opinions are not, standing alone, sufficient to support a reasonable juror's calculation of the actual cash value of the destroyed property. However, his testimony regarding the property's replacement value could support a jury's finding as to actual cash value, when record evidence relevant to depreciation is considered.  See, e.g., R & P Realty Co. v. Peerless Indem. Ins. Co., 193 Conn. App. 374, 377 (2019) ("Generally, the 'actual cash value' of a loss is the cost of repairing or

---

[27] Precision sought to preclude Mr. Vizzo's testimony.  See Mot. to Preclude Testimony of Vincent Vizzo (Doc. No. 239).  However, this court has issued a Ruling denying in part Precision's Motion to Preclude Mr. Vizzo's testimony. See Feb. 28, 2022 Ruling on Mots. to Preclude.

replacing the loss, less depreciation, whereas the 'replacement cost' of a loss is the actual cost of repairing or replacing the loss without a deduction for depreciation.")

With respect to depreciation, the record contains evidence of the depreciation and actual cash value of at least one homeowners' goods.  Specifically, Mr. Vizzo testified that Terry Conlon's personal property was actually appraised and the pricing did not look "unusual" based on photographs.  See id. at 188.  An appraiser also assessed the items in Conlon's house and determined that he had antique items, and Vizzo testified that "replacement costs and actual cash value in this case are one and the same" because "there would be no depreciation taken on these [antique] items."  Id. at 193-94.

Furthermore, MDC's 30(b)(6) deponent, Mr. David Rutty, testified at his deposition that some property owners, although not most, provided the purchase date of their items above $300. See Rutty Depo. at 48 (Doc. No. 278-12).  While Precision argues that such information provided by homeowners is "speculative, generalized, and unsubstantiated", see Precision Reply to MDC Response to Precision Motion for Summary Judgment (Doc. No. 305),  it is well established under Connecticut law that a "court, in valuing personal property, may rely on the testimony of its owner as to its value." See Kammili v. Kammili, 197 Conn. App. 656, 674, cert. denied, 335 Conn. 947 (2020) (citing Saporiti  v. Austin A. Chambers Co., 134 Conn. 476, 479–80 (1948) (stating that "[t]estimony of the [party] as to the value of the furniture was proper, although no qualification other than his ownership of it was shown")).[28]

---

[28] In its Opposition, MDC cites to paragraphs 25-27 of its Statement of Additional Material Facts for the proposition that Mr. Fleming, Precision's own expert, has provided estimates as to the value of personal property damages, totaling "$30,000 in personal property loss for 62 Linbrook Road; 15,000 in

Thus, a genuine issue of material fact exists as to the proper amount of personal damages, and a reasonable juror could find in MDC's favor—at the very least, a factfinder could reasonably find more than nominal damages by drawing "reasonable inferences" based on record evidence of antiques owned by at least one homeowner. See Wasko, 87 Conn. App. at 400 n. 8.  The court cannot determine, at this stage in the litigation and on the basis of the record before it, that a lack of evidence warrants limiting personal property damages to a de minimis amount as a matter of law. Therefore, Precision's Motion for Partial Summary Judgment against MDC is denied.

E.    Ludlow's Motion for Partial Summary Judgment (Doc. No. 255) as to MDC's First Amended Complaint (Doc. No. 92)

Ludlow moves for partial summary judgment as to three Counts of MDC's Second Amended Complaint: Count One, sounding in failure of performance; Count Eight, sounding in equitable subrogation; and Count Ten, sounding in common law indemnification.  See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 2-5 (Doc. No. 255-1).  Ludlow also seeks Summary Judgment on its Counterclaim as to the MDC seeking return of its contractual retainage.  See id. at 5; Ludlow Answer to MDC Am. Compl. (Doc. No. 102).

---

personal property loss for 58 Linbrook Road; $10,000 in personal property loss for 154 North Main Street; and $10,000 in personal property loss for 64 Linbrook Road. See MDC Opp'n to Precision Mot. for Summary J. as to MDC (Doc. No. 278).  However, MDC's Statement of Facts in Opposition to Summary Judgment (Doc. No. 278-1) does not contain a paragraph numbered 27, and paragraphs 25 and 26 are not related to Mr. Fleming's damages assessment.  See MDC SOF at ¶¶ 25-26 (Doc. No. 278-1).  The court has identified no exhibit, either attached to MDC's Opposition or elsewhere in the voluminous record, that contains Mr. Fleming's purported estimates. Moreover, counsel has not pointed to any portion of Mr. Fleming's Report nor his deposition that contain such estimates or a basis for such estimates. See Fleming Report (Doc. No. 238-2); Fleming Depo. (Doc. No. 238-3). The court considers this a misrepresentation to the court by MDC's counsel.

1.      Count One: Failure of Performance

Ludlow seeks summary judgment as to the first Count of MDC's First Amended Complaint sounding in failure of performance.  See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 12-18.  In the Complaint's first Count, MDC alleges that Ludlow failed to "perform all work in accordance with the Contract designs, drawings, and specifications" as required by the General Contract between MDC and Ludlow ("the Contract").[29]  See MDC Am. Compl. at ¶ 27, Count One.  MDC claims that Ludlow failed to install a safe and functioning liner pursuant to the Contract.  Id. at ¶ 28, Count One. Specifically, MDC alleges that Ludlow:

a.  Failed to perform and complete the project to the satisfaction of MDC, as evidenced by its ongoing demands for satisfaction;

b.  Failed to ensure that its finished work was safe for reasonably foreseeable use, as evidenced by the Collapse and failure of its Liner;

c.  Failed to ensure that the finished work, specifically the Liner was compliant with all codes and regulations; and

d.  Refused to pay damages as required under the Contract.

Id.

Ludlow moves for summary judgment on the first Count, arguing that (1) there is no genuine issue of material fact that Ludlow did not cause the liner's collapse; and (2) the record evidence could not support a reasonable juror's finding that Ludlow breached

---

[29] The general contract between MDC and Ludlow was executed on September 27, 2016. Contract Number 2013B-11A at 1 ("Prime Contract") (Doc. No. 283-5).  The Prime Contract incorporates by reference the Project Manual, as modified by the likewise incorporated Special Provisions. Prime Contract at 3-4; see also Project Manual (Doc. No. 283-14); Special Provisions (excerpted at 283-5).  The Prime Contract also incorporates four addenda. Prime Contract at 5. The court refers collectively to the Prime Contract, Project Manual, Special Provisions, and Contract Addenda as "the Contract."

its contract with MDC, because MDC has not disclosed an expert opinion regarding Ludlow's alleged breach.  See id. at 2.

Under Connecticut law, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  Chiulli v. Zola, 97 Conn.App. 699, 706-07 (2006) (internal quotation marks omitted).  Moreover, "proof of causation" is "part and parcel of a party's claim for breach of contract damages."  Meadowbrook Ctr., Inc. v. Buchman, 149 Conn. App. 177, 186 (2014).  Indeed, "causation is an element—and a crucial one—of the plaintiff's prima facie case."  McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc., 93 Conn.App. 486, 503–4 (2006) (citations omitted).  As the court discusses in the subsections below, Ludlow contends that the record before this court is insufficient to support a reasonable juror's finding in MDC's favor as to the elements of causation or breach.

a.      Whether Ludlow Caused the Liner's Collapse

Ludlow first argues the evidence in the record cannot support a finding by a reasonable juror that Ludlow caused the liner's collapse.  See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 12.  As Connecticut courts have clarified, "the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's  injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct."  Meadowbrook Ctr., Inc., 149 Conn. App. at 188–89.  Thus, to establish causation, MDC must show that the injuries—i.e. the liner's collapse and resulting damages—were foreseeable to Ludlow and "naturally and directly" resulted from Ludlow's conduct.

64

In support of its position, Ludlow asserts that it did not design, manufacture, purchase, or install the liner.  <u>See</u> Ludlow SOF at ¶¶ 6, 14.  Thus, Ludlow argues, "the competing causes of MDC's damages are either: Precision's faulty installation and/or the manufacture and wet-out of the liner by Saertex and Granite."  <u>See</u> Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 13-15.  However, under the terms of the Contract, Ludlow is liable to MDC for the acts or omissions of its subcontractor, Precision, and its suppliers, Saertex and Granite.  Section 6.06(C) of the Project Manual states that "[Ludlow] shall be fully responsible to [MDC] . . . for all acts and omissions of the Subcontractors, Suppliers, and other individuals or entities performing or furnishing any of the Work just as [Ludlow] is responsible for [Ludlow's] own acts and omissions."  <u>See</u> Contract at § 6.06(C), 00700-29 (Doc. No. 255-17).  Thus, even if Ludlow did not design, manufacture, purchase, or install the liner, a reasonable juror could find that Ludlow had a contractual obligation for the acts and omissions of Saertex, Granite, and Precision—Ludlow's suppliers and subcontractors which undisputedly did manufacture and install the liner.  <u>See</u> MDC Statement of Facts at pp. 2-3, ¶¶ 8-9; pp. 3-4, ¶¶ 13-14 (admitting Ludlow's statements that Precision installed the liners, while Saertex and Granite manufactured the liners).  Therefore, if MDC's damages were the foreseeable, "natural[ ] and direct[ ]" result of Precision's installation or Saertex or Granite's manufacture of the liner, a reasonable finder of fact could determine that Ludlow is responsible to MDC for those acts or omissions under the terms of the Contract.  <u>See</u> <u>Meadowbrook Ctr., Inc.</u>, 149 Conn. App. at 188–89 (stating the causation standard for breach of contract).

There is evidence in the record on the basis of which a reasonable juror could find that either Precision's installation or Granite or Saertex's manufacturing caused the liner's failure, leading to sewage backup damaging adjacent properties, resulting in damages to MDC.  For instance, expert testimony offered by Granite experts Drs. Moll and Vytiniotis implicates Precision's installation, suggesting that Precision punctured the liner and failed to remove water from the host pipe, causing the liner's resin to migrate, weakening it, and leading to its collapse.[30]  See Exponent Report at 52-53 (Doc. No. 243-2).  As to Granite, one of Precision's experts, Dr. Knight, opines that "the [liner's] low resin content is consistent with a defect in the liner wet out process performed by Granite Inliner that occurred prior to the shipment of the liner to the site . . . ."  See Knight Nov. 13, 2020 Report at 29.  With respect to Saertex, Dr. Knight also opines, on the basis of his testing, that the liner's physical properties did not conform to Saertex's standard reported values, and that the liner failed "due to Saertex and/or Granite's improper manufacture." See id. at 25.  Taking into account these reports, the evidence

---

[30] Granite's experts opine, for example, that:

- "Puncture marks with coincident pre-cure deformation of the subject liner, coupled with cured resin identified on the exterior of the subject styrene barrier layer, establish that these breaches in the styrene barrier layer occurred as the result of the installation process."

- "Punctures observed in the styrene barrier layer provided a pathway for resin migration in the subject liner causing non-uniform resin distribution and localized areas with a lack of resin, resulting in decreased strength and ultimately the collapse of the subject liner from forces acting on the subject liner such as ground water pressure and gravity."

- "Water was likely present within the host pipe during installation. The source of such water was water flowing from lateral pipe connections and/or groundwater within the sandy and silty soils infiltrating through the numerous cracks of the host pipe or via the manhole walls."

See Exponent Report at 52-53.

upon which they rely, and other evidence in the record, a reasonable finder of fact could determine that the acts or omissions of Ludlow's subcontractors or suppliers naturally and directly caused the liner's collapse. Thus, under the terms of the Contract, acts or omissions for which Ludlow could be found legally responsible under Section 6.06(C) of the Project Manual could be found, by a reasonable juror, to have caused the liner's collapse. See Contract at § 6.06(C), 00700-29 (Doc. No. 255-17).

Finally, issues of material fact exist as to whether the "general contractor nonliability rule" protects Ludlow from its contractual responsibility for the acts and omissions of its subcontractors and suppliers. As the Supreme Court of Connecticut has explained, "as a general matter. . . a general contractor is not liable for the torts of its independent subcontractors . . . . We have long held, however, that [t]o this general rule there are exceptions", "if [it] is under a legal duty to see that the work is properly performed, the [general contractor] will be responsible for resultant injury." Archambault v. Soneco/Ne., Inc., 287 Conn. 20, 53–54, 946 A.2d 839, 860 (2008) (citing Pelletier v. Sordoni/Skanska Construction Co., 264 Conn. 509, 517–18, 825 A.2d 72 (2003)) (discussing whether a general contractor was liable to a subcontractor's employee for the subcontractor's negligence). Here, a reasonable juror could determine that Ludlow, the general contractor, has assumed legal responsibility to MDC, the project's owner, for the work of Ludlow's subcontractors and suppliers, contracting around the presumption against liability of a general contractor for a subcontractor's torts. See Girolametti v. Michael Horton Assocs., Inc., 332 Conn. 67, 77 (2019) (noting that standard form contracts used in the construction industry typically make the general contractor responsible for the actions of subcontractors).

Thus, there is sufficient evidence in the record from which a reasonable juror could find that the liner's failure and MDC's damages resulted from the acts or omissions for which Ludlow was legally responsible under its Contract with MDC.

b.    Whether Ludlow Breached its Contract with MDC

Ludlow also argues that expert testimony is necessary to prove both breach and causation in this case, as Connecticut courts require parties to submit expert opinions when "the question involved goes beyond the field of ordinary knowledge and experience . . . ." See State v. Buhl, 321 Conn. 688, 700 (2016).[31]  However, the cases Ludlow cites to support its argument are largely inapposite, as none of them hold that Connecticut courts require expert testimony to prove the elements of breach of contract; indeed, the majority of the cases on which Ludlow relies involve professional malpractice claims, which require proof of the standard of care.[32]  In malpractice cases, expert testimony is necessary to establish the standard of care to which the professional

---

[31] As the court has discussed above, see pp. 64-67, supra, a reasonable juror could determine that the Contract holds Ludlow responsible for the acts and omissions of Precision, Granite, and Saertex, and experts have offered testimony regarding whether acts attributable to Precision, Granite, or Saertex caused the liner's failures. Thus, the court addresses only Ludlow's argument that expert testimony is necessary to prove the breach element.

[32] See State v. Buhl, 321 Conn. 688, 700 (2016) (determining that expert testimony was not necessary to prove the public nature of Facebook posts in a breach of the peace action); see also Tatum v. Oberg, 804 F. Supp. 2d 88, 94 (D. Conn. 2011) (holding that Connecticut law requires expert testimony to establish the standard of professional care in legal malpractice cases); Buckley v. Deloitte & Touche USA LLP, 541 F. App'x 62, 64 (2d Cir. 2013) (holding that a district court did not abuse its discretion in granting a Motion for Summary Judgment governed by Pennsylvania law when the record lacked sufficient evidence to permit a finding of breach after an expert's opinion was precluded); Brye v. State, 147 Conn. App. 173, 181 (2013) (holding, in the context of a negligence claim, that expert testimony was necessary to determine the relevant standard of care); Matyas v. Minck, 37 Conn. App. 321, 327 (1995) ("in order to prove professional negligence, expert testimony was required."); Canale v. KBE Bldg. Corp., No. UWYCV156026262S, 2017 WL 4621399, at *4-5 (Conn. Super. Ct. Sept. 5, 2017) (determining expert testimony was necessary to establish professional architect's duty in a malpractice case); Green v. Ensign-Bickford Co., 25 Conn. App. 479, 488, 595 A.2d 1383, 1388 (1991) (holding, in the context of proximate causation for a negligence claim, expert testimony was necessary to prove that an explosion could throw someone out of bed a mile away).

68

should have adhered.  <u>See, e.g.</u>, <u>Tatum v. Oberg</u>, 804 F. Supp. 2d 88, 94 (D. Conn. 2011) (holding that Connecticut law requires expert testimony to establish the standard of professional care <u>in legal malpractice cases</u>).  However, such testimony is generally not required to prove breach of contract claims like the instant claim, where, by definition, "two parties contract for a specific result."  <u>See, e.g.</u>, <u>Poulin v. Yasner</u>, 64 Conn. App. 730, 733 (2001) (holding, where a patient brought both medical malpractice and breach of contract claims against a physician, that "[b]ecause a contract claim involves a situation where the [parties] contract for a specific result[,] proof of a contract claim does not usually require expert . . . testimony.").

Here, MDC and Ludlow contracted for a specific result: a liner installed in conformity with the Contract and free from defects.  <u>See</u> Contract at § 1.1, 00500-1 (Doc. No. 283-5 at 1) ("Contractor shall perform the Work as specified or indicated In the Contract Documents"); Contract at § 6.19 ("Contractor warrants and guarantees to Owner that all Work will be in accordance with the Contract Documents and will not be defective.") (Doc. No. 283-5 at 10); <u>see also</u> September 22, 2021 Ruling at 17-19 (concluding that "the Work", under any of the multiple definitions offered in the Contract, "include[s] installation of the liner and the liner itself.").  Evidence in the record could support a reasonable juror's finding that Ludlow did not deliver on its promises.  Indeed, the parties agree that the liner collapsed within five months of its installation and caused sewage blockages and property damages.  <u>See</u> MDC SOF at ¶10.  Thus, determining whether Ludlow performed on its promise to install a working liner is not "beyond the field of ordinary knowledge and experience", and a reasonable finder of fact could

determine that Ludlow breached its contract with MDC on the basis of the evidence in the record.

### 2. Count Eight: Equitable Subrogation

Ludlow also seeks summary judgment as to Count Eight of MDC's Amended Complaint sounding in equitable subrogation. <u>See</u> Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 21-23. MDC's eighth Count alleges that MDC compensated homeowners harmed by the liner's failure, making reimbursements that Ludlow should have paid "in equity and good conscience." <u>See</u> MDC Am. Compl. at ¶¶ 27-30, Count Eight.

As the court discussed above in the context of insurance claims, "an insurer's right to subrogation attaches, by operation of law, on paying an insured's loss." <u>Gibbs</u>, 966 F.2d at 106; <u>see also</u> pp. 45-55, <u>supra</u> (discussing insurer Charter Oak's equitable subrogation claim against Ludlow). However, even where, as here, the party seeking subrogation has not agreed in advance to insure the compensated party, subrogation may nonetheless be warranted "to promote and to accomplish justice." <u>See</u> <u>Wasko v. Manella</u>, 269 Conn. 527, 532 (2004) (citing <u>Westchester Fire Ins. Co. v. Allstate Ins. Co.</u>, 236 Conn. 362, 371 (1996) (citing cases involving subrogation claims brought by parties who were not insurers)). Indeed, equitable subrogation "is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." <u>Id.</u> It permits a payor to step "into the shoes of the party it paid in order to recover the payments that it made", in order to "prevent the unjust enrichment of the party whose debt it paid." <u>Id.</u> at 548 (quoting <u>Westchester Fire Ins. Co.</u>, 236 Conn. at 367 (internal quotations omitted)). Ultimately, the soundness of an equitable subrogation claim "depends on the equities and attending facts and

circumstances of each case . . . . The determination of what equity requires in a

particular case, the balancing of the equities, is a matter for the discretion of the trial

court." Allstate Ins. Co. v. Palumbo, 296 Conn. 253, 260 (2010) (internal citations and

quotations omitted).[33]

Ludlow contends that there is no genuine issue of material fact that Ludlow is not

liable to MDC for equitable subrogation, arguing that undisputed record evidence shows

that MDC voluntarily remitted payment to the homeowners.  Ludlow Mem. in Support of

Mot. for Summary J. as to MDC at 18-21.  Further, Ludlow argues that allowing

subrogation would be unjust, as Ludlow's involvement in the liner's installation was

"limited" and the evidence does not support a finding that Ludlow caused the liner's

collapse.  See id. at 20-21.  However, the court concludes that genuine issues of

material fact exist as to the voluntariness of MDC's payments and whether Ludlow, in

the interest of equity, should have made payments to homeowners.

      a.       Whether MDC Issued Voluntary Payments to Homeowners

Ludlow contends that undisputed evidence in the record shows that MDC

remitted voluntary payments to homeowners whose property was damaged by the

sewage backup.  See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 20.

---

[33] Both Ludlow and MDC inexplicably cite to General Star Indemnity Co. v. Travelers Indemnity Co., for the proposition that "Equitable subrogation has four primary elements: (1) the party asserting subrogation has paid the debt; (2) the party asserting subrogation was not a volunteer; (3) the party asserting subrogation was not primarily liable for the debt; and (4) no injustice will be done to the other party by allowing subrogation"  See Gen. Star. Indem. Co. v. Travelers Indem. Co., No. CV0840233383S, 2013 WL 1849285, at *19 (Conn. Super. Ct. Apr. 9, 2013); see also Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 19; MDC Opp'n to Ludlow Mot. for Summary J. as to MDC at 11.  As the General Star court clearly states, these are the elements for equitable subrogation under Arizona law, which was applicable to the General Star parties' dispute. See id. ("In Arizona, the law of equitable subrogation has been described as follows . . . .") (emphasis added).  While Connecticut courts weigh similar considerations, neither party disclosed to the court that General Star's balancing test applied Arizona law.

Under Connecticut law, "the doctrine of equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." Westchester Fire Ins. Co., 236 Conn. at 371 (internal quotation marks and citation omitted). However, as the Second Circuit has explained:

> "Equitable subrogation benefits only those who have some obligation, however indirect, to pay the debt at issue. For example, it applies to an insurer who pays its insured's medical bills before a suit against the party who caused the injury has been completed, id. at 372–73, 672 A.2d 939, or to a surety who pays its obligee and then sues its principal to vindicate the rights of that obligee[.] Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff, 354 F.3d 945, 951 (8th Cir.2004)."

Elm Haven Const. Ltd. P'ship v. Neri Const. LLC, 376 F.3d 96, 101 (2d Cir. 2004) (affirming a grant of summary judgment against a general contractor's claim for equitable subrogation as to its subcontractor, because the general contractor was not bound to issue payments it made to claimants).

Here, the record could support a reasonable juror's finding that MDC had an obligation, "however indirect", to compensate homeowners for their losses caused by the sewage backup and flooding. It is undisputed that MDC owned the pipe which deposited raw sewage onto homeowners' property, causing damages. See MDC SOF at ¶ 1, p. 1 (admitting Ludlow's statement that MDC "owns and operates the water and sewer lines in the towns under its jurisdiction"); Id. at ¶ 10. As a consequence, MDC faced exposure to liability or claims brought by homeowners. Indeed, similar injuries to property resulting from the failure of sewage lines have prompted injured homeowners to sue. See, e.g., Brusby v. Metro. Dist., 160 Conn. App. 638, 641 (2015); see also

72

<u>DeMarco v. City of Middletown</u>, No. MMXCV116006185S, 2014 WL 1721935, at *1 (Conn. Super. Ct. Apr. 3, 2014). Moreover, MDC has submitted records that several homeowners signed releases of claims, settling any potential claims against MDC. <u>See</u> Releases of Claims (Doc. No. 136-12).

A reasonable finder of fact could determine, on the basis of the record evidence, that MDC made payments to homeowners to discharge threatened liabilities and protect its own interests. Thus, a genuine issue of material fact exists as to whether MDC's payments were voluntary. The court cannot grant summary judgment on this ground.

b.   <u>Whether Ludlow Should Have Compensated the Homeowners</u>

Ludlow argues that allowing subrogation would be unjust, because Ludlow's involvement in the liner's installation was "limited" and the evidence does not support a finding that Ludlow caused the liner's collapse. <u>See id.</u> at 20-21. Under the doctrine of equitable subrogation, a payor steps "into the shoes of the party it paid in order to recover the payments that it made", in order to "prevent the unjust enrichment of the party whose debt it paid." <u>Wasko</u>, 269 Conn. at 548 (quoting <u>Westchester Fire Ins. Co.</u>, 236 Conn. at 367 (internal quotations omitted)). Here, MDC (the payor) seeks to stand in the shoes of homeowners (the parties it paid) to recover payments MDC alleges "would otherwise be payable by Ludlow [(the party whose debt MDC paid)] to homeowners." MDC Am. Compl. at ¶ 27, Count Eight.

Genuine issues of material fact exist as to whether Ludlow, rather than MDC, should have "in equity and good conscience" paid the homeowners' claims. The question of Ludlow's own negligence with respect to the liner's failure has not yet been determined and turns on genuine issues of material fact, including the extent of

73

Ludlow's involvement in the liner's installation.  See, e.g., J. Pio Depo. at 27; 49-50 (Doc. No. 283-7) (Ludlow's foreman testifying that he was on site and observed the liner's installation).  The extent of MDC's involvement is likewise disputed.  See Jones Depo. at 95 (MDC's construction services supervisor stating that he was on site the first day of the liner's installation); M. Pio Depo at 30-31 (Doc. No. 283-8) (Ludlow's project manager testifying that MDC had no involvement in the installation of the liner); see also Levesque Aff. at ¶ 14 (Doc. No. 283-2) ("MDC contracted all responsibilities regarding the Liner installation to Ludlow and took no part in the physical installation.").  Moreover, the cause of the liner's failure is still a matter of disputed fact. See pp. 64-67, supra; see also Jones Depo. at 58-60 (Doc. No. 255-6) (MDC's construction services supervisor testifying that water was present in the host pipe at the time of installation); Exponent Report at 52-53 (opining that the liner showed signs of resin migration resulting from contact with water during installation).

"[T]he issue of causation generally is a question reserved for the trier of fact . . . the issue becomes one of law when the mind of a fair and reasonable person could reach only one conclusion." Davis v. Monro, Inc., No. CV196053857S, 2021 WL 6101690, at *4 (Conn. Super. Ct. Dec. 6, 2021).  Because the extent of Ludlow's and MDC's involvement in the installation turns on genuine issues of material fact, the court cannot resolve on summary judgment whether Ludlow, in equity and good conscience, should have compensated the homeowners for their claims.  Accordingly, the court denies summary judgment to Ludlow as to MDC's claim for equitable subrogation as it relates to MDC's payments to homeowners.

c.          Payments to Serrantino Law and ServPro

Ludlow also seeks summary judgment on Count Eight to the extent that MDC

seeks to recover in equitable subrogation for MDC's payments to Serrantino Law.  See

Ludlow Reply to MDC Opp'n to Ludlow Mot. for Summary J. as to MDC at 6-7 (Doc. No.

303).  As Mr. David Rutty, MDC's Rule 30(b)(6) witness, testified, Ludlow hired ServPro

Newington ("ServPro") as a subcontractor to clear homeowners' properties of sewage.

Rutty Depo. at 54 (Doc. No. 283-13).  Ludlow was "not satisfied with the work" and

refused to compensate ServPro for its work. Rutty Depo. at 54.  As a result, ServPro

hired Serrantino Law to sue homeowners to recover the costs.  Id.  To avoid litigation

"against our property owners or customers", MDC paid Serrantino Law ("Serrantino") for

ServPro's work to avoid litigation.  See id.

Ludlow argues that MDC failed to plead any allegations relating to MDC's

payments to Serrantino, a collection firm hired by a subcontractor, ServPro.  See MDC

Am. Compl. at ¶¶ 1-29, Count Eight.  However, MDC's Amended Complaint alleges that

Ludlow failed to make payments to homeowners, to correct the liner failure, and to

compensate those harmed by the effects of the failure.  See id.  In the body of its

Amended Complaint, in a paragraph incorporated into Count Eight, MDC also alleges:

> As a result of the Collapse [of the liner], the MDC has expended substantial
> sums of money and has been exposed to liability from potential claims
> arising from the Collapse, and other expenses pertaining to the
> rehabilitation of impaired property and replacement of the Liner as well as
> additional employee resources and time to correct the damage done.

Id. at ¶ 21, Factual Allegations.  Moreover, MDC's Amended Complaint requests "[a]

declaratory judgment that MDC has paid money or expended sums to correct the

damage done by Ludlow that would otherwise be payable to homeowners by Ludlow

that MDC has paid and is entitled to" and other relief the court deems just and equitable. See MDC Am. Compl. at Request for Relief, Count Eight (emphasis added).

As the Second Circuit has made clear, a plaintiff's complaint "need not contain 'detailed factual allegations[.]'" Matson v. Bd. of Educ. of City Sch. Dist. of New York, 631 F.3d 57, 63 (2d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Nor does the plausibility pleading standard established by the Supreme Court in Twombly and Iqbal  "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (holding that allegations must "raise a right to relief above the speculative level"); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Here, MDC has alleged that it "expended substantial sums of money" to remedy the damage caused by the liner's failure, see MDC Am. Compl. at ¶ 20, Factual Allegations, that Ludlow, through its subcontractor Precision, caused the liner failure, id. at ¶ 21, and that Ludlow "should have paid all amounts to correct the Liner failure and to compensate those harmed by the effects of the failure." See MDC Am. Compl. at ¶ 29, Count Eight.  These allegations contain sufficient detail to plausibly plead the MDC's equitable subrogation claim and to support the theory that MDC now asserts: that MDC issued its payments to Serrantino to protect MDC's own interests in preventing claims against MDC by homeowners harmed after Ludlow refused to pay ServPro's bill.  See Rutty Depo. at 54.  Thus, the allegations in the Amended Complaint are sufficient to

plead a claim for equitable subrogation against Ludlow with respect to MDC's payments to ServPro.

Moreover, bearing in mind that Connecticut's "broad" doctrine of equitable subrogation encompasses "every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter", genuine issues of material fact exist as to whether MDC's payments to Serrantino were, as Ludlow argues, "voluntary."  See Westchester Fire Ins. Co., 236 Conn. 362, 371; see also Ludlow Reply to MDC Opp'n to Ludlow Mot. for Summary J. as to MDC at 6-7. Insomuch as MDC had an obligation, "however indirect", to pay homeowners, see pp. 71-73, supra, it likewise had an obligation to pay ServPro through Serrantino.  David Rutty testified that ServPro hired Serrantino Law to sue homeowners for the unpaid costs of remediating the sewage waste. See Rutty Depo. at 54.  Such a suit would expose MDC to homeowners' claims for their losses.  Thus, genuine issues of material fact exist as to whether MDC acted to protect its own interest and shield itself from liability by recompensing Serrantino for payments that Ludlow withheld but, "in equity and good conscience", should have paid.

Thus, the court denies Ludlow's Motion for Summary Judgment as to MDC's claim regarding its right to recover payments to Serratino under the theory of equitable subrogation.

3.      Count Ten: Common Law Indemnification[34]

Ludlow moves for summary judgment as to Count Ten of MDC's First Amended

Complaint for common law indemnification.[35]  In Count Ten, MDC alleges that Ludlow's

negligence was direct and superseded any negligence attributable to MDC, causing

MDC damages.  See MDC Am. Compl. at ¶¶ 27-30, Count Ten. Specifically, MDC

alleges that Ludlow controlled the liner's "installation, hardening, and inspection

processes", and that Ludlow's negligence was the direct, immediate cause of the liner's

failure and collapse. Id. at ¶ 28, Count Ten. Further, MDC alleges that it reasonably

relied upon Ludlow and was unaware that the liner was defective. Id. at ¶ 29, Count

Ten.

Under Connecticut law, common law indemnification "imposes an implied

obligation of indemnity on a tortfeasor whose active negligence is primarily responsible

for a plaintiff's injuries, thus superseding the indemnitee's passive negligence. . . ."

McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc., 93 Conn.

App. 486, 523 (2006).  To prove common law indemnification, a passively negligent

---

[34] MDC has filed a Motion to Amend Count Ten of its Amended Complaint.  See MDC Mot. to Am.
(Doc. No. 313).  However, MDC's proposed amendment to Count Ten is immaterial to the court's
consideration of Ludlow's Motion for Summary Judgment, because the court concludes that MDC
adequately stated a claim for common law indemnification in its First Amended Complaint. The proposed
amendment to Count Ten adds no new material factual allegations. Moreover, Ludlow does not seek
summary judgment on the basis of any pleading failures in Count Ten of the First Amended Complaint.

[35] The court has already determined that Ludlow owes MDC a contractual duty to indemnify "to
the extent that MDC's damages were not caused by MDC's own negligence."  See Sept. 22, 2021 Ruling
on Mots. for Summary J. at 310.

Common law indemnification permits a plaintiff to recover compensation from a defendant "only
upon proving that the party against whom indemnification is sought either dishonored a contractual
provision or engaged in some tortious conduct."  Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65,
74, (1990). Because the court has already concluded that Ludlow has a duty to indemnify MDC pursuant
to the Contract, and because MDC's allegation, in Count Ten, that "Ludlow's negligence was direct and
superseded any negligence of the MDC" sounds in tort, the court construes Ludlow's Count Ten as a
claim for common law indemnity grounded in tort.

plaintiff must prove: "(1) that the other tortfeasor was negligent; (2) that his negligence, rather than the plaintiff's, was the direct, immediate cause of the accident and injuries; (3) that he was in control of the situation to the exclusion of the plaintiff; and (4) that the plaintiff did not know of such negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent." Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 74 (1990).

In its Motion, Ludlow seeks summary judgment as to this count on the grounds that there is no genuine issue of material fact that (1) Ludlow was not in exclusive control over the liner's manufacture or installation to the exclusion of MDC; or (2) Ludlow's negligence was not the direct and immediate cause of the accident and injuries. See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 21.  As discussed below, the court denies Ludlow's Motion, because there are genuine issues of material fact as to whether Ludlow controlled the liner's installation to MDC's exclusion.

a.      Whether Ludlow Was In Control to MDC's Exclusion

Ludlow argues that it was not in exclusive control over the dangerous condition that led to the accident, namely, "either the installation [or] the manufacture of the liner." See id. at 22.  The Supreme Court of Connecticut has clarified that "exclusive control over 'the situation'" means "exclusive control over the dangerous condition that gives rise to the accident." Skuzinski v. Bouchard Fuels, Inc., 240 Conn. 694, 706 (1997). The "situation" is "the condition of danger from which a foreseeable risk of harm . . . is claimed to have arisen due to [negligent conduct]" rather than the negligent conduct itself. Pellecchia v. Connecticut Light & Power Co., 139 Conn.App. 767, 775 (2012), cert. denied, 308 Conn. 911 (2013).  Generally, the existence of exclusive control is a

question of fact.  See Pouliot v. Paul Arpin Van Lines, Inc., 367 F. Supp. 2d 267, 271 (D. Conn. 2005) (citing Skuzinski, 240 Conn. 694, 705 (1997)).  However, "the issue may properly be decided as a question of law" where it does not "turn upon any meaningful dispute about the alleged facts." Id.

Here, the facts are disputed.  First, evidence in the record could support a reasonable juror's finding that Ludlow exercised control over the liner's installation. Ludlow's foreman, Mr. Jonathan Pio, testified that he oversaw the liner's installation, remaining on site until the work had concluded. J. Pio Depo. at 50. He also stated that he "set up the bypass pump" and checked on the liner. Id. at 27, 49. While Ludlow argues that a subcontractor was responsible for installing the bypass pump, and Ludlow was "several streets away" at the time of the liner's installation, see Ludlow SOF at ¶ 24, Mr. Pio's testimony creates a genuine issue as to the material fact of Ludlow's role in supervising and enabling the liner's installation.

Second, and more importantly, there are genuine issues of material fact as to whether the control Ludlow exercised over the liner's installation was "to the exclusion" of MDC.  Ludlow points to the deposition testimony of Mr. Jones, MDC's construction services supervisor, who stated: "I was on that site . . . , it primarily was on Linbrook Road with the lining." Jones Depo. at 95. While he avers that he was not on site every day, he states that he was present for "the first day of installation" of the liner. Id. at 113. However, the testimony of Ludlow's own project manager, Michael Pio contradicts that of Mr. Jones.  See M. Pio Depo. at 30-31.  At his deposition, Mr. Pio stated that MDC was not involved in the liner's installation:

| MDC Counsel: | With respect to the installation of this liner, what involvement did the MDC have in the installation of the liner? |
| Mr. M. Pio: | Nothing. |
| MDC Counsel: | Now, during the course of -- Well, withdrawn. You have indicated that MDC was not involved in the installation, correct? |
| Mr. M. Pio: | Correct. |
| MDC Counsel: | Of the liner, just so we're clear? |
| Mr. M. Pio: | Correct. |

See id.  MDC also offers the Affidavit of Christopher Levesque, MDC's Chief Operating Officer, who avers that "MDC contracted all responsibilities regarding the Liner installation to Ludlow and took no part in the physical installation." See Levesque Aff. at ¶ 14.

Given the factual nature of the question of exclusive control, see Weintraub v. Richard Dahn, Inc., 188 Conn. 570, 573 (1982), along with the disputed evidence in the record as to MDC and Ludlow's relative levels of control over the installation, the court denies summary judgment on this ground.

          b.            Whether Ludlow or MDC's Negligence Caused the Failure

Ludlow also seeks summary judgment on the ground that the record evidence does not support a finding that Ludlow's negligence, rather than that of MDC, directly and immediately caused the liner's failure.  See Ludlow Mem. in Support of Mot. for Summary J. as to MDC at 23.  However, as the court has already discussed, see pp. 64-67, supra, the cause of the liner's failure turns on disputed issues of material fact.

Moreover, even if, as Ludlow argues, the record evidence undisputedly showed that MDC's inspectors were present during the installation of the liner and the bypass, such a showing would not be sufficient to merit summary judgment on the issue of common law indemnification.  Ludlow has failed to argue that MDC's purported presence during installation and failure to identify or rectify any defects would have constituted more than mere passive negligence.  Indeed, such a failure to inspect could constitute "prototypical passive negligence, an element of common-law indemnification, which would allow a jury to find [MDC] liable to [homeowners] for their passive negligence, yet permit the jury to find [Ludlow] liable for its active negligence."   See Maxfield v. City of Stamford, No. FSTCV196039333S, 2019 WL 7630763, at *2 (Conn. Super. Ct. Nov. 8, 2019) (citing Chicago Title Ins. Co. v. Accurate Title Searches, Inc., 173 Conn. App. 463, 484 n.13 (listing "several circumstances where an indemnitee's passive negligence may arise as a matter of law", including cases where "parties . . . were allegedly negligent in their management or supervision of others and thus financially responsible for the active negligence of the others").  Thus, even if MDC employees were present during the installation, Ludlow could still be found to be primarily negligent.  Because the question of the cause of the liner's failure turns on disputed facts, and "[t]he question of whether a party is primarily negligent and thereby precluded from indemnification from another tortfeasor is ordinarily one for the trier of fact." Weintraub, 188 Conn. at 573–74 (1982), the court denies summary judgment on the ground that MDC's negligence rather than Ludlow's negligence caused the liner's failure.

4.      Counterclaim: Contractual Retainage

Finally, Ludlow moves for Summary Judgment on its Counterclaim against MDC sounding in breach of contract.  See Ludlow Answer to MDC Am. Compl. at pp. 11-14 (Doc. No. 102).  In its counterclaim, Ludlow alleges that MDC has wrongfully withheld contractual retainage of $236,512.03.  Id.  In the following subsections, the court discusses the relevant sections of the Contract[36] before applying them to Ludlow's Motion.

a.      Relevant Contractual Provisions

i.      Retainage from Progress Payments

The Contract provided for MDC to make "progress payments" to Ludlow over the course of the project.  See Contract at § 6.1, 00500-2 (Doc. No. 255-3) ("[MDC] will make progress payments and final payment in accordance with Article 14 of the Standard General Conditions of the Construction Contract which are a part of the Contract Documents").  Under Section 14.02(A)(3) and (4) of the Standard General Conditions,[37] governing progress payments, MDC was authorized to retain up to five percent of those payments, conditioned upon Ludlow's making satisfactory progress.  See Contract at 14.02(A)(3)-(4), 00700-53 (Doc. No. 255-17).  MDC was also permitted, under Section 14.02(D)(1), to refuse to make full payment of the progress payments because "claims have been made against Owner on account of Contractor's performance or furnishing of the work."  See id. at 14.02(D)(1), 00700-56.

---

[36] As discussed above, the court uses the term "Contract" to refer to the General Contract between MDC and Ludlow, incorporating by reference the Prime Contract, Project Manual, Special Provisions, and Contract Addenda. See p. 63 n. 29, supra.

[37] The Standard General Conditions are found at section 00700 of the Project Manual.  See Contract (Doc. No. 255-3)

ii.      Release of the Warranty Retainage

The Contract also provides, in Section 14.07(C)(2), for MDC's release to Ludlow

of the warranty retainage withheld from the progress payments:

> Provided that any work required under Section 13.07 has been completed
> or not required, the warranty retainage held shall be paid one year from the
> date of Substantial Completion or one year from the completion of warranty
> work, whichever is later, less any costs collectible under Section 13.07.

Id. at § 14.07(C)(2), 00700-58.  This section obligates MDC to return to Ludlow the

retainage one year after either "Substantial Completion" or the conclusion of "warranty

work."

The Contract defines Substantial Completion in Section 14.04.  See id. at §

14.04, 00700-57.  To establish a date of Substantial Completion, Ludlow "shall notify"

MDC and the Engineer[38] that the work is substantially complete. Id. at § 14.04(A),

00700-57.  "Promptly" after such notification, MDC, Ludlow, and the Engineer "shall

make an inspection of the Work to determine the status of completion."  Id. at §

14.04(B), 00700-57.  The date of Substantial Completion is then determined by the

Engineer, approved by MDC, and recorded in a certificate of Substantial Completion.

See id. at § 14.04(A)-(C), 00700-57.

Meanwhile, warranty work is defined in Section 13.07, which prescribes a one-

year "Correction Period."  Id. at § 13.07, 00700-51.  During such one-year period,

Ludlow agrees to provide certain warranty work, including: "correct[ing] . . . defective

Work" and "satisfactorily correct[ing] . . . any damage to . . . land or areas resulting

---

[38] The Contract defines the Engineer in Article 2 of the Prime Contract: "The Project has been designed by Paul Rodriquez of Freeman Companies, LLC. Unless advised otherwise, the Owner will act as Engineer in connection with completion of the Work in accordance with the Contract Documents." Prime Contract at § 2.1.

84

therefrom." Id. at § 13.07(A)(2)-(4), 00700-51.  Moreover, Section 13.07(B) specifies

that, if the Work is found defective within the year-long Correction Period:

> . . . [I]n an emergency where delay would cause serious risk of loss or damage, [MDC] may have the defective Work corrected or repaired or may have the rejected Work removed and replaced. All claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of or relating to such correction or repair or such removal and replacement (including but not limited to all costs of repair or replacement of work of others) will be paid by [Ludlow].

Id. at § 13.07(B), 00700-51.

b.      Whether MDC Owes Ludlow the Warranty Retainage

The parties agree that the liner collapsed on or about October 3, 2018, and that

MDC allegedly expended funds to compensate the homeowners, remediate impaired

property, and replace the liner.  See MDC SOF at p. 3, ¶¶ 10-11 (restating and

admitting Ludlow's facts).  Ludlow contends, and MDC denies, that the warranty work

was completed on October 29, 2018, and that Ludlow spent its own resources to

replace the liner.  See MDC SOF at p.9, ¶ 37.  The parties agree that there are no

issues with the replacement liner.  Id. at p. 10, ¶ 45.  However, both Ludlow and MDC

also acknowledge that MDC's construction manager, John Whitcomb, avers MDC has

not issued a formal certificate of Substantial Completion.  See id. at p. 10, ¶ 43; see

also Whitcomb Depo. at 31 (Doc. No. 255-11)

Ludlow alleges that, because it provided the warranty work required by § 13.07 of

the Contract by replacing the liner and assisting in remediation, its warranty work

concluded on or about October 29, 2018.  See Ludlow Counterclaim at ¶ 13.

Accordingly, under Section 14.07(C)(2), Ludlow contends, MDC was obligated to remit

the retainage by October 29, 2019, "one year from the date of Substantial Completion or

one year from the completion of warranty work, whichever is later." Id. at § 14.07(C)(2), 00700-58.  MDC disagrees, arguing that ambiguity exists as to whether the retainage payment has come due, because MDC has not yet issued a formal certificate of Substantial Completion or conducted the requisite final inspection.[39]  See MDC SOF at p.10, ¶ 43.

Although the parties agree that MDC has not issued a certificate of Substantial Completion, the Contract's language is ambiguous as to whether the project's Substantial Completion depends on the issuing of a certificate of Substantial Completion.  The court cannot determine as a matter of law, on the basis of unambiguous contract language, that the parties intended the warranty retainage be released before a certificate of Substantial Completion has been produced pursuant to Section 14.04.  See Contract at § 14.04(A)-(C), 00700-57; see also Cruz v. Visual Perceptions, LLC, 311 Conn. 93, 101 (2014) ("When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact").  This determination is material to ascertaining whether "the warranty retainage must be paid", because payment must be released only after one year has passed from the date of Substantial Completion.  See id. § 14.07(C)(2), 00700-58.

Furthermore, the language of the Contract is ambiguous as to whether MDC is entitled to withhold the retainage to cover certain costs attributable to Ludlow.  See MDC Opp'n to Ludlow Mot. for Summary J. as to MDC at 17.  Section 14.07(C)(2)

---

[39] MDC also argues that Sections 14.02(A)(3) and (4) of the Contract, which grant MDC the right to withhold up to five percent of its progress payments, create ambiguity regarding MDC's obligation to return the contractual retainage to Ludlow. See MDC Opp'n to Ludlow Mot. for Sum. J. at 16-17. However, this argument is unavailing, because Section 14.02 pertains to progress payments and could not reasonably be interpreted to alter MDC's obligation to pay the retainage under Section 14.07. See Contract at § 14.07(C)(2), 00700-58.

requires MDC to pay the warranty retainage "less any costs collectible under Section 13.07." See id. at § 14.07(C)(2), 00700-58.  Section 13.07(B) allows, "in an emergency where delay would cause serious risk of loss or damage", for MDC to pay to correct defective work.  See id. at § 13.07(B), 00700-51.  Under such circumstances, Ludlow agreed to assume responsibility for "claims, costs, losses, and damages . . . arising out of such correction or repair . . . (including but not limited to all costs of repair or replacement of work of others) . . . ."  See id. at § 13.07(B).

Evidence in the record could support a reasonable juror's finding that, when raw sewage flooded homes and yards, delay would have caused risk of loss or damage, and that MDC spent amounts far in excess of the $236,512.03 retainage to address claims, costs, losses, or damages arising from the liner repair.  See, e.g., MDC Invoices (Doc. No. 283-12) (seeking payment from Ludlow of "sums paid by [MDC]" from 2018, through February 2020, "for property damage, restoration expenses, and clean-up services.").  Thus, there are material issues of disputed fact as to whether MDC owed Ludlow the Retainage after "costs collectible under Section 13.07."  See Contract at § 14.07(C)(2), 00700-58.  In light of these issues of fact, granting summary judgment to Ludlow as to its contractual retainage Counterclaim would be inappropriate.

For the reasons discussed above, the court denies Ludlow's Motion for Summary Judgment in full.  The court also denies Ludlow's Motion as to its contractual retainage Counterclaim.

## V.    CONCLUSION

For the reasons discussed above:

Granite's Motion for Summary Judgment (Doc. No. 246) as to Counts Two, Five, and Six of Precision's Complaint (Doc. No. 1) is denied in full.

Saertex's Motion for Summary Judgment (Doc. No. 256) as to Counts One through Six of Precision's Complaint (Doc. No. 1) is denied in full.

Precision's Motion for Summary Judgment (Doc. No. 253) as to the Insurance Companies' Intervenor Complaint (Doc. No. 67)  is granted in part as to Count One and denied in part as to Counts Two through Ten.

Precision's Motion for Partial Summary Judgment (Doc. No. 254) as to MDC with respect to personal property damages is denied in full.

Ludlow's Motion for Summary Judgment (Doc. No. 255) as to Counts One, Eight, and Ten of MDC's First Amended Complaint (Doc. No. 92) is denied in full.  Ludlow's Motion for Summary Judgment (Doc. No. 255) is also denied as to Ludlow's Contractual Retainage Counterclaim (Doc. No. 102).

The Insurance Companies' Motion for Leave to File a Sur-Reply to Precision's Reply (Doc. No 309) is terminated as moot.  In their Motion, the Insurance Companies sought to reply to a case cited in Precision's Reply: Palm Beach Grading, Inc. v. Nautilus Ins. Co., 434 F. App'x 829, 831 (11th Cir. 2011).  The need for such a sur-reply is moot, as the court did not rely upon Palm Beach in resolving Precision's Motion for Summary Judgment as to the Insurance Companies.

**SO ORDERED.**

Dated at New Haven, Connecticut this 28th day of February 2022.


___/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge